ASHLEY E. BAUERLE
CA Bar No. # 271119
COZEN O'CONNOR
501 West Broadway, Suite 1610
San Diego, CA 92101
Telephone: 800.782.3366
Facsimile: 619.234.7831
Email: abauerle@cozen.com

MATTHEW F. NOONE
Pro Hac Pending
COZEN O'CONNOR
One Liberty Place, 1650 Market St., Ste 2800
Philadelphia, PA 19103
Telephone: (215)665-2192
Facsimile: (215)665-2013
Email: mnoone@cozen.com

Attorneys for Plaintiff,
ACE AMERICAN INSURANCE COMPANY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACE AMERICAN INSURANCE COMPANY, | Case No.: |
| Plaintiff, | **COMPLAINT** |
| vs. | Magistrate: |
| ACCELLION, INC., | Judge: |
| Defendant. | |

Plaintiff, Ace American Insurance Company as subrogee of a Boston law firm, ("Plaintiff or "Ace"), by its attorneys, Cozen O'Connor, as and for its complaint herein, alleges the following upon information and belief:

**THE PARTIES**

1. Plaintiff, Ace American Insurance Company a/s/o a Boston law firm, is a corporation duly organized and existing under the laws of the State of Pennsylvania, and maintains its principal place of business in New Jersey.

COZEN O'CONNOR
501 WEST BROADWAY, SUITE 1610
SAN DIEGO, CA 92101

2.     At all times material hereto, Ace was authorized to issue insurance policies in the State of Massachusetts.

3.     At all times relevant hereto, Defendant, Accellion, Inc. ("Defendant") is and was a company duly organized and existing under the laws of the State of Delaware, and maintains its principal place of business at 1804 Embarcadero Road, Suite 200, Palo Alto, California 94303.

4.     At all times material hereto, Defendant was a technology company in the business of providing software for secure electronic file sharing.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are residents of different states and the amount in controversy exceeds $75,000.

6.     Venue is proper pursuant to 28 U.S.C. §1391 in that the Defendant resides in California. and is subject to personal jurisdiction within this district.

## FACTS COMMON TO ALL COUNTS ALLEGATIONS

7.     At all times material hereto, Plaintiff provided cyber insurance coverage to a Boston law firm pursuant to insurance policy D95129845 ("Subject Policy").

8.     At all times material hereto, Defendant operated a business providing software for secure electronic file sharing to private and public businesses from their principal place of business in Palo Alto, California.

9.     At all times material hereto, Defendant provided collaboration system software services to a Boston law firm pursuant to a contract signed on March 23, 2012 ("Collaboration System Order Form"). A redacted copy of the Collaboration System Order Form is attached hereto as "Exhibit A."

10.     The Terms and Conditions of the Collaboration System Order Form expressly incorporate by reference the terms and conditions of the Accellion File Transfer System License Agreement ("License Agreement"). A copy of the License Agreement which Accellion has represented to plaintiff's counsel was in effect in December 2020 is attached hereto as "Exhibit B".

COZEN O'CONNOR
501 WEST BROADWAY, SUITE 1610
SAN DIEGO, CA 92101

11.     On or about December 16, 2020, Defendant learned of SQL Injection and OS Command Execution vulnerabilities in its File Transfer Appliance ("FTA"), as a result of the exploit tripping the FTA's built-in anomaly detector on a customer's device.

12.     Pursuant to Accellion's own Maintenance Support Policy ("Support Policy"), these vulnerabilities were considered to be of "critical severity," because hacker exploitations of these vulnerabilities could result in "material loss of [customer] data."

13.     The Support Policy required Accellion to "use reasonable efforts to resolve the critical error and/or to provide a work around within forty-eight (48) hours from initial report of the problem."

14.     Accellion's Maintenance Support Policy also required Accellion to contact the customer reporting the problem with a status report within four hours of the initial report, and provide further status reports every 8 hours until the error is resolved.

15.     Upon information and belief, Accellion knew or should have known that each of its other approximately 200 FTA customers were also vulnerable to exploitations from hackers due to these same vulnerabilities.  Despite this knowledge, Accellion did not notify any of its other customers about the critical vulnerabilities in their FTA systems until Sunday, December 20, 2020.

16.     Accellion notified its customers about the critical vulnerabilities in its FTA for the first time on Sunday, December 20, 2020, at 11:13 a.m. PST, when it sent out an email to all contacts in Salesforce with FTA Security Advisory and FTA Tech Advisory boxes checked.  The subject matter of the email stated "Critical Customer Alert: Urgent FTA security update."  The text of the email stated, in pertinent part:  "Accellion has released security software update FTA-9_12_380 with critical, time-sensitive security fixes.  We strongly urge you to update your system as soon as possible."

17.     Accellion's only known attempt to notify the insured law firm was to send, on December 20, 2020, the critical, time-sensitive security fix to two persons who were no longer employed at the law firm, Anne J. and Chris C., neither of which had worked at the law firm in years.

COZEN O'CONNOR
501 WEST BROADWAY, SUITE 1610
SAN DIEGO, CA 92101

COZEN O'CONNOR
501 WEST BROADWAY, SUITE 1610
SAN DIEGO, CA 92101

18.     The law firm's email system was set up to send bounce back notifications to persons who were attempting to email a person who was no longer employed at the law firm.  As a result, Accellion would have received two immediate bounce back emails from the law firm's email server advising that neither Anne J. nor Chris C. were employed at the firm as of December 20, 2020.

19.     Anne J. and Chris C. had both left the firm several years before December 20, 2020. The fact that these former employees were sent the Critical Customer Alert email demonstrates that Accellion had never bothered to send out test emails to the persons on the FTA Security Advisory and Tech Advisory notification lists to confirm and/or verify the lists' accuracy.

20.     On March 1, 2017, Gregory P., a law firm employee, notified Theresa Batis of Accellion by email that Chris C. no longer worked at the law firm.  Gregory P. asked Theresa Batis to "replace his information with my information going forward."

21.     On March 1, 2017, Marissa Kandarian of Accellion responded by email advising Gregory P. that "[W]e have updated our systems."

22.     On March 27, 2017, the law firm again requested Accellion to "please have our account updated by removing Chris [C.] and adding Greg P. instead."

23.     Notwithstanding receiving multiple notifications that Chris C. no longer worked at the firm, and multiple requests to update the law firm's notification list to substitute Greg P. for Chris C., Accellion still sent the December 20, 2020 Critical Customer Alert email to Chris C.

24.     On or about December 22, 2020, the law firm learned that an unauthorized user had accessed its Accellion FTS and exfiltrated multiple confidential files.  These files were exfiltrated *after* Accellion had issued its December 20, 2020 Critical Customer Alert email.

25.     Had Accellion properly notified the law firm about the need to update its FTA with the critical, time-sensitive security fixes, the law firm would have updated its FTA system and the confidential files would not have been exfiltrated, and thus no ransom payment would have needed to be made, nor would the law firm have had to incur substantial expenses responding to the breach.

26.     The law firm subsequently received an $8,000,000 ransom demand from the criminal hacker, threatening to publish the exfiltrated confidential files on the internet if the ransom was not paid.

27.     After negotiations with the criminal organization, and pursuant to the terms and conditions of its insurance policy, Plaintiff and/or its insurer paid more than two million dollars the criminal organization on behalf of the law firm in exchange for the criminal organization's agreement not to publish the exfiltrated files, as well as to secure promises from the bad actor to provide a list of all data taken, and also a promise that all data in their possession would be destroyed.  In addition, the law firm incurred $375,000 in expenses and attorney time responding to the breach.

28.     After the incident, the law firm contacted Accellion to inquire why it had not received the Critical Customer Alert: Urgent FTA security update on December 20, 2020.  Frank Balonis of Accellion advised the law firm that the law firm had not updated its FTA Security Advisory notification list.

29.     When the law firm visited the portal to attempt to update its FTA Security Advisory contacts list, it could not locate the means by which to do so.  The law firm then contacted Frank Balonis for assistance and he advised them that updating the FTA Security Advisory contacts list could only be accomplished by Accellion.

30.     The law firm never received any periodic instructions from Accellion about the existence of the FTA Security Advisory notification list, nor did the law firm ever receive any periodic notifications about the existence of this list or the need to update it.  As a result, no one at the law firm knew that this highly important and critical notification list even existed, nor did the law firm know on December 20, 2020 that there were no current law firm employees on the notification list.

