UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ACE AMERICAN INSURANCE COMPANY**, <br><br> Plaintiff, <br><br> vs. <br><br> **ACCELLION, INC.,** <br><br> Defendant. | Case No. 4:21-cv-09615-YGR <br><br> **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS** <br><br> Re: Dkt. No. 18 |

Plaintiff Ace American Insurance Company brings this subrogation action against defendant Accellion Inc., seeking to recover for the losses allegedly sustained by Ace's insured due to criminal hacking of Accellion's file-sharing system. Defendant now moves to dismiss the complaint for failure to name the insured and for failure to state a claim for relief. (Dkt. No. 18.) For the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** the motion to dismiss.[1]

## I. BACKGROUND

The complaint alleges that Ace provided cyber insurance coverage to a Boston law firm. (Complaint, Dkt. No. 1, ¶ 7.) The firm had been licensing a file-sharing software called File Transfer Appliance ("FTA") from Accellion since 2012. (*Id.* ¶¶ 9–10; Exs. A (Order Form), B (License Agreement).) On December 16, 2020, Accellion learned of certain vulnerabilities in its FTA system "as a result of [an] exploit tripping the FTA's built-in anomaly detector on a customer's device." (*Id.* ¶ 11.) Pursuant to Accellion's maintenance support policy, "these vulnerabilities were considered to be of 'critical severity,' because hacker exploitations of these vulnerabilities could result in 'material loss of [customer] data.'" (*Id.* ¶ 12.) The policy required Accellion to "use reasonable efforts to resolve the critical error and/or to provide a work around within forty-eight (48) hours from initial report of the problem." (*Id.* ¶ 13.)

---

[1] Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Rule 7-1(b), the Court finds this motion appropriate for decision without oral argument, though the motion was discussed at the initial case management conference.

Accellion did not notify its FTA customers about these vulnerabilities until December 20. (*Id.* ¶ 15.) At that time, Accellion sent an email to customers on its FTA Security Advisory and FTA Tech Advisory notification lists. (*Id.* ¶ 16.) The subject of the email read: "Critical Customer Alert: Urgent FTA security update." (*Id.*) The text of the email stated: "Accellion has released security software update FTA-9_12_380 with critical, time-sensitive security fixes. We strongly urge you to update your system as soon as possible." (*Id.*)

According to the complaint, "Accellion's only known attempt to notify the insured law firm was to send, on December 20, 2020, the critical, time-sensitive security fix to two people who were no longer employed at the law firm, Anne J. and Chris C., neither of wh[om] had worked at the law firm in years." (*Id.* ¶ 17.) "Accellion would have received two immediate bounce back emails from the law firm's email server advising that neither Anne J. nor Chris C. were employed at the firm as of December 20, 2020." (*Id.* ¶ 18.) Years before, in March 2017, a law firm employee, Gregory P., had notified Accellion by e-mail that Chris C. no longer worked at the firm and asked that Chris's information be replaced with his "going forward." (*Id.* ¶ 20.) Accellion's representative Marissa Kandarian responded: "[W]e have updated our systems." (*Id.* ¶ 21.) Also prior to December 2020, another law firm employee, Keith S., accessed the administrative portal on Accellion's server and signed up to receive notification of "system alerts." (*Id.* ¶ 31.) Keith S. never received the December 20 email, despite being registered to receive system alerts. (*Id.* ¶ 33.)

On December 22, 2020, the firm learned that a criminal hacker exfiltrated multiple confidential files. (*Id.* ¶ 24.) The firm subsequently received an $8,000,000 ransom demand threatening to publish the files on the internet if the ransom was not paid. (*Id.* ¶ 26.) After negotiations with the hacker, and pursuant to the terms and conditions of its insurance policy, Ace paid more than two million dollars on behalf of the firm in exchange for the hacker's agreement to provide a list of all data taken, to destroy all such data in their possession, and not to publish the same. (*Id.* ¶ 27.) In addition, the law firm incurred $375,000 in expenses and attorney time responding to the data breach. (*Id.*)