31.     Prior to December 20, 2020, the law firm's employee, Keith S., went into the Accellion administrative portal on the server and signed up to receive notification of "system alerts," which according to Accellion's literature meant that Keith S. would include alerts for necessary system updates.

COZEN O'CONNOR
501 WEST BROADWAY, SUITE 1610
SAN DIEGO, CA 92101

COZEN O'CONNOR
501 WEST BROADWAY, SUITE 1610
SAN DIEGO, CA 92101

32.     There was no mention on the Accellion server administrative portal that Keith S. or anyone else at the law firm needed to be also added additional distribution lists in order to get system alert notifications, including alert notifications regarding software updates.

33.     Keith S. never received the December 20, 2020 Critical Customer Alert email, despite being registered to receive system alerts, including software updates,

34.     Pursuant to the terms of the subject policy, and otherwise by operation of law, Plaintiff  is contractually, legally and equitably subrogated, to the extent of its payments, to the law firm's rights against Defendant to recover for the amounts paid as a result of the loss, as well as to pursue any uninsured losses suffered by the law firm by virtue of an assignment of such claims, if any.

## COUNT I

## NEGLIGENCE

35.     Plaintiff hereby incorporates by reference each and every allegation set forth above in paragraphs one (1) through thirty-four (34) as though fully set forth herein at length.

36.     The aforesaid loss and resulting damages sustained by Plaintiff were caused by the negligence, gross negligence, carelessness, recklessness and/or negligent acts and/or omissions of Defendant, its agents, servants and/or employees acting within the scope of their employment, both in general and in the following particulars:

a.      failing to give prompt and timely notification to its customers, including the law firm, of the critical security vulnerabilities Accellion discovered on December 16, 2020, so that customers could decide for themselves whether to shut down their FTA's until Accellion developed patch software to fix the problem;

b.      failing to notify the law firm on December 20, 2020 about the existence of the critical, time sensitive security fixes, and the need for the law firm to update its FTA as soon as possible to protect against the possibility of the material loss of data;

c.      failing to advise, instruct and/or educate its customers, including the law firm, about the existence and purpose of the FTA Security Advisory and FTA Tech Advisory lists, and the urgent need to keep these contact lists current;

d.      failing to provide the law firm with the means to update the FTA Security Advisory and the FTA Tech Advisory lists on the law firm's FTA administrative portal;

e.      failing to advise customers when signing up to receive notification for system alerts, including software updates, on the administrative portal server about the existence of the FTA Security Advisory and Tech Advisory customer contact lists, and about the need to sign up for security alert notifications on those contact lists as well;

f.      ignoring and failing to take further steps to notify the law firm about the critical, time-sensitive security fixes that needed to be updated to the law firm's FTA as soon as possible after Accellion received the bounce back error notifications from the law firm's email server notifying Accellion that Ann J.'s and Chris C.'s email addresses were no longer valid;

g.      failing to take steps to periodically test and verify the accuracy and currentness of its FTA Security Advisory and Tech Advisory customer contact lists;

h.      failing to take any other reasonable preventative measures that would have sufficiently avoided the damage;

i.      otherwise failing to use due care under the circumstances; and

j.      other acts of negligence as may be revealed in the course of discovery proceedings.

37.     Defendant's aforementioned negligence/gross negligence, which caused the unauthorized exfiltration of data in this case, amounted to gross negligence as Defendant's conduct, acts and omissions were both want of even scant care, and constituted an extreme departure from ordinary conduct, particularly considering that Accellion knew or should have known by virtue of the bounce back emails that the law firm never received notification of the critical, time-sensitive security fixes designed specifically to prevent the "material loss of data."

38.     As a direct and proximate result of the aforesaid negligence, gross negligence, carelessness, recklessness and/or negligent acts and/or omissions of Defendant, its agents, servants and/or employees, the damage described above was allowed to occur causing Plaintiff's insured to suffer the exfiltration of highly sensitive and confidential information and to expenses and losses, including the requirement payment of a ransom, to prevent the disclosure of the confidential

COZEN O'CONNOR
501 WEST BROADWAY, SUITE 1610
SAN DIEGO, CA 92101

COMPLAINT

1  information to the public, and for the destruction of the unauthorized data copies, resulting in
2  damages totaling in the approximate amount of $2.4 million, according to proof at trial.

3       39.     As a direct and proximate result of Defendant's failure to properly secure the FTS
4  system and/or to notify its customers of the security breach so that they could take their own
5  necessary measures to protect their data, Plaintiff's insured filed a claim with Plaintiff under the
6  subject policy for damages.

7       40.     Pursuant to the terms and conditions of its insurance policy, Plaintiff paid to or on
8  behalf of the law firm an amount in excess of Two Million Dollars, and the law firm incurred an
9  additional amount of approximately $375,000 in responding to the breach.

10      41.     Pursuant to the terms of the subject policy, and otherwise by operation of law,
11 Plaintiff  is contractually, legally and equitably subrogated, and has further been assigned the law
12 firm's rights against Defendant to recover the damages incurred in the approximate amount of $2.4
13 million as a result of the loss.

**COUNT II**

**BREACH OF CONTRACT**

16      42.     Plaintiff incorporates paragraphs one (1) through (41) as though fully stated herein
17 at length.

18      43.     Plaintiff's insured and Defendant entered into a Contract and incorporated terms
19 and conditions attached as Exhibits A and B.

20      44.     Pursuant to paragraph 5 of the Accellion Solutions License Agreement,
21 maintenance support services were part of the contract between Accellion and the law firm.
22 Pursuant to this paragraph, Accelion was required "to make available to [the law firm] all Updates
23 to the supported Accellion Solution that Accellion makes generally available to its other
24 customers."

25      45.     Defendant breached this contractual obligation by failing to advise current law firm
26 employees about security software update FTA-1_12_380 with critical, time-sensitive security
27 fixes, and the need to update the law firm's FTA system as soon as possible, like Accellion did for
28 substantially all of its other customers.

COZEN O'CONNOR
501 WEST BROADWAY, SUITE 1610
SAN DIEGO, CA 92101

46.     As a result of the Defendant's breach of contract, the law firm's FTA was not updated and, as a result, hackers exfiltrated confidential files from the FTA, and the law firm incurred expenses responding to the exfiltration in an amount in excess of $375,00 and  was forced to pay the hackers over $2 ,000,000.00 to prevent the release of the exfiltrated files to the public.

47.     Defendant's breach of contract was the direct, legal, proximate and current cause of the damages suffered by Plaintiff and its insured.

48.     Based on Defendant's breaches of said contract provisions, Plaintiff suffered damages, in the amount of approximately $2.4 million, amount to be proven at trial.

## COUNT III

### FRAUD/MISREPRESENTATION/NEGLIGENT MISREPRESENTATION

49.     Plaintiff hereby incorporates by reference paragraphs one (1 ) through forty-eight (48), as though fully set forth at length herein.

50.     Pursuant to paragraph 5 of the Accellion Solutions License Agreement, Accellion represented that it would provide maintenance support services for the license term at no additional charge.  It further represented that, "As part of Maintenance Support Services, Accellion will make available to Customer all Updates to the supported Accellion Solution that Accellion makes generally available to its other customers."

51.     This representation contemplated the performance of future acts and, as such, it constituted an on-going and continuing statement of material fact.

52.     Accellion intended the law firm to rely upon the representations made in paragraph 5 of the License Agreement.

53.     The law firm reasonably relied upon the statements contained in paragraph 5 of the license agreement.

54.     Accellion knew or should have known that the statements in paragraph 5 that of the Accellion Solutions License Agreement were false and misleading when it received the bounce back notifications from the law firm that the intended recipients of the Accellion's Critical Customer Alert emails were no longer law firm employees.

COZEN O'CONNOR
501 WEST BROADWAY, SUITE 1610
SAN DIEGO, CA 92101

COZEN O'CONNOR
501 WEST BROADWAY, SUITE 1610
SAN DIEGO, CA 92101

55.     The law firm was harmed by its justifiable reliance upon the defendant's fraudulent, reckless and/or negligent misrepresentation.

56.     The law firm's reliance on the defendant's fraudulent, reckless and/or negligent misrepresentation was a substantial factor in causing the harm that the law firm sustained.