Two sections of the license agreement governing the law firm's use of Accellion's FTA software at the time are pertinent here:

2

5. Maintenance Support Services. Except for Web Orders, Accellion provides Maintenance Support Services for the License Term at no additional charge under the terms set forth at http://www.accellion.com/supportguidelines/enterprise.html, which is incorporated herein by reference.  As part of Maintenance Support Services, **Accellion will make available to Customer all Updates to the supported Accellion Solution that Accellion makes generally available to its other customers**.  Customer shall provide Accellion access to the Accellion Solution to install such Updates if required by Accellion.  Customer agrees to deploy any critical Updates, as identified by Accellion, within five (5) days following receipt.  Accellion will not be liable to Customer for damages, liabilities, fines, costs, and/or expenses, including costs of litigation and reasonable attorneys' fees, which Customer may incur, based upon or arising out of Customer's failure to implement any critical Updates.

* * *

10. Limitation of Liability. EXCEPT FOR THE INDEMNIFICATION OBLIGATIONS HEREIN, FOR A BREACH OF SECTION 7 (CONFIDENTIALITY), OR FOR CUSTOMER'S INTENTIONAL BREACH OF THE LICENSES GRANTED IN THIS AGREEMENT, **IN NO EVENT SHALL EITHER PARTY, AND ACCELLION'S LICENSORS, AFFILICATES AND SUPPLIERS, BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOSS OF PROFITS, REVENUE, DATA OR USE ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE USE OR PERFORMANCE OF THE PRODUCTS OR SERVICES SUPPLIED HEREUNDER, WHETHER IN AN ACTION IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR OTHERWISE,** EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGES. WITHOUT LIMITING THE FOREGOING IN THIS SECTION, EXCEPT FOR A BREACH OF SECTION 7 OF THIS AGREEMENT (CONFIDENTIALITY), ACCELLION'S AGGREGATE LIABILITY FOR DAMAGES SHALL IN NO EVENT EXCEED THE TOTAL FEES RECEIVED FROM THE LICENSES GRANTED TO CUSTOMER UNDER THIS AGREEMENT IN THE PREVIOUS TWELVE MONTHS FOR THE APPLICABLE ACCELLION SOLUTION.  THE PARTIES EXPRESSLY ACKONWLEDGE AND AGREE THAT THE PRICES AND TERMS OF THIS AGREEMENT WERE MADE IN RELIANCE UPON THE LIMITATION OF LIABILITY SPECIFIED HEREIN, WHICH ALLOCATE THE RISK BETWEEN ACCELLION AND CUSTOMER.

(*Id.* ¶ 10, Ex. B (License Agreement) (emphasis in bold supplied).)

Through this lawsuit, Ace seeks damages of approximately $2.4 million from Accellion. The complaint asserts counts for negligence, breach of contract, and negligent misrepresentation. Count I (negligence) alleges that Accellion acted with negligence and/or gross negligence by:

(a) failing to give prompt and timely notification to its customers, including the law firm, of the critical security vulnerabilities Accellion discovered on December 16, 2020, so that customers could decide for themselves whether to shut down their FTA's until Accellion developed patch software to fix the problem;
(b) failing to notify the law firm on December 20, 2020 about the existence of the critical, time sensitive security fixes, and the need for the law firm to update its FTA as soon as possible to protect against the possibility of the material loss of data;
(c) failing to advise, instruct and/or educate its customers, including the law firm, about the existence and purpose of the FTA Security Advisory and FTA Tech Advisory lists, and the urgent need to keep these contact lists current;
(d) failing to provide the law firm with the means to update the FTA Security Advisory and the FTA Tech Advisory lists on the law firm's FTA administrative portal;
(e) failing to advise customers when signing up to receive notification for system alerts, including software updates, on the administrative portal server about the existence of the FTA Security Advisory and Tech Advisory customer contact lists, and about the need to sign up for security alert notifications on those contact lists as well;
(f) ignoring and failing to take further steps to notify the law firm about the critical, time-sensitive security fixes that needed to be updated to the law firm's FTA as soon as possible after Accellion received the bounce back error notifications from the law firm's email server notifying Accellion that Ann[e] J.'s and Chris C.'s email addresses were no longer valid;
(g) failing to take steps to periodically test and verify the accuracy and currentness of its FTA Security Advisory and Tech Advisory customer contact lists;
(h) failing to take any other reasonable preventative measures that would have sufficiently avoided the damage;
(i) otherwise failing to use due care under the circumstances; and
(j) other acts of negligence as may be revealed in the course of discovery proceedings.