57.     As a result of the aforementioned fraudulent, reckless and/or negligent misrepresentations, Defendant has committed fraud, misrepresentation and/or negligent misrepresentation, resulting in the payment of a ransom to prevent the disclosure of confidential files to the public, with said damages totaling in the approximate amount of $2.4 million, according to proof at trial.

**COUNT IV**

**NEGLIGENT MISREPRESENTATION**

58.     Plaintiff hereby incorporates by reference paragraphs one (1) through fifty-seven (57), as though fully set forth at length herein.

59.     On March 1, 2017, Gregory P. emailed Marissa Kandarian at Accellion and advised her that Chris C. no longer worked at the law firm, and further asked that, "[Accellion] replace his information with my information going forward?"

60.     On the same day, Marissa Kandarian advised Gregory P. that "we have updated our systems."

61.     Marissa Kandarian's statement was a misrepresentation of an existing fact because the FTA Security Advisory and Tech Advisory notification lists were never updated to replace Chris C.'s name with Gregory P.'s name.

62.     Marissa Kandarian lacked reasonable grounds for making this statement of fact because she obviously never updated the FTA Security Advisory and Tech Advisory notification lists, which both still contained Chris C.'s name.

63.     Marissa Kandarin intended Gregory P. to rely upon the factual assertion she made concerning updating Accellion's systems.

64.     Gregory P. did not know that there were any items within Accellion's systems where his name did not replace Chris C.'s name, such as on the FTA Security Advisory and Tech Advisory notification lists.

65.     Gregory P. justifiably relied upon Marissa Kandarian's misrepresentation that Accellion's systems had been updated its systems and replaced Chris C.'s information with Gregory P.'s information.

66.     As a result of Marissa Kandarin's misrepresentation, the law firm did not receive the Critical Customer Alert email on December 20, 2020, and as a result, the law firm did not know about the need to update its FTA system as soon as possible.

67.     The law firm was harmed by its justifiable reliance upon the defendant's negligent misrepresentation concerning updating its systems with Greg P.'s name.

68.     The law firm's reliance on the defendant's negligent misrepresentation was a substantial factor in causing the harm that the law firm sustained.

69.     As a result of the aforementioned negligent misrepresentations, Defendant has committed negligent misrepresentation, resulting in the payment of a ransom to prevent the disclosure of confidential files to the public, with said damages totaling in the approximate amount of $2.4 million, according to proof at trial.

## COUNT V

## FRAUD/MISREPRESENTATION/NEGLIGENT MISREPRESENTATION

70.     Plaintiff hereby incorporates by reference paragraphs one (1 ) through sixty-nine (69), as though fully set forth at length herein.

71.     Accellion represented that persons signing up on the Accellion administrative portal on the server to receive "system alerts" would receive alerts for any necessary system updates.

72.     This representation contemplated the performance of future acts and, as such, it constituted an on-going and continuing statement of material fact.

73.     Accellion intended the law firm to rely upon the representations made on the Accellion administrative portal on the server.

COZEN O'CONNOR
501 WEST BROADWAY, SUITE 1610
SAN DIEGO, CA 92101

74. The law firm reasonably relied upon the statements made on the Accellion administrative portal on the server concerning the receiving system alerts for any necessary system updates.

75. Accellion knew or should have known that the statements made on the administrative portal on the server were false and misleading when it decided to exclude the persons who signed up for notification of system updates on the Accellion administrative portal on the server from the distribution of the December 20, 2020 Critical Customer Alert email.

76. The law firm was harmed by its justifiable reliance upon the defendant's fraudulent, reckless and/or negligent misrepresentation.

77. The law firm's reliance on the defendant's fraudulent, reckless and/or negligent misrepresentation was a substantial factor in causing the harm that the law firm sustained.

78. As a result of the aforementioned fraudulent, reckless and/or negligent misrepresentations, Defendant has committed fraud, misrepresentation and/or negligent misrepresentation, resulting in the payment of a ransom to prevent the disclosure of confidential files to the public, with said damages totaling in the approximate amount of $2.4 million, according to proof at trial.

WHEREFORE, Plaintiff demands judgment be entered in its favor and against Defendant in an amount in excess of more than Two Million Four Hundred Thousand Dollars, together with interest and costs of the action, and such other and further relief as this Court deems just and proper.

Dated: December 13, 2021          COZEN O'CONNOR


                                   By: /s/ Ashley E. Bauerle
                                   ASHLEY E. BAUERLE
                                   MATTHEW F. NOONE
                                   Attorneys for Plaintiff
                                   ACE AMERICAN INSURANCE COMPANY

COZEN O'CONNOR
501 WEST BROADWAY, SUITE 1610
SAN DIEGO, CA 92101

COMPLAINT

# EX. A



**ORDER FORM**

**Accellion Secure File Sharing Solutions**

| | |
|---|---|
| Order Form Date: | 20-Mar-12 |
| Expiration Date: | 03-Apr-12 |
| Account #: | |

| Contact: | Bill To: | Ship To: |
|---|---|---|
| Boston, MA | USA | Boston, MA |
| USA | Phone: | USA |
| Phone: | Fax: | Phone: |
| Fax: | Email: | Fax: |
| Email: | | Email: |

Purchase Order # (Required):

| Model | Description | License Period | Term | QTY | Unit Price | Total Price | Total Fees ($) |
|---|---|---|---|---|---|---|---|
| CSUMS | Collaboration System of Outlook Plugin Users with Microsoft Productivity Suite Support | Apr 01, 2012 to Mar 31, 2013 | Annual | 125 | 180.00 | 22,500.00 | 22,500.00 |
| CSIMNG | Collaboration System iManage Plugin for 125 Users | Apr 01, 2012 to Mar 31, 2013 | Annual | 1 | 3,250.00 | 3,250.00 | 3,250.00 |
| CSAV | Collaboration System Anti Virus | Apr 01, 2012 to Mar 31, 2013 | Annual | 1 | 500.00 | 500.00 | 500.00 |
| CSVC-AV | Installation of a VMWare Virtual Controller | | One Time | 1 | 2,500.00 | 2,500.00 | 2,500.00 |

| | |
|---|---|
| **Discount 100% on CSVC-AV and 20% on CSUMS.** | **($ 7,000.00)** |
| **Total Fees Due (excluding applicable taxes, duties, and actual freight)** | **USD 21,750.00** |

| | |
|---|---|
| Accellion: | Accellion Inc. (Incorporated in Delaware) |
| Located at: | 1804 Embarcadero Road, #200 Palo Alto, CA 94303 |
| Accellion Account Executive: | Eric Birenbaum eric.birenbaum@accellion.com |
| | **FAX TO: 650.350.4335 or EMAIL TO: orders@accellion.com** |

**Order Form Terms and Conditions**

1. **Incorporation of Online License Agreement.** This Order Form is subject to and incorporates by reference the terms and conditions of the Accellion File Transfer System. License Agreement ("Agreement") available online at http://www.accellion.com/license/termsv2.html. All capitalized terms used herein have the meanings stated in the Agreement, unless stated otherwise.

2. **Term and Payment Terms.** The duration of this Order Form is for the "License Term" set forth above. Upon expiration of the initial License Term or a subsequent License Term, this Order Form shall automatically renew for an additional License Term at Accellion's then-current rates unless either party provides written notice of its intent not to renew at least thirty (30) days prior to the end of the then-current License Term. Payment terms are net thirty (30) days from invoice date. All taxes, other than those based on Accellion's net income, are Customer's responsibility. As a courtesy, for the initial License Term Accellion will send an invoice on or around the Shipment Date (defined below).

3. **Maintenance Support Services.** Maintenance Support Services are included in the annual end-user subscription fees and are provided in accordance with Accellion's then-standard Maintenance Support Policy or, if Customer has paid for Enterprise Support, Accellion's then-current Enterprise Support Policy. Accellion's Maintenance Support Policy in effect as of the date of this Order Form is set forth at http://www.accellion.com/supportguidelines/standard.html and Accellion's Enterprise Support Policy is set forth at http://www.accellion.com/supportguidelines/enterprise.html.

4. **End User Licenses.** If applicable, Licensee may exceed the initial number of users licensed above and thereafter pay additional fees. Accellion will invoice Licensee for those additional users at a prorated amount of the annual rate stated in the Order Form above. Upon payment, Licensee will be licensed for the additional users going forward.