(Compl. ¶ 36.) Count II (breach of contract) alleges that Accellion breached the license agreement's maintenance support services section, which required Accellion "to make available to [the law firm] all Updates to the supported Accellion Solution that Accellion makes generally available to its other customers." (*Id.* ¶ 44.) Count IV (negligent misrepresentation) alleges that on March 1, 2017, a law firm employee, Gregory P., advised Accellion representative Marissa Kandarian that Chris C. no longer worked at the law firm, asked that Accellion "replace[ ] his information with [that of Gregory

4

P.'s] going forward," and was then told by Accellion that "we have updated our systems" though it never did so.  (*Id.* ¶¶ 59–61.)[2]

## II. LEGAL FRAMEWORK

Under Rule 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted.  Dismissal under Rule 12(b)(6) is proper if there is a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)). The complaint must plead "enough facts to state a claim [for] relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  If the facts alleged do not support a reasonable inference of liability, stronger than a mere possibility, the claim must be dismissed.  *Id.* at 678–79; *see also In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (stating that a court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences").  If a court dismisses a complaint, it should give leave to amend unless "the pleading could not possibly be cured by the allegation of other facts."  *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

## III. ANALYSIS

Defendant moves to dismiss the complaint on five grounds: (1) plaintiff fails to name the insured-subrogor law firm; (2) the license agreement's limitation of liability provision bars all claims; (3) the negligence count fails to state a claim for relief because it is barred by the economic loss doctrine; (4) the breach of contract count fails to state a claim for relief because plaintiff fails to identify a specific contractual provision actually breached; and (5) the misrepresentation-based counts fail to state a claim for relief because plaintiff fails to allege certain particularities.  The Court addresses each ground in turn.

---

[2] Plaintiff has voluntarily dismissed counts III and V, both for "fraud/misrepresentation/ negligent misrepresentation."  (Opposition to Motion to Dismiss ("Opp."), Dkt. No. 19, at 14.)

5

**(1) FAILURE TO NAME SUBROGOR**

Defendant first contends that the complaint must be dismissed for failing to name the insured law firm, but defendant offers no valid reason why this warrants dismissal of the complaint. Indeed, defendant acknowledges that plaintiff is suing as subrogee of the law firm and does not specifically argue that the subrogation relationship is insufficiently pled. Although defendant argues that the firm's assignment of its rights "is contrary to the documents attached to the [c]omplaint" (Mtn. at 8), defendant does not cite a specific provision or explain why this is so.[3]

To the extent that defendant argues that the law firm must be named as a real party in interest, this argument fails without a showing that the subrogation relationship is insufficiently pled. "An action must be prosecuted in the name of the real party in interest," Fed. R. Civ. P. 17(a)(1), meaning the party who possesses, "under the substantive law, the right sought to be enforced." *United HealthCare Corp. v. Am. Trade Ins. Co.*, 88 F.3d 563, 569 (8th Cir. 1996). "Because the insurance company as subrogee stands stands in the shoes of the insured, it is the real party in interest in the insured's suit to the extent of the subrogation." *Cummings v. United States*, 704 F.2d 437, 439 (9th Cir. 1983)

To the extent that defendant argues that plaintiff must make the law firm's identity at this stage of the proceedings in order for it to properly respond to the complaint, this argument also fails. Under notice pleading in federal court, the complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal quotations omitted). "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002). A plaintiff need not allege "'specific facts' beyond those necessary to state his claim and the grounds showing entitlement to relief." *Twombly*, 550 U.S. at 570. Defendant appears to know precisely which of its customers is plaintiff's insured. In moving to dismiss, defendant states that "[t]he [c]omplaint is silent on [certain] material points and for good reason: the unnamed Boston law firm never requested updated notice for security