5. **Purchase Order.** If Customer's procurement processes require the issuance of a purchase order, then on or before the Shipment Date, Customer shall issue a purchase order ("Purchase Order") to Accellion with the Purchase Order number set forth above. The parties agree that none of the terms and conditions of any such Purchase Order (or subsequent Purchase Orders from customer) shall apply to or modify the Agreement between the parties as documented in this Order Form and the Agreement, and that any terms or conditions in such Purchase Orders are null and void.

6. **Shipment.** For purposes of this Order Form, the date of shipment of the Product to Customer, or, for downloadable software, the date it is made available for download, shall be referred to hereinafter as the "Shipment Date". No shipment will occur prior to Accellion's receipt of a complete and duly executed Order Form. If credit is denied, shipment will occur once payment has been received.

7. **Authority.** By signing this Order Form, Customer represents and warrants that (i) it has read and understands the Accellion File Transfer System License Agreement that is incorporated by reference herein and agrees to be bound by its terms.

8. **Publicity.** Customer hereby consents to Accellion's inclusion of Customer's name in a customer listing, provided that Customer is not the sole Customer listed.

**Accellion**

Signature: _____

Printed Name: _____

Title: _____

Date: _____

Effective Date: _____

**Customer**

Signature: _____

Printed Name: _____

Title: _____

Date: 3/23/2012

PO Number: _____

Please verify billing & shipping information above

# EX. B



# Legal

## ACCELLION SOLUTIONS LICENSE AGREEMENT 19.1

**ACCELLION SOLUTIONS LICENSE AGREEMENT**

THIS ACCELLION SOLUTIONS LICENSE AGREEMENT (THE "AGREEMENT") APPLIES TO THE USE OF ANY SOFTWARE PROVIDED DIRECTLY OR INDIRECTLY BY ACCELLION.  BY EITHER FOLLOWING THE ONLINE ACCEPTANCE PROCESS PROVIDED BY ACCELLION OR INSTALLING, ACCESSING, OR USING ALL OR ANY PORTION OF THE SOFTWARE, YOU AGREE TO BE LEGALLY BOUND BY THIS AGREEMENT.  A CONTRACT IS THEN FORMED BETWEEN ACCELLION AND EITHER YOU PERSONALLY, IF YOU ARE USING THE SOFTWARE FOR YOURSELF, OR THE COMPANY OR OTHER LEGAL ENTITY, WHICH YOU REPRESENT ("CUSTOMER").  IF CUSTOMER IS LOCATED IN CANADA OR THE UNITED STATES, "ACCELLION" MEANS ACCELLION USA, LLC, A DELAWARE CORPORATION WITH A PLACE OF BUSINESS AT 1804 EMBARCADERO PLACE, SUITE 200, PALO ALTO, CA  94303; OTHERWISE, "ACCELLION" MEANS ACCELLION PTE LTD, AN ENTITY ORGANIZED UNDER THE LAWS OF SINGAPORE WITH A PRINCIPAL PLACE OF BUSINESS AT BLK 750C CHAI CHEE RD #04-09 to 12, VIVA BUSINESS PARK, SINGAPORE 469003.

**1.    Accellion Software; Ordering.**

1.1    Accellion Software. Accellion licenses its software products on a subscription basis. Software is made available as a software-only (or "virtual") solution, as a hosted solution, or on a physical appliance. Customer's rights to use Accellion software apply only to the Accellion software licensed under an Order (defined below).

1.2    Order Process. Orders for Accellion software and services may be made online, through written Orders placed directly with Accellion, or through an Accellion authorized reseller ("**Channel Partner**").  An order becomes part of this Agreement upon acceptance by Accellion or a Channel Partner (the accepted order referred to as the "**Order**"), provided that for Orders placed through Channel Partners, only the line items for Accellion's published products and services listed in the Order and which are provided to and paid for by Customer constitute the "Order." The terms of Customer's form of purchase order or similar documents shall not apply to the relationship of Parties. In the event of any conflict between the terms of any Order and the terms of this Agreement, the terms of this Agreement shall govern.

1.3    Delivery.  For downloadable versions of the Accellion software, Customer may download the software from a link provided by Accellion.  For hosted versions of the Accellion Solution, access shall be provided through a password-protected web interface.  Delivery occurs when such link or access is made available to Customer.

**2.    Applicable Terms.**

2.1    Web Orders.  If Customer purchases a license online (a "**Web Order**"), then terms of this Agreement include the Web Order

Terms set forth in Section 13. In the event of any conflict between Section 13 and other Sections of this Agreement, Section 13 shall apply.

2.2     <u>Trial Versions</u>.  If Customer has ordered or downloaded a trial version of Accellion software, then the provisions of Sections 4.2, 5, 6.3, 8.1, 8.3, 9.2, 9.3, 9.4 and 12.2 shall not apply during the trial but shall be effective upon the date Customer upgrades to a paid subscription for such Accellion software.

2.3     <u>Accounts for Web Orders</u>.  This Section 2.3 applies to Orders placed online with Accellion.  Customer represents that the account information provided upon registration ("***Account Info***") is accurate, current and complete and that it will maintain Account Info current at all times.   Customer is solely liable for use of and access to the account and Accellion shall not have any liability to Customer for unauthorized access or use of the account.  Account Info is protected by Accellion's Privacy Policy, as modified from time to time, located at http://www.accellion.com/privacy-policy, the most current terms of which are incorporated herein by reference. If Customer sets up an account using an email address with an email domain of an Accellion Solutions licensee (e.g. where Customer's employer is already an Accellion Solutions licensee), then Customer consents to Accellion's disclosure of Customer's usage information to such party.

2.4     <u>Inapplicability of Purchase Orders</u>.  The terms and conditions of this Agreement shall govern the relationship of the Parties regarding Accellion software and services utilized by Customer and Customer's form of purchase order and similar documents shall have no force or effect.

3.      Definitions.  Unless otherwise specified, capitalized terms used in this Agreement will have the meanings attributed to them in this Section 3.

"***Accellion Solution***" means the object code versions of the Accellion software identified on an Order and includes related Server Software, Client Software, Updates, and Documentation, but does not include Open Source Software, which is provided pursuant to Section 4.5.

"***Affiliate***" means an entity which directly or indirectly controls, is controlled by or is under common control with a party to this Agreement.

"***Client Software***" means the object code versions of the desktop client software for the licensed Accellion Solution.

"***Designated User***" means the number of users for whom Customer has purchased rights to use the Accellion Solution, as set forth on the applicable Order, plus any additional True-Up Users added pursuant to Section 6.3 below.  Designated Users may consist of: (i) employees and independent contractors of Customer and its Affiliates, and (ii) individual representatives of vendors and/or service providers of Customer and its Affiliates.

"***Documentation***" means Accellion's standard written materials and specifications for the Accellion Solution licensed by Customer, as updated or revised by Accellion from time to time.

"***Effective Date***" means (i) for Orders submitted to Accellion, the date that Accellion accepts the Order; or (ii) for orders submitted to a Channel Partner on a form other than an Accellion Order form, the date Accellion makes the software available to Customer for download or, for software provided on a physical appliance, the date of shipment.

"***Hosted Services***" means the remote access and use of a hosted version of the Accellion Solution as hosted by Accellion, excluding Web Orders.

"*License Term*" means the subscription period for use of the Accellion Solution, as identified on the applicable Order. Each renewal is a separate License Term. For trial versions, the License Term period shall be for the period of forty-five (45) days unless otherwise indicated by Accellion.

"*Maintenance Support Services*" means the support services provided by Accellion to Customer in accordance with the applicable Maintenance Support Policy as described in Section 5.

"*Release*" means a version of the Accellion Solution for which Accellion charges a separate fee.

"*Server Software*" means the object code server software versions of the Accellion Solution, as identified on the applicable Order.

"*Update*" means additions, upgrades, or modifications to the Accellion Solution. Updates do not include Releases.

4.     **License Terms**.

4.1     <u>License Grant</u>.  Subject to the terms and conditions of this Agreement, Accellion hereby grants to Customer during the License Term, a non-exclusive, non-transferable and non-sublicensable license to: (a) install and use the Client Software on supported environments for up to the number of Designated Users; and (b) use, access, and for Accellion Solutions not hosted by Accellion, copy the Server Software on supported environments for up to the number of copies identified on the Order for Customer's internal business purposes.