---

[3] To the extent that defendant is making an argument regarding the sufficiency of pleading subrogation, defendant fails to articulate a basis for such an argument aside from the unsupported claim that the assignment is contrary to the documents attached to the complaint.

patches and, incredibly, unsubscribed from receipt of such notifications. The 'notice' alleged in the [c]omplaint involved subscription renewals, not security. Plaintiff's misrepresentation claims—both intent and negligent based—are therefore incapable of amendment without [ ] setting forth allegations not supported by the underlying evidence." (Mtn. at 19.) Thus, defendant itself demonstrates that the notice pleading standard has been satisfied, which is all that is required at this stage of the proceeding.[4] Accordingly, the motion to dismiss for failure to identify the law-firm subrogor is **DENIED**.[5]

**(2) LIMITATION OF LIABILITY**

Next, defendant moves to dismiss all of the claims, each of which seek damages, on the basis that the license agreement limits liability for "any indirect, incidental, special or consequential damages, or damages for loss of profits, revenue, data or use arising out of or in connection with this Agreement or the use or performance of the products or services supplied hereunder, whether in an action in contract, warranty, tort (including negligence), product liability or otherwise." (License Agreement § 10.) Plaintiff does not argue that this limitation provision is invalid or otherwise not generally applicable. Instead, plaintiff responds that the provision does not bar its claims to the extent that they are based on defendant's gross negligence.

While limitation of liability clauses can successfully limit recovery for claims based on ordinary negligence, California law forbids limiting liability for gross negligence. *City of Santa Barbara v. Superior Court*, 41 Cal.4th 747, 777 (2007) ("[P]ublic policy generally precludes enforcement of an agreement that would remove an obligation to adhere to even a minimal standard of care."). Defendant does not dispute this or otherwise argues that the limitation provision shields it from liability for gross negligence. Therefore, the limitation provision here will not preclude recovery in tort or breach of contract where losses are the result of gross negligence. Thus, the question before the Court is whether the remaining counts are based on sufficient allegations of gross negligence.

---

[4] Whether continued redaction of the law firm's identify is warranted as this case proceeds is a different matter.

[5] For the first time on reply, defendant argues that the doctrine of superior equities bar plaintiff's claims in subrogation. The Court will not entertain this new contention.

7

Under California law, a defendant is grossly negligent when it exhibits "the want of even scant care or an extreme departure from the ordinary standard of conduct." *Kearl v. Board of Med. Quality Assurance,* 189 Cal. App. 3d 1040, 1252–53 (1986); *cf. Frittelli, Inc. v. 350 North Canon Drive, LP*, 202 Cal. App. 4th 35, 48 (2011) (ordinary negligence involves "mere nonfeasance, such as the failure to discover a dangerous condition or to perform a duty") (citation and internal quotation marks omitted). "Gross negligence falls short of a reckless disregard of consequences, and differs from ordinary negligence only in degree, and not in kind. *Anderson v. Fitness Int'l, LLC*, 4 Cal. App. 5th 867, 881 (2016) (citation and internal quotation marks omitted); *see also Royal Ins. Co. of Am. v. Southwest Marine*, 194 F.3d 1009, 1015 (9th Cir. 1999) ("Case law from this circuit indicates gross negligence is simply a point on a continuum of probability, and its presence depends on the particular circumstance of each case.") (citation and internal quotation marks omitted). "In assessing where on the spectrum a particular negligent act falls, the amount of care demanded by the standard of reasonable conduct must be in proportion to the apparent risk.  As the danger becomes greater, the actor is required to exercise caution commensurate with it." *Hass v. RhodyCo Prods.*, 26 Cal. App. 5th 11, 32 (2018) (citation and internal quotation mark omitted). "Generally it is a triable issue of fact whether there has been such a lack of care as to constitute gross negligence but not always." *Chavez v. 24 Hour Fitness USA, Inc.*, 238 Cal. App. 4th 632, 640 (2015) (citation omitted).