4.2     <u>Hosting</u>.

(a)     <u>By Accellion</u>.  If Hosted Services are ordered by Customer, they are provided pursuant to the terms of Accellion's Hosting SLA located at http://www.accellion.com/terms/hostingsla, which is incorporated herein by reference.

(b)     <u>By Customer's Outsourced Provider</u>. For virtual versions of the Accellion Solution, if Customer elects to engage its own outsourcing provider (each a "*Outsourced Provider*"), then: (i) Customer may sublicense to Outsourced Provider the right to install and operate the Accellion Solution in the form as provided by Accellion, solely for the benefit of Customer and subject to the terms and conditions of this Agreement; (ii) Customer shall be liable for any acts or omissions of Outsourced Provider in violation of this Agreement; and (iii) Customer shall identify in writing to Accellion a single point of contact at Outsourced Provider for any maintenance and technical support matters.  In order to provide warranty and Maintenance Support Services, Accellion requires remote access to the Accellion Solution and may require on-site access.  Failure to provide Accellion with such reasonable access shall relieve Accellion of its warranty and Maintenance Support Services obligations with respect to such Accellion Solution.

4.3     <u>License Restrictions</u>. Customer shall not copy the Accellion Solution except to make a reasonable number of copies for the purposes of security back-up, relocation or disaster recovery; provided, however, that Customer may make and use the number of copies of Client Software that it deems appropriate unless the number of copies of Client Software is restricted as set forth on the applicable Order.  The Accellion Solution may not be modified, disclosed, reverse-engineered, disassembled, or decompiled except and to the extent allowed by applicable law. Customer shall not transfer, sell, license, sublicense, outsource, rent or lease the Accellion Solution or use it for service bureau or other third-party use. All rights not expressly granted hereunder are reserved. Customer is solely responsible and liable for the use of and access to the Accellion Solution by Designated Users and for all files and data transmitted, shared, or stored using the Accellion Solution. Customer acknowledges and agrees that the licenses granted herein are neither contingent upon the delivery of any future functionality or features nor dependent upon any

oral or written public comments made by Accellion with respect to future functionality or features.

4.4     Ownership.  All right, title, and interest, including without limitation all intellectual property rights, in and to the Accellion Solution, including any and all modifications, enhancements, derivative works, Updates and Releases, are the sole and exclusive property of Accellion and its licensors. Customer shall not remove, and shall reproduce on any permitted copies, all proprietary, copyright, trademark and trade secret notices contained in or placed upon the Accellion Solution. Customer will take reasonable precautions (including the precautions used for Customer's own confidential information) to prevent the unauthorized use or disclosure of the Accellion Solution, the Documentation, or the results of any performance or benchmark tests of the Accellion Solution.  Customer will not allow the Software or any performance or benchmark test results to be made available to any third party unless Accellion approves that disclosure.

4.5     Open Source Software. Customer agrees that any software or materials which may be made available by Accellion, or otherwise obtained or used by Customer, subject to an open source license or other open source terms ("***Open Source Software***") shall be and shall remain subject to the terms and conditions of the original providers and are not part of the Accellion Solution. Open Source Software terms are made available either with the Accellion Solution or through the administration interface of the applicable Accellion Solution.

**5.     Maintenance Support Services.**  Except for Web Orders, Accellion provides Maintenance Support Services for the License Term at no additional charge under the terms set forth at  http://www.accellion.com/supportguidelines/enterprise.html, which is incorporated herein by reference. As part of  Maintenance Support Services, Accellion will make available to Customer all Updates to the supported Accellion Solution that Accellion makes generally available to its other customers. Customer shall provide Accellion access to the Accellion Solution to install such Updates if required by Accellion. Customer agrees to deploy any critical Updates, as identified by Accellion, within five (5) days following receipt. Accellion will not be liable to Customer for damages, liabilities, fines, costs, and/or expenses, including costs of litigation and reasonable attorneys' fees, which Customer may incur, based upon or arising out of Customer's failure to implement any critical Updates.

**6.     Payment; True-Up Users.**

6.1     Payment.  Customer shall pay the fees specified in the Order. Orders are firm commitments of Customer and are not cancelable by Customer.  For orders made directly with Accellion, (i) Customer shall pay invoices in U.S. dollars within thirty (30) days of the invoice date and without offset or deduction, and (ii) all payment terms are subject to approval of Customer's creditworthiness, which approval may be withdrawn at any time; and (iii) payments are non-refundable except as otherwise explicitly stated in this Agreement and Accellion may apply a late charge on overdue invoices at a rate of one and one-half (1.5%) per month or the maximum allowed by law, whichever is less. FOR WEB ORDERS AND FOR UPGRADES FROM TRIAL VERSIONS TO PAID VERSIONS, CUSTOMER CONSENTS TO ALLOW ACCELLION TO CHARGE THE CUSTOMER'S CREDIT CARD, EITHER DIRECTLY OR THROUGH ITS PAYMENT PROCESSORS, FOR THE AMOUNTS DUE FOR THE INITIAL LICENSE TERM AND ANY RENEWALS, PLUS APPLICABLE TAXES.

6.2     Taxes.  All fees are exclusive of value-added tax, sales tax, customs duties, or similar taxes or imposts, including withholding taxes, and shall be made by Customer without deduction therefore.  Customer shall pay all such taxes or duties, except taxes based on Accellion's net income, and reimburse Accellion or its Channel Partner if either is required to pay any taxes or duties.

6.3     True-Up Users.  If Customer orders the True-Up Program, then Customer is permitted to add additional Licensed Users above their paid user count throughout the License Term ("***True-Up Users***"). Customer must report usage to Accellion in order to take advantage of the True-Up Program. Accellion may look at usage at any time to determine True-Up Users. True-Up Users

added during the License Term will be charged based on the peak overage throughout the License Term and those True-Up Users shall be included as Licensed Users for any subsequent renewals. The True-Up Program shall automatically renew each License Term unless Customer notifies Accellion in writing thirty (30) days prior to the renewal term. When the License Term expires, should Customer decide not to renew or to reduce their previous paid user count Order by fifty percent (50%), then Accellion shall be entitled to invoice Customer for such True-Up Users at a prorated amount of the annual rate stated in the applicable Order (i.e. for such calendar quarter and the remaining License Term).

6.4    <u>Automated Reporting</u>.  The Server Software periodically transmits technical data to Accellion. That data does not include the content of any emails or attachments, file names or any personally identifiable information.  The transmitted information contains aggregate non-personal usage information for each day the Accellion Solution is in use, including but not limited to: (i) the number of and type of messaging senders and recipients, (ii) account usage information, and (iii) the type of Accellion Solution features used and related data.  Customer will not in any way attempt to configure the Accellion Solution or create systems that prevent the transmission or delivery of such usage data. Accellion uses such data only for Accellion's own internal business purposes and such data shall be considered Accellion's Confidential Information.  Accellion only discloses such data (a) in an aggregated form with data from other customers in which neither Customer's identity nor that of Designated Users are revealed, or (b) as required by applicable law.

## 7.    **Confidentiality**.

7.1    <u>Confidential Information</u>.  Each party agrees not to use the Confidential Information of the other party for any purpose other than strictly for the purpose of performing its obligations or exercising its rights under this Agreement. Additionally, except as authorized below, each party agrees to maintain in confidence and not disclose any Confidential Information acquired directly or indirectly from the other party. "***Confidential Information***" shall include, but is not limited to, matters of a technical, financial, commercial, business, or other proprietary nature.  The results of any performance, penetration and/or benchmark tests of the Accellion Solution shall be the Confidential Information of Accellion.  Confidential Information does not include any information which (a) is or becomes publicly known other than through a breach of this Agreement by the receiving party; or (b) is already known to the receiving party at the time of disclosure as evidenced by the Receiving party's written documentation, provided that it was not previously obtained directly or indirectly by the receiving party from the disclosing party; (c) is lawfully received by the receiving party from a third party having no obligation of confidentiality with respect thereto; or (d) is proven by receiving party to have been independently developed by employees of the  receiving party who have not had direct or indirect access to, or directly or indirectly received any, Confidential Information under this Agreement; or (e) is authorized in writing by the disclosing party to be released from the confidentiality obligations herein.  Accellion may share Customer Confidential Information with its parent and subsidiary companies ("***Affiliates***"), but shall remain liable for any act or omission of such Affiliates in violation of this Agreement.  Each party agrees that in the event of such party's actual or threatened violation of the provisions of this section, the other party will not have an adequate monetary remedy and shall be entitled to seek appropriated immediate injunctive relief without any requirement to post bond, in addition to any other available remedies.