Count I for negligence alleges that defendant failed to act with due care in a number of ways, namely, by: failing to timely notify its customers regarding system vulnerabilities (Compl. ¶ 36(a)); failing to notify the firm at all regarding security updates, including taking further steps to notify the firm about the same after receiving bounce back error notifications (*Id.* ¶ 36 (b), (f)); failing to advise its customers about the security alert notification lists and the need to sign up and keep contact information current (*Id.* ¶ 36 (c), (e)); and failing to maintain accurate and current security alert notification lists, including providing the firm in particular with the means to update its contact information for security alert notification purposes (*Id.* ¶ 36 (d), (g)).  The Court views these asserted breaches of duty in light of the backdrop described in the complaint.  For example, Accellion allegedly failed to act despite its own maintenance support policy contemplating an urgent response, and within two days of Accellion releasing the security update, a criminal hacker had exfiltrated files

from the firm.[6]  Moreover, although Accellion "attempt[ed] to notify the insured law firm," it did so by contacting "persons who were no longer employed at the firm, Anne J. and Chris C., neither of wh[om] had worked at the law firm in years." (*Id.* ¶ 17.)  The law firm had asked to replace Chris C. as Accellion's contact at the firm, while another law firm employee, Keith S., signed up to receive notification of system alerts but never received the December 20 email.  The totality of these allegations demonstrate that not only was timing, in fact, of the essence but also that the firm attempted more than once to ensure that its contact information with Accellion was up-to-date.  In light of the totality of these allegations, which are viewed in the light most favorable to plaintiff, the Court finds that count I plausibly alleges losses resulting from gross negligence.  *See*, *e.g.*, *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 800 (N.D. Cal. 2019) ("The complaint plausibly alleges gross negligence, since it contends that Facebook did essentially nothing to safeguard users' information – conduct that might well be characterized as lacking 'even scant care'") (quoting *City of Santa Barbara*, 41 Cal.4th at 754).[7]

Counts II (breach of contract) and IV (negligent misrepresentation) incorporate the aforementioned allegations (Compl. ¶¶ 42, 58) and can also be said to plausibly allege losses resulting from gross negligence.  With respect to the breach of contract claim, the alleged breach of defendant's contractual obligation to make available all updates to its customers arguably stems from the alleged failures delineated above.  Likewise, with respect to the negligent misrepresentation claim, the alleged misrepresentation that Accellion updated the firm's contact information was

---

[6] Defendant points out that plaintiff fails to attach a copy of the purported maintenance support policy.  Because plaintiff quotes relevant excerpts of the alleged policy, the Court finds the failure to attach the policy itself to be a non-issue.

[7] Accellion also argues that the complaint fails to allege that the law firm complied with the notice or the amendment provisions of the license agreement, suggesting that the firm did not properly update its contact information with Accellion.  The Court does not resolve factual disputes at this procedural juncture.  Nothing in the pleadings indicate that the firm's attempts to maintain current contact information with Accellion was somehow void.

The parties also dispute whether Accellion's actions constituted notice.  Plaintiff denies that the firm received notice, whereas defendant contends that it did notify the law firm, "it just did not notify the law firm about the availability of the patch in the way the law firm supposedly desired." (Mtn. at 16.)  Again, at this juncture, the Court construes the allegations in the light most favorable to plaintiff as the non-movant and assumes that plaintiff did not receive notice as alleged.

9

presumably caused by some of these failures (*e.g.*, failing to provide the firm with the means to update its contact information for security alert notification purposes).

Because each of the counts are supported by plausible allegations of gross negligence, the limitation of liability provision does not preclude recovery for losses resulting from the same.[8] Accordingly, the motion to dismiss on the basis of the limitation provision is **DENIED** to this extent.