7.2    <u>Customer Protected Data</u>.  Customer acknowledges that Accellion does not need or require access to any files or attachments stored or transmitted with the Accellion Solution or any personally identifiable information about any Customer personnel, other than as described in Section 6.3, or customers (collectively, "***Protected Data***").  If Customer desires Accellion to receive and access any Protected Data, Customer shall first obtain the written approval of an executive officer of Accellion, which may be withheld by Accellion in its sole discretion. Customer will be responsible for the Protected Data and for complying with any regulations, laws, or conventions applicable to the Protected Data. If Customer is a "covered entity" or a "business associate" and maintains "protected health information" (as those terms are  defined in 45 CFR § 160.103) as part of Protected Data, Customer agrees to Accellion's Business Associate Agreement ("***BAA***") available on the Internet at <u>https://www.accellion.com/legal/accellion-business-associate-agreement</u>  which is incorporated herein by reference.  If

Customer is subject to the General Data Protection Regulation (EU) 2016/679 ("**GDPR**"), Customer agrees to Accellion's Data Processor Addendum available on the Internet at https://www.accellion.com/legal/accellion-dpa which is incorporated herein by reference.

7.3    Notice and Consent Regarding Transfer of Data.  Use of the Accellion Solution requires that when a Customer's End Users contact Accellion for customer service issues, the personal data of Customer's End Users (including but not limited to End User's email addresses, first and last names, geographic location, and phone number) be processed in the United States of America by Accellion USA, LLC, in Europe by Accellion UK Ltd and Accellion GmbH, and in Singapore by Accellion PTE Ltd, where customer support teams and computing systems and infrastructure necessary for Customer's exercise of its rights hereunder are located. Support would not be available without such processing of personal data in the United States of America, Europe, and Singapore, and, pursuant to Article 49 of the GDPR, Customer hereby expressly consents to the processing by, and transfer of personal data to, Accellion USA, LLC in the United States of America, Accellion UK Ltd and Accellion GmbH in Europe, and Accellion PTE Ltd in Singapore for that purpose. Accellion UK Ltd, Accellion GmbH, and Accellion PTE Ltd are subsidiaries of Accellion USA, LLC and each entity processes such personal data in compliance with the contractual requirements established with Customer.

**8.    Limited Warranties and Disclaimer.**

8.1    Limited Accellion Solution Performance Warranty.

(a)    Warranty. Accellion warrants to Customer that for a period of thirty (30) days after the date of delivery: (i) the media on which the Accellion Solution is furnished under normal use will be free from material defects in materials and workmanship; and (ii) the Accellion Solution and Open Source Software will operate in substantial conformance with the Documentation.

(b)    Remedy. Any warranty claim must be made by written notice to Accellion within the applicable warranty period. Accellion's entire liability and Customer's exclusive remedy under the warranty in subsection (a) above shall be replacement or repair of the defective media or Accellion Solution that does not meet Accellion's limited warranty and if Accellion is unable to repair or replace defective components of the Accellion Solution within a reasonable period of time (not to exceed thirty (30) days from Accellion's receipt of Customer's notice), this Agreement shall terminate, in which case: (i) Accellion shall refund all license fees received by Accellion for the Accellion Solution for the applicable License Term, and (ii) Customer shall uninstall and destroy the nonconforming Accellion Solution and certify in writing that it has done the same. Accellion is not liable under any warranty or otherwise for defects or liability caused by the use of the Accellion Solution in any manner or for any purpose other than that for which it was licensed to Customer, or for causes not within Accellion's reasonable control. Warranties are void if failures are caused in whole or in part by accident, abuse, misuse, or modifications not authorized in writing by Accellion.

8.2    Virus Protection.  Accellion warrants to Customer that, to the best of Accellion's knowledge as of the date of delivery, the Accellion Solution will be free from any viruses, spyware, trojans, or disabling or malicious code, provided that Server Software includes disabling mechanisms that prevent access to the Server Software following expiration of the License Term.

8.3    Limited Services Warranty.  Accellion warrants that for a period of thirty (30) days following installation or professional services, such services will be provided in a professional and workmanlike manner consistent with generally accepted industry standards.  As Customer's sole and exclusive remedy and Accellion's sole and exclusive liability for breach of the foregoing warranty, Accellion will, at its sole option and expense, and provided that Accellion is notified of any such breach during the warranty period, re-perform the services, or if Accellion is unable to perform the services as warranted, refund the fees paid to Accellion for the services.

8.4   <u>Disclaimer</u>.  THE EXPRESS LIMITED WARRANTIES IN THIS SECTION ARE IN LIEU OF ALL OTHER WARRANTIES AND CONDITIONS EXPRESS OR IMPLIED, CONTRACTUAL OR STATUTORY, INCLUDING BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON- INFRINGEMENT.  ACCELLION DOES NOT WARRANT THAT THE USE OF THE ACCELLION SOLUTION WILL BE UNINTERRUPTED OR ERROR FREE OR THAT ALL NONMATERIAL DEFICIENCIES OR ERRORS ARE CAPABLE OF BEING CORRECTED. ACCELLION MAKES NO REPRESENTATIONS OR WARRANTIES CONCERNING THE PRODUCTS OR SERVICES PROVIDED BY ITS CHANNEL PARTNERS OR ANY HOSTED SERVICES PROVIDERS, AND SHALL HAVE NO LIABILITY WITH RESPECT TO ANY ACT OR OMISSION OF ANY CHANNEL PARTNER OR HOSTED SERVICES PROVIDERS.  NO CHANNEL PARTNER OR HOSTED SERVICES PROVIDER SHALL HAVE ANY AUTHORITY TO BIND ACCELLION TO ANY TERMS OR CONDITIONS OTHER THEN THOSE EXPRESSLY SET FORTH HEREIN.

**9.    <u>Indemnification</u>.**

9.1   <u>Customer Indemnity</u>.  Customer will, at its expense, indemnify and hold Accellion, its Affiliates and their respective officers, directors, employees, agents, successors and assigns ("***Accellion Indemnitees***") harmless against any settlement agreed to by Customer, or any award of damages, liabilities, fines, costs, and/or expenses, including costs of litigation and reasonable attorneys' fees, which Accellion Indemnitees may incur, based upon or arising out of (i) any use of the Accellion Solution by Customer in breach of this Agreement, and (ii) the data, files, and content transmitted, shared, or stored using the Accellion Solution.

9.2   <u>Accellion Indemnity</u>. Accellion will defend any action brought against Customer to the extent that it is based upon a third party claim that the Accellion Solution infringes such third-party's U.S. patent or foreign patent existing as of the Effective Date of the applicable Order or any copyright, or misappropriates any trade secret (each a "***Claim***"), and will pay any costs (including reasonable attorney's fees) and damages finally awarded or paid in settlement of the Claim provided that Customer will give Accellion: (i) prompt written notice of such Claim, (ii) all cooperation and assistance reasonably requested by Accellion in the defense of the Claim, at Accellion's expense, and (iii) sole control over the defense and settlement of the Claim, provided that (a) Customer may participate in the defense of the Claim at its sole expense, and (b) Accellion may not, without the prior written consent of Customer, enter into a settlement which admits liability of Customer or imposes a monetary obligation on Customer.

9.3   <u>Exclusions</u>. Accellion will have no liability for a Claim to the extent it results from: (a) modification of the Accellion Solution made by a party other than Accellion, if the Claim would not have arisen but for the modification; (b) the combination, operation or use of the Accellion Solution with third party data, software, equipment or devices, if such Claim would not have arisen but for such combination, operation or use; (c) Customer's failure to use updated or modified software provided by Accellion if use of such updated or modified software or hardware would have resolved the Claim; or (d) compliance by Accellion with designs, plans or specifications furnished by Customer or on Customer's behalf, if the Claim would not have arisen but for such designs, plans or specifications.