**(3) FAILURE TO STATE A CLAIM FOR NEGLIGENCE**

Defendant moves to dismiss the negligence count for failure to state a claim on the basis of the economic loss rule. This rule "functions to bar claims in negligence for pure economic losses in deference to a contract between litigating parties." *Sheen v. Wells Fargo Bank, N.A.*, 12 Cal.5th 905, 2022 WL 664722, at *6 (Cal. Mar. 7, 2022); *see Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal.4th 979, 988 (2004) ("The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise."). The purpose of the rule is to "prevent[ ] the law of contract and the law of tort from dissolving one into the other." *Robinson*, 34 Cal.4th at 988 (citation omitted).

"Not all tort claims for monetary losses between contractual parties are barred by the economic loss rule. But such claims are barred when they arise from—or are not independent of—the parties' underlying contracts." *Sheen*, 2022 WL 664722, at *7; *see also Erlich v. Menezes,* 21 Cal.4th 543, 554 (1999) ("A breach of contract is tortious only when some independent duty arising from tort law is violated."). Defendant asserts that plaintiff does not identify a duty independent of Accellion's contractual obligations. Plaintiff does not deny defendant's assertion nor otherwise responds that some duty independent of the license agreement exists. Instead, plaintiff argues that the "special relationship" exception to the economic loss rule applies.

---

[8] Defendant makes a related argument that "if, for some reason Accellion is found to be liable, [its] 'aggregate liability for damages shall in no event exceed the total fees received from the licenses granted'" to the law firm. (Mtn. at 13 (quoting License Agreement § 10).) Defendant submits that said fees "are *de minimis* when compared to the damages alleged in the [c]omplaint." (*Id.*) The amount of damages is a factual question not appropriate at this stage of the proceedings. Therefore, defendant's reliance on the aggregate liability clause fails.

As an initial matter, the Court finds that plaintiff's negligence count "arises from, and is not independent of," the license agreement. *See Sheen*, 2022 WL 664722, at *7. Indeed, plaintiff concedes that its "negligence claims all arise out of [ ] Accellion's negligent performance of its service obligations under the License Agreement." (Opp. at 11). "The economic loss rule is designed to limit liability in commercial activities that negligently or inadvertently go awry . . . ." *See Robinson*, 34 Cal. 4th at 991 n.7; *see also* Restatement (Third) of Torts: Economic Harm, § 3 (2012) ("The economic loss rule states that there is no liability in tort for economic loss caused by negligent performance of a contract"). Therefore, the economic loss rule presumptively bars plaintiff's negligence count.

As to whether an exception to the economic loss rule applies in this case, plaintiff submits that "the complaint sufficiently establishes the existence of a special relationship between the law firm and Accellion." (Opp. at 9.) This exception was first announced in *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 804 (1979), which adopted a multifactor approach set forth in from *Biakanja v. Irving*, 49 Cal. 2d 647, 650 (1958) to determine whether a special relationship existed. *See J'Aire*, 24 Cal. 3d at 804 ("Where a special relationship exists between the parties, a plaintiff may recover for loss of expected economic advantage through the negligent performance of a contract although the parties were not in contractual privity. *Biakanja* . . . [so] held.[.]")

Although the parties extensively brief whether the complaint satisfies the *Biakanja*/*J'Aire* factors to invoke the purported special relationship exception to the economic loss rule, the California Supreme Court recently issued a decision holding that such "factors are not applicable when, as here, the litigants are in contractual privity and the plaintiff's [negligence] claim is not 'independent of the contract arising from principles of tort law.'" *Sheen*, 2022 WL 664722, at *19 (quoting *Erlich*, 21 Cal. 4th at 551). "Put differently, *Biakanja* does not displace the contractual economic loss rule when that rule squarely applies." *Id.* at *15 (citations omitted); *see also id.* at *8 ("If we are to give deference to the parties' agreement—and more generally to accord respect to contract doctrines—we cannot sustain a tort duty in such circumstances."). Thus, plaintiff's reliance on the special relationship exception to the economic loss rule is unavailing in this case.

Because plaintiff's negligence count arises from the license agreement, triggering the economic loss rule, and because the special relationship exception to the rule does not apply to contracting parties, the motion to dismiss the negligence count on the basis of the economic loss rule is **GRANTED**.