9.4   <u>Remedies</u>. If the Accellion Solution is held or is likely to be held as infringing, then Accellion may (i) replace the Accellion Solution, without additional charge, with a non-infringing product that is at least functionally equivalent; (ii) modify the Accellion Solution to avoid the infringement; (iii) obtain a license for Customer to continue use of the Accellion Solution: or (iv) if none of the foregoing are commercially reasonable, terminate the license for the infringing Accellion Solution and refund a pro rata portion of all fees received by Accellion for the Accellion Solution as measured over the License Term.  Upon such termination Customer shall uninstall and destroy the nonconforming Accellion Solution and certify in writing that it has done the same. ACCELLION'S AGGREGATE INDEMNIFICATION LIABILITY FOR CLAIMS OF INFRINGEMENT OR MISAPPROPRIATION SHALL NOT EXCEED THE FEES PAID BY CUSTOMER FOR THE APPLICABLE ACCELLION SOLUTION. THIS SECTION 9 SHALL CONSTITUTE ACCELLION'S SOLE AND EXCLUSIVE LIABILITY AND CUSTOMER'S SOLE AND EXCLUSIVE REMEDY FOR A CLAIM OF INFRINGEMENT

OR MISAPPROPRIATION OF INTELLECTUAL PROPERTY RIGHTS OF ANY KIND.

10.    **Limitation of Liability.**  EXCEPT FOR THE INDEMNIFICATION OBLIGATIONS HEREIN, FOR A BREACH OF SECTION 7 (CONFIDENTIALITY), OR FOR CUSTOMER'S INTENTIONAL BREACH OF THE LICENSES GRANTED IN THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY, AND ACCELLION'S LICENSORS, AFFILIATES AND SUPPLIERS, BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOSS OF PROFITS, REVENUE, DATA OR USE ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE USE OR PERFORMANCE OF THE PRODUCTS OR SERVICES SUPPLIED HEREUNDER, WHETHER IN AN ACTION IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGES. WITHOUT LIMITING THE FOREGOING IN THIS SECTION, EXCEPT FOR A BREACH OF SECTION 7 OF THIS AGREEMENT (CONFIDENTIALITY), ACCELLION'S AGGREGATE LIABILITY FOR DAMAGES SHALL IN NO EVENT EXCEED THE TOTAL FEES RECEIVED FROM THE LICENSES GRANTED TO CUSTOMER UNDER THIS AGREEMENT IN THE PREVIOUS TWELVE MONTHS FOR THE APPLICABLE ACCELLION SOLUTION.  THE PARTIES EXPRESSLY ACKNOWLEDGE AND AGREE THAT THE PRICES AND TERMS OF THIS AGREEMENT WERE MADE IN RELIANCE UPON THE LIMITATION OF LIABILITY SPECIFIED HEREIN, WHICH ALLOCATE THE RISK BETWEEN ACCELLION AND CUSTOMER.

11.    **Term and Termination.**

11.1    <u>Term</u>. This Agreement commences on the Effective Date and shall continue for the License Term on the applicable Order, unless terminated earlier as provided in this Agreement.  Except for a trial version which shall terminate at the end of the applicable trial period, or unless otherwise expressly set forth on the Order, the License Term shall be automatically extended for a period of the same duration unless one party provides written notice of its intent not to renew at least thirty (30) days prior to the end of the then-current License Term.

11.2    <u>Termination</u>. Either party may terminate this Agreement or any license granted under this Agreement if: (i) the other party breaches any material provision of this Agreement for any reason, which breach has not been cured within thirty (30) days of written notice; or (ii) the other party becomes subject of a voluntary or involuntary petition in bankruptcy, or any proceeding relating to insolvency, receivership, liquidation or assignment for the benefit of creditors, which is not dismissed within sixty (60) days after commencement.

11.3    <u>Consequences of Termination</u>. Upon termination or expiration of this Agreement, for any reason, all rights granted under this Agreement shall terminate, and Customer will promptly return to Accellion or, at Accellion's request, destroy, the applicable Accellion Solution and provide Accellion with written certification by an officer of Customer certifying compliance with the foregoing. Customer's obligations to pay taxes and any amounts past due along with the following provisions shall survive any expiration or termination of this Agreement: Sections 4.3, 4.4, 4.5, 7, 8, 9, 10, 11.3 and 12.

12.    **Miscellaneous.**

12.1    <u>Notice</u>. Notices under this Agreement shall in writing and delivered via electronic mail, facsimile (with confirmation of receipt), in person, by overnight courier, or by prepaid certified or registered mail, return receipt requested, to a party at its addresses set forth on the Order, as amended by notice pursuant to this Section.  Notice by mail shall be deemed received five (5) days after deposit in the U.S. mails, with other notice deemed effective upon receipt.

12.2    <u>Assignment</u>.  Neither party may assign this Agreement without the prior written consent of the other party, provided that either party may transfer or assign this Agreement without such consent, whether by operation of law or otherwise, pursuant to a merger or other corporate reorganization or the sale of all or substantially all of the assets to which this Agreement relates. Accellion may delegate its obligations to Accellion Affiliates provided that Accellion shall remain liable for proper performance of

this Agreement. Any other purported assignment by Customer shall be null and void. This Agreement shall bind the Parties and their permitted successors and assigns.

12.3    Modification, Waiver, and Remedies.  No modification, alteration, amendment or addition shall be effective unless made in writing, dated and signed by a duly authorized representative of each party. No waiver of any breach hereof shall be held to be a waiver of any other or subsequent breach.  Each party's rights and remedies are in addition to any other rights and remedies provided by law or in equity. No choice of any remedy shall constitute an election of remedies.

12.4    Publicity. Customer hereby consents to Accellion's inclusion of Customer's name in a customer listing, provided that Customer is not the sole Customer listed.

12.5    Force Majeure. Neither party shall be liable to the other for delays or failures in performance resulting from causes beyond the reasonable control of that party, including, but not limited to, acts of God, labor disputes or disturbances, material shortages or rationing, riots, acts of war, governmental regulations, communication or utility failures, or casualties. The foregoing shall not apply to Customer's payment and the mutual confidentiality obligations of the Parties.

12.6    Export.  Customer acknowledges that the Accellion Solution is subject to United States and local country laws governing import, export, distribution and use. Customer is responsible for compliance by Customer and the Designated Users with United States and local country laws and regulations and shall not export, use or transmit the Accellion Solution (i) in violation of any export control laws of the United States or any other country, (ii) to any country requiring as a condition of import the disclosure of source code, or (iii) to anyone on the United States Treasury Department's list of Specially Designated Nationals or the U.S. Commerce Department's Table of Deny Orders.

12.7    Government Licensing.  If the Accellion Solution is accessed or used by any agency or other part of the U.S. Government, the U.S. Government acknowledges that (i) the Accellion Solution and accompanying materials constitute "commercial computer software" and "commercial computer software documentation" under paragraphs 252.227.14 and 252.227.7202 of the DoD Supplement to the Federal Acquisition Regulations ("DFARS") or any successor regulations, and the Government is acquiring only the usage rights specifically granted in this Agreement; (ii) the Accellion Solution constitutes "restricted computer software" under paragraph 52.227-19 of the Federal Acquisition Regulations ("FAR") or any successor regulations and the government's usage rights are defined in this Agreement and the FAR.

12.8    Governing Law.  This Agreement shall be governed by the laws of the United States and the State of California, without reference to conflict of laws principles.  Any dispute between the parties regarding this Agreement will be subject to the exclusive venue of the state and federal courts in the state of California in San Francisco, San Mateo and Santa Clara counties.  If the Accellion entity is Accellion PTE Ltd., this Agreement shall be governed by the laws of England and Wales, without reference to conflict of laws principles.  Any dispute between the parties regarding this Agreement will be subject to the exclusive venue of the courts in and for Singapore.  The parties hereby consent to the exclusive jurisdiction and venue of such courts. Each party hereby waives its right to a trial by jury for any disputes between the Parties arising from this Agreement.  The parties agree that the Uniform Computer Information Transactions Act and the United Nations Convention on the International Sale of Goods will not apply to this Agreement.  Any dispute by one party to this Agreement against the other, which dispute arises from this Agreement, must be brought in accordance with this Section within one (1) year after the cause of action arises.