### (4) FAILURE TO STATE A CLAIM FOR BREACH OF CONTRACT

Defendant moves to dismiss the breach of contract count for plaintiff's purported failure to identify a specific provision of the contract actually breached. This argument is belied by a review of the complaint, which alleges:

> Pursuant to paragraph 5 of the Accellion Solutions License Agreement, maintenance support services were part of the contract between Accellion and the law firm. Pursuant to this paragraph, Accellion was required "to make available to [the law firm] all Updates to the supported Accellion Solution that Accellion makes generally available to its other customers."
>
> Defendant breached this contractual obligation by failing to advise current law firm employees about security software update FTA-112380 with critical, time-sensitive security fixes, and the need to update the law firm's FTA system as soon as possible, like Accellion did for substantially all of its other customers.

(Compl. ¶¶ 44–45.) Accordingly, the motion to dismiss the breach of contract count for failure to state a claim is **DENIED**.

### (5) FAILURE TO STATE A CLAIM FOR MISREPRESENTATION

Defendant moves to dismiss misrepresentation-based counts for failure to state a claim but only attacks the allegations underlying the misrepresentation claims set forth in counts III and V, which plaintiff has since voluntarily dismissed. Nowhere in its moving papers does defendant consider the allegations underlying count IV for negligent misrepresentation, namely, the exchange between law firm employee Gregory P. and Accellion's representative Marissa Kandarian concerning the replacement of Chris C. as Accellion's firm contact. Although defendant addresses these allegations in its reply papers, the Court will not entertain new arguments raised for the first

time in reply.[9]  Accordingly, the motion to dismiss the misrepresentation counts for failure to state a claim is **DENIED AS MOOT** with respect to counts III and V and **DENIED** with respect to count IV.[10]

### IV. CONCLUSION

For the foregoing reasons, the motion to dismiss is hereby **GRANTED IN PART AND DENIED IN PART**.[11]  In sum, counts III and V for "fraud/misrepresentation/negligent misrepresentation" have been voluntarily dismissed.  Count I for negligence is barred by the economic loss rule.  Count II for breach of contract and count IV for negligent misrepresentation survive insofar as they seek to recover for losses resulting from gross negligence, which is plausibly alleged here.  The asserted grounds for dismissing these counts for failure to state a claim are unavailing.

Defendant shall respond to the remaining claims within **14** days of this Order.

This Order terminates Docket Number 18.

**IT IS SO ORDERED.**

Dated: **April 11, 2022**

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

---

[9] In any event, all of the arguments in this regard raise factual questions not appropriate at this stage of the proceedings.  For example, defendant queries: "[W]ho is Gregory P.?  What role does he play at the law firm?  Why is his alleged reliance sufficient to establish reliance by the law firm?  Why is stating the systems have been updated sufficient to establish the statement actually means the FTA Security Advisory and Tech Advisor notification lists were updated, when that is not what the [c]omplaint alleges Ms. Kandarian stated?" (Reply at 13–14.)  "Did someone else properly sign up on the Accession administrative portal?" (*Id.* at 14.)

[10] Defendant did not brief the economic loss doctrine argument as to any of the misrepresentation-based counts, including for negligent misrepresentation.

[11] Defendant requests that the Court take judicial notice of the fact that plaintiff filed an opposition to a motion to relate in the action *Brown v. Accellion, Inc.*, No. 21-cv-1155 (EJD).  (Dkt. No. 18-2.)  Defendant cites portions of this filing, none of which were relevant to the Court's decision here.  Therefore, the request for judicial notice is **DENIED**.  Defendant also requests that the Court strike the affidavit of Ashley Bauerle filed in support of plaintiff's opposition on the ground that the affidavit alludes to matters not supported by admissible evidence.  (Reply at 15.)  The affidavit purportedly attests to what facts "the evidence in this case will support" (Dkt. No. 19-1.)  The Court **DENIES AS MOOT** defendant's request because the Court did not rely on the affidavit in deciding this motion.

13