12.9    Severability.  If any provision of this Agreement is finally determined to be contrary to, prohibited by, or invalid under applicable laws or regulations, this Agreement will be modified so as to give effect to the intent of the Parties to the maximum possible extent.  The remaining provisions of this Agreement shall remain in full force and effect.

12.10   Entire Agreement; Construction.  This Agreement constitutes the complete and exclusive agreement between the parties and supersedes any and all prior communications, representations and understandings, whether written or oral. There are no third-party beneficiaries of Customer. Section headings are for convenience only and shall not affect interpretation of the relevant section. This Agreement is in the English language only, which language shall be controlling in all respects, and all versions hereof in any other language shall not be binding on the parties hereto. All communications and notices to be made or given pursuant to this Agreement shall be in the English language. This Agreement may be executed in counterparts, each of which shall be considered an original, but all of which together shall constitute the same instrument.  Execution and delivery of this Agreement may be evidenced by facsimile or PDF (Portable Document Format) and shall hold the same force and effect as an original signature for purposes of binding the Parties.

**13.**   **Web Order Terms.**   The terms of this Section 13 apply to Web Orders only. REGARDLESS OF WHERE CUSTOMER IS LOCATED, "ACCELLION" MEANS ACCELLION USA, LLC, A DELAWARE CORPORATION WITH A PLACE OF BUSINESS AT 1804 EMBARCADERO PLACE, SUITE 200, PALO ALTO, CA  94303

13.1   License Term; Renewals. Customer's initial License Term shall be from the date of purchase through the term of the type of account purchased by Customer (monthly or annual) and shall automatically renew for additional terms of the same duration unless Customer cancels by sending an email to cancel@accellion.com which includes Customer's customer I.D. and the email address of the originator of Customer's account. IF CUSTOMER DOESN'T CANCEL CUSTOMER'S SUBSCRIPTION BY THE END OF THE THEN-CURRENT LICENSE TERM, CUSTOMER WILL BE CHARGED FOR, AGREES TO PAY SUBSCRIPTION FEES AND AUTHORIZES ACCELLION TO CHARGE CUSTOMER'S CREDIT CARD ON FILE FOR A SUBSEQUENT LICENSE TERM.

13.2   Storage and Bandwidth Fees. For the hosted version of the Accellion Solution, Customer's use is subject to storage and bandwidth limitations and Customer will be charged $1.00 per gigabyte (or the then-current per-gigabyte charge) that exceeds the storage limit or bandwidth limit for Customer's subscription ("***Excessive Use Charges***").  Customer may review Customer's storage and bandwidth usage through the Admin Console. To purchase additional bandwidth and/or storage, contact sales@accellion.com. Fees for Customer's subscription together with Excessive Use Charges are referred to as "Subscription Fees." CUSTOMER CONSENTS TO ALLOW ACCELLION TO CHARGE CUSTOMER'S CREDIT CARD, EITHER DIRECTLY OR THROUGH ITS PAYMENT PROCESSORS, FOR EXCESSIVE USE CHARGES.

13.3   Communications from Accellion.  Customer understands and agrees that Customer and Designated Users may receive certain communications from Accellion, such as service announcements and administrative messages, and that Customer and Designated Users will not be able to opt out of receiving them.

13.4   Restrictions.  Customer acknowledges and agrees that Customer, Designated Users and other users with access to shared folders: (i) will not use the Accellion Solution to transmit any communications or messages that constitute spam, are obscene, abusive, harassing, threatening, racist, malicious, illegal, fraudulent, defamatory, libelous, harmful to minors, or that violate or infringe the rights of third parties; and (ii) will comply with policies applicable to the hosted version of the Accellion Solution as made available to Customer by Accellion from time to time.

13.5   Representations and Warranties. Customer represents and warrants to Accellion that: (i) Customer and Designated Users are not subject to export control restrictions established by laws and regulations of the United States of America and Customer shall comply with all export and import laws, rules, regulations and restrictions of the jurisdictions in which Customer resides; (ii) Customer, Designated Users, and other users with access to shared folders have all necessary rights to any data stored on or sent with the Accellion Solution ("Customer Data") and that use of Customer Data as contemplated herein does not violate any third party rights; and (iii) Customer hereby grant Accellion and its contractors the right to use, copy, cache and transmit Customer's Data in conjunction with Customer's use of the Accellion Solution.

13.6    Termination.

(a)    Termination by Customer. Customer may terminate this Agreement at any time by contacting cancel@accellion.com and providing Customer's relevant Account Info and the email address of the originator of Customer's account.

(b)    Termination by Accellion. Accellion may terminate this Agreement without notice if: (i) Customer is in default and/or if Customer fails to pay applicable fees, (ii) if Customer otherwise violates the express terms of this Agreement, or (iii) in the event Accellion is prevented from providing any portion or all of the hosted version of the Accellion Solution by the actions of a third party.

(c)    Effect of Termination. In the event Accellion terminates this Agreement pursuant to Section 13.6(b)(iii) above, Accellion shall remit to customer a pro rata amount of any prepayment.  In the event this Agreement is terminated for any other reason, Customer will not be entitled a refund of any prepaid amounts and will remain liable to pay for Excessive Use Charges. Upon termination, the licenses granted to Customer by Accellion shall cease, Customer's account will be terminated following billing and payment of any past due amounts, and Customer will no longer be able to use the Accellion Solution.  In addition to the terms identified in Section 11.3, Sections 13.5, 13.6(c), and 13.7 shall survive expiration or termination of this Agreement.

13.7    Inapplicability of Certain Terms.  The support provisions of Section 5 and the indemnification provisions in Sections 9.2, 9.3 and 9.4 shall not apply to Web Orders, although Customer will be entitled to receive Updates.

13.8    Assignment. Neither this Agreement nor any rights or obligations of Customer hereunder may be assigned by Customer in whole or in part without the prior written approval of Accellion. Any assignment in violation of the foregoing shall be null and void.

13.9    Miscellaneous. Accellion may modify or amend this Agreement at any time by posting a revised version on our website at www.accellion.com which Customer agrees constitutes sufficient notice to Customer of such modification or amendment. Such amendments and modifications shall be effective upon renewal of Customer's License Term. As a party to this Agreement, Customer, if a resident of California, is entitled to the following specific consumer information under California Civil Code Section 1789.3: The Complaint assistance Unit of the Division of Consumer Services of the Department of Consumer Affairs may be contacted in writing at 400 R Street, Sacramento, California 95814, or by telephone at (800) 952-5210. Florida residents may contact the Florida Department of Financial Services in writing at 200 East Gaines Street, Tallahassee, Florida, 32399, or by telephone at 1-800-342-2762.

SIGN UP FOR THE LATEST BLOG
POSTS AND NEWS

First Name*

Company*

Business Email*

Last Name*

SUBMIT

## CONTACT  US

### Sales

+1-650-687-3130

sales@accellion.com

### Support

+1-888-654-3778

support@accellion.com

### Stay Connected

### PLATFORM

Platform Overview

Communication Consolidation

Unified Visibility

Unified Security

Unified Compliance

### INDUSTRY

Government

Healthcare

Financial Services

Legal

Manufacturing and Engineering

Higher Education

### CAPABILITIES

CISO Dashboard

Secure File Sharing

Secure Email

Secure Mobile

Remote Work Security

Enterprise App
Sharing

Secure Web Forms

Secure Collaboration

Virtual Data Rooms

Boardroom
Communications

Secure Managed File
Transfer

SFTP Server

Secure Content Access

Microsoft Office 365
Plugins

### COMPLIANCE

HIPAA

GDPR

FedRAMP

FIPS

SOC 2

CMMC

Data Sovereignty

eDiscovery

### RESOURCES

Resource Center

Case Studies

Customers

### COMPANY

About Us

Contact Us

Management Team

eBooks

Product Briefs

Webinars

Whitepapers

Developer

Blog

– Third Party Risk

– Regulatory Compliance

– GDPR Compliance

– HIPAA Compliance

– Secure Email

– Secure File Transfer

Investors

Partners

Press & Media

Events

Careers

Pricing

© 2021 ACCELLION. All rights reserved.

Privacy Policy | Legal

This website uses cookies to enhance your experience. By continuing to visit this site you agree to the use of cookies. To find out more about the cookies we use, see our Privacy Policy

✖