1   PHILIP L. GREGORY (95217)
    pgregory@gregorylawgroup.com
2   **GREGORY LAW GROUP**
3   1250 Godetia Drive
    Woodside, CA 94062
4   Telephone:      (650) 278-2957

5   *Attorney for Defendant and*
    *Counterclaimant Accellion, Inc.*
6

7                **UNITED STATES DISTRICT COURT**

8               **NORTHERN DISTRICT OF CALIFORNIA**

9

10  ACE AMERICAN INSURANCE
    COMPANY,                                      **Case No. 21-cv-09615-YGR**
11
                                                  **COUNTERCLAIM OF DEFENDANT**
12                       Plaintiff,               **ACCELLION, INC. AGAINST PLAINTIFF**
                                                  **ACE AMERICAN INSURANCE COMPANY**
13          v.

14  ACCELLION, INC.,                              Complaint Filed: December 15, 2021

15                       Defendant.

16

17

18  _____

19  ACCELLION, INC.,

20                       Counterclaimant,

21          v.

22  ACE AMERICAN INSURANCE
    COMPANY,
23
                         Counter-Defendant.
24

25  _____

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF CONTENTS</u>

NATURE OF THE ACTION ............................................................................... 1

THE PARTIES ................................................................................................... 6

JURISDICTIONAL STATEMENT .................................................................... 6

FACTUAL BACKGROUND .............................................................................. 6

      A.    Accellion is a Leading Provider of Secure File Sharing Technologies ........ 6

          1.    The Company ..................................................................... 6

          2.    The FTA Software at Issue Here ......................................... 7

          3.    Transition to Kiteworks ...................................................... 8

      B.    The Criminal Cyber Attack on Accellion's FTA Customers ....................... 9

      C.    Accellion's Contractual Relationship with the Boston Law Firm ............. 10

FIRST COUNTERCLAIM FOR RELIEF ........................................................ 14

SECOND COUNTERCLAIM FOR RELIEF .................................................... 15

THIRD COUNTERCLAIM FOR RELIEF ....................................................... 15

FOURTH COUNTERCLAIM FOR RELIEF .................................................... 16

FIFTH COUNTERCLAIM FOR RELIEF ........................................................ 17

SIXTH COUNTERCLAIM FOR RELIEF ....................................................... 18

PRAYER FOR RELIEF ................................................................................... 19

Defendant and Counterclaimant Accellion, Inc. ("Accellion"), by and through its undersigned counsel, alleges and asserts claims against Plaintiff and Counter-Defendant Ace American Insurance Company ("Ace American"), as follows:

## NATURE OF THE ACTION

1.     This case arises as a result of a sophisticated criminal hack of a computer system that Accellion did not manage, host, or operate, affecting data that Accellion did not collect, control, or have access to, which allegedly occurred at a Boston law firm the underlying Complaint refuses to identify.

2.     Whereas the Complaint fails to identify the Boston law firm, it admits the Boston law firm was in contractual privity with Accellion. The Complaint attaches an end user license agreement ("EULA") that governs the commercial license of software from Accellion to the unnamed Boston law firm. A true and correct copy of the EULA attached to the Complaint is attached hereto as **Exhibit 1**. According to the Complaint, the EULA governs the Boston law firm's license for the file-sharing software at issue here and developed by Accellion—a product called File Transfer Appliance ("FTA")—which facilitated large file transfers and was allegedly used by the unidentified Boston law firm to store and transfer information it collected.

3.     Critically, the EULA limits Accellion's liability in the event of a data breach involving the FTA software: "EXCEPT FOR THE INDEMNIFICATION OBLIGATIONS HEREIN, FOR A BREACH OF SECTION 7 (CONFIDENTIALITY), OR FOR CUSTOMER'S INTENTIONAL BREACH OF THE LICENSE GRANTED IN THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY…BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOSS OF PROFITS, REVENUE, DATA OR USE ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE USE OR PERFORMANCE OF THE PRODUCTS OR SERVICES SUPPLIED HEREUNDER, WHETHER IN AN ACTION IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGES…ACCELLION'S AGGREGATE LIABILITY FOR

1   DAMAGES SHALL IN NO EVENT EXCEED THE TOTAL FEES RECEIVED FROM THE

2   LICENSES GRANTED TO CUSTOMER UNDER THIS AGREEMENT IN THE PREVIOUS

3   TWELVE MONTHS FOR THE APPLICABLE ACCELLION SOLUTION. THE PARTIES

4   EXPRESSLY ACKNOWLEDGE AND AGREE THAT THE PRICES AND TERMS OF THIS

5   AGREEMENT WERE MADE IN RELIANCE UPON THE LIMITATION OF LIABILITY

6   SPECIFIED HEREIN, WHICH ALLOCATE THE RISK BETWEEN ACCELLION AND

7   CUSTOMER." *See* Ex. 1, § 10.

8       4.      The limitation of liability provision in the EULA is extremely important to

9   Accellion, as the provision ensures Accellion is in the business of licensing its software, not in

10  the business of providing unlimited cyber insurance to its customers. The unnamed Boston law

11  firm obviously recognized the express limitation of Accellion's liability and, as a result,

12  purchased insurance from Ace American precisely to address this exposure. Allowing insurers

13  like Ace American to circumvent the express limitation of liability provision in Accellion's

14  contract with its customers would render the limitation of liability nugatory. In fact, the EULA

15  not only limits Accellion's liability in the event of a data breach, it also expressly reminds

16  customers that, as with any software, they may experience defects, interruptions, and errors. *Id.*

17  at ¶¶ 8.1(b), 8.4.

18      5.      Similarly, the EULA makes clear that Accellion has no obligation to indemnify its

19  customers for a data breach, and limits Accellion's potential liability to the fees paid by the

20  customer in the previous twelve months. *Id*. at ¶¶ 9.2, 10. Here, the fees paid to Accellion by the

21  unidentified Boston law firm in the twelve months prior to the data breach total $42,181.82.

22      6.      Under the EULA, Accellion simply grants each FTA customer a license to the

23  FTA software, and then the FTA customer is responsible for maintaining and updating the FTA

24  software. In this vein, each FTA customer subject to the EULA, including the unidentified

25  Boston law firm, acknowledges it is "<u>solely responsible and liable</u> for the use of and access to"

26  the FTA software "and for all files and data transmitted, shared, or stored using" the FTA

27  software, and further agrees that it is responsible for deploying critical updates in five days or

28  less. *Id*. at ¶¶ 4.3, 5 (emphasis added).

7.      In December 2020 (the "December Attacks") and January 2021 (the "January Attacks"), respectively, sophisticated cybercriminals exploited previously unknown vulnerabilities in the FTA software at a customer's site (collectively, the "Attacks"). For purposes of clarity, while the December Attacks and the January Attacks both targeted the FTA software at the customer's site, the Attacks exposed distinct zero-day vulnerabilities, neither of which were previously known by Accellion despite extensive penetration tests and a robust bug bounty program. As soon as Accellion learned of the Attacks on the FTA software at the first customer's site, Accellion acted swiftly to support its customers, including by releasing patches to close the vulnerabilities.

8.      The December Attack is germane here. By December 20, 2020, mere days after learning of the December Attack, Accellion developed and circulated a patch via the software program HubSpot to completely fix the vulnerability. On information and belief based on the allegations in the Complaint, the Boston law firm did not receive the December 20, 2020 notification; this was because the Boston law firm had opted out from receiving notifications of software updates from Accellion. Put another way, as a direct result of its own action, the Boston law firm did not receive the December 20 security notice, which advised customers to immediately apply the patch. According to the allegations in the Complaint, had the Boston law firm chosen to receive said notice of security updates—it had affirmatively opted out—the Boston law firm would have received notice of the patch on December 20 and, had it installed the patch before December 22, the Boston law firm would have averted the December Attack on its FTA software.

9.      Notwithstanding the Boston law firm's affirmative choice to forego receipt of software update notices, Accellion later reached out to the unidentified Boston law firm, this time via Salesforce, emails, and phone calls. Accellion continued to follow up, and finally got through to an employee of the unidentified Boston law firm on December 22, 2020 at approximately 7:30 pm ET, resulting in the firm installing the initial patch the same day on its FTA software. By that time, through no fault of Accellion, according to the allegations of the Complaint, the unnamed Boston law firm had been hacked.

10.     On information and belief, the attack on the unnamed Boston law firm began on December 21, 2020 at approximately 1:00 pm ET, and continued on December 22 through approximately 5:45 pm ET. Critically, at approximately 1:00 am ET on December 22, the anomaly detector embedded in the FTA software at the Boston law firm's site notified the Boston law firm of suspicious activity, and instructed the firm to contact Accellion. In other words, had the Boston law firm taken action when the anomaly detector was triggered, it could have prevented over 14 hours of the criminal hack. However, the recipient of the notice from the anomaly detector at the Boston law firm was out of the office, and an automated out of office email was sent to Accellion advising Accellion that the individual was out of office. For purposes of clarity, the anomaly detector in the FTA software was designed to and successfully notified FTA customers of suspicious or "anomalous" activity, sending the customer a notification from an Accellion URL when an anomaly was detected. This high level of security was unusual in legacy products such as the FTA software.

11.     On December 22, 2022, after receiving the automated out of office email, Accellion continued its efforts to follow up, ultimately making contact with the Boston law firm and conducting a videoconference that same day to assist the firm. On information and belief based on the allegations in the Complaint, however, the FTA software at the unidentified Boston law firm was the victim of a criminal hack, wherein data the law firm had stored or transmitted on the FTA software at its site was stolen. Thereafter, on information and belief based on the allegations in the Complaint, the unidentified Boston law firm incurred costs to shore up its cyber security systems, was the victim of a ransom request, and paid, directly or through Ace American, a ransom amount.

12.     At no time prior to making these alleged ransom payments or incurring these costs was Accellion consulted, either as to whether the unidentified Boston law firm should incur costs to shore up its cyber security systems or pay, directly or through Ace American, a ransom amount. Instead, on information and belief based on the allegations in the Complaint, to resolve the breach of the FTA software at its site, the unidentified Boston law firm contacted its

cyber insurer, Ace American, which claims to have incurred fees and costs on behalf of the unidentified Boston law firm in the amount of $2,400,000.00.

13.   In its Complaint, Ace American claims to stand in the Boston law firm's shoes via "an assignment" of claims, if any. *See* Complaint, ¶ 34. This "assignment" is expressly proscribed by the EULA: "Neither this Agreement nor any rights or obligations of Customer hereunder may be assigned by Customer in whole or in part without the prior written approval of Accellion. Any assignment in violation of the foregoing shall be null and void." *See* Ex. 1, § 13.8.

14.   An immediate, real, and justiciable controversy exists between Accellion and Ace American warranting declaratory relief as to whether Ace American is barred from maintaining this action given the non-assignment clause in the EULA.

15.   In the alternative, to the extent this Court allows Ace American to proceed against Accellion in any capacity, because Ace American purports to stand in the shoes of the Boston law firm, immediate, real, and justiciable controversies exist warranting declaratory relief as to whether Accellion's <u>potential</u> liability is limited to $42,181.82, the amount of the unidentified Boston law firm's license fee for the license term in question based on the provision in the EULA that limits Accellion's potential liability to the fees paid by the customer in the previous twelve months. *See* Ex. 1, § 10. For purposes of clarity, Accellion expressly denies any liability to Ace American or to the unidentified Boston law firm; Accellion held up its end of the bargain and acted with due care.

16.   In the alternative, again to the extent this Court allows Ace American to proceed against Accellion in any capacity given the non-assignment clause in the EULA, Ace American, as a self-proclaimed proxy for the unidentified Boston law firm, is liable to Accellion for breach of contract, including breach of Sections 5 (Maintenance Support Services) and 13.8 (Non-Assignment) of the EULA.

17.   As a direct result of Ace American's misconduct, Accellion has incurred, and continues to incur, fees and costs, including attorneys' fees and costs, for which it is entitled to repayment in full. This Counterclaim follows.

**THE PARTIES**

18.     Counterclaimant Accellion, Inc. is a Delaware corporation, with its principal place of business at 1804 Embarcadero Road, Suite 200, Palo Alto, California 94303.

19.     On information and belief based on the allegations in the Complaint, Counter-Defendant Ace American Insurance Company is a Pennsylvania corporation, with its principal place of business in New Jersey.

**JURISDICTIONAL STATEMENT**

20.     This Court has jurisdiction over the subject matter of this lawsuit pursuant to 28 U.S.C. § 1332, as the parties are residents of different states and the amount in controversy exceeds $75,000.00. This Court also has jurisdiction over Accellion's declaratory relief claims pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*

21.     This Court has jurisdiction over Ace American as it is the plaintiff in the underlying action and has therefore submitted to the jurisdiction of this Court by filing a Complaint in the first instance against Accellion.

22.     The events giving rise to the claims alleged herein occurred, among other places, within this judicial district. Venue in the Northern District of California is therefore proper pursuant to 28 U.S.C. § 1391(b)(2).

23.     This Counterclaim is compulsory and brought in accordance with Federal Rule of Civil Procedure 13(a)(1) as against Ace American.

**FACTUAL BACKGROUND**

**A.  ACCELLION IS A LEADING PROVIDER OF SECURE FILE SHARING TECHNOLOGIES**

**1.     The Company**

24.     Accellion is a software company that develops and licenses secure file-sharing technologies. It has released two industry-leading file-sharing software products since its founding in 1999. Thousands of customers—from small businesses to government agencies to Fortune 500 companies—used Accellion's first product, the FTA software, for decades to securely transfer large and sensitive files. In January 2014, Accellion launched Kiteworks, a successor product built on a different code base that offered enhanced security, functionality,

and integration into customers' software and security infrastructures. By early 2020, most FTA customers had upgraded to Kiteworks, and Kiteworks remains Accellion's flagship product today.

### 2.   <u>The FTA Software at Issue Here</u>

25.     This case concerns the FTA software, Accellion's earlier "legacy" product. When Accellion released the FTA software in the early 2000s, the technology underlying the product was state of the art, and the FTA software remained a very good product with no known vulnerabilities prior to the Attacks. For example, since 2017, the FTA software was subjected to at least 21 different penetration tests and vulnerability scans conducted for Accellion's FTA customers by top industry cybersecurity vendors for these services. None of those tests identified the zero-day vulnerabilities that were ultimately targeted in the Attacks.

26.     Most customers, including the unidentified Boston law firm, used the FTA software pursuant to the EULA. *See* Ex. 1. The EULA limits Accellion's liability in the event of a data breach involving the FTA software (*see* Ex. 1, § 10) and reminds customers that, as with any software, they may experience defects, interruptions, and errors with the FTA software. *Id*. at §§ 8.1(b), 8.4. Similarly, the EULA makes clear Accellion has no obligation to indemnify FTA customers for a data breach, and further limits Accellion's potential liability to the fees paid by the customer in the previous twelve months. *Id*. at § 10. Recognizing this express limitation of Accellion's liability, certain FTA customers purchased insurance to address this liability exposure. As relevant here, the Boston law firm purchased cyber insurance from Ace American.

27.     Accellion did not provide the FTA software as a service. Instead, Accellion granted each FTA customer a license, and then those customers were responsible for maintaining and updating their FTA software. Each FTA customer acknowledged that it is "*solely responsible and liable* for the use of and access to" the FTA software "and for all files and data transmitted, shared, or stored using" the FTA software, and further agreed that the FTA customer is responsible for deploying critical updates in five days or less. *Id*. at §§ 4.3, 5 (emphasis added).

28.     Importantly, no data of the FTA customers flowed through Accellion's internal systems, and Accellion did not (and does not) have the ability to access the content of information that customers stored or transferred with the FTA software. Put another way, Accellion never hosted the data of the FTA customers that was transferred or stored with the FTA software (nor does it do so with Kiteworks). Instead, FTA customers, like the Boston law firm, had the following hosting options: (1) some FTA customers hosted the data on their own systems ("on premises"); (2) other FTA customers used cloud storage space they arranged themselves; and (3) some FTA customers hosted data on cloud storage space within Amazon Web Services that Accellion arranged, separately from licensing the FTA software. In all cases, it remained the customer, not Accellion, that was responsible for maintaining the FTA software and timely installing software updates.

29.     The EULA underscores that Accellion will not access "any personally identifiable information about any Customer personnel…or customers (collectively, 'Protected Data')." *Id*. at § 7.2. In the limited circumstances where a "Customer desires Accellion to receive and access any Protected Data, Customer shall first obtain the written approval of an executive officer of Accellion[.]" *Id*. If Accellion does access personal information being stored or transferred on the FTA software at the FTA customer's request, that customer affirms that it "will be responsible for the Protected Data and for complying with any regulations, laws, or conventions applicable to the Protected Data." *Id*. Section 7 of the EULA was part of the value proposition for FTA customers: not even Accellion views the data that the customers are securely storing or transferring. As a result, however, Accellion does not know what kinds of documents or information were being transmitted or stored by the customer with the FTA software—or whose  personal information might have been compromised in the Attacks.

### 3.     Transition to Kiteworks

30.     Accellion continued to add features to the FTA software over the years, and also launched Kiteworks, the result of a ground-up product development effort using a brand-new code base. Accellion first released Kiteworks in 2014.

31. By 2017, Accellion was encouraging existing FTA customers to migrate to Kiteworks—including by offering incentives such as lower pricing for Kiteworks relative to the FTA software. In encouraging existing FTA customers, Accellion emphasized Kiteworks as a more robust security option to protect against cyberthreats in accord with the cyber environment over the prior four years, as well as the fact that, since June 2017, Kiteworks had been FedRAMP compliant—the highest USA federal Cyber standard—a certification that requires a rigorous annual security audit of the software and the company as a whole, based on comprehensive standards developed by cybersecurity and cloud experts from government agencies and private industry.

32. While most FTA customers transitioned to Kiteworks prior to the Attacks, others, including the Boston law firm, did not. This resistance was driven in large part by customers' familiarity and satisfaction with the FTA software and its integration into their existing systems, while not taking into account the legacy nature of the FTA software. Although Accellion continued to encourage customers to move to Kiteworks, including by making renewed licenses for the FTA software more expensive than Kiteworks, Accellion could not simply abandon its FTA customers and force them to stop using a product they paid for annually and depended upon, especially when the FTA software had no known security vulnerabilities. The unnamed Boston law firm was fully aware of all that is explained above.

## B.   THE CRIMINAL CYBER ATTACK ON ACCELLION'S FTA CUSTOMERS

33. In December 2020 and January 2021, sophisticated cybercriminals exploited previously unknown ("zero-day") vulnerabilities in the FTA software. Although the attackers exploited the same vulnerabilities, they targeted individual customers' FTA systems, not any systems or servers at Accellion.

34. As soon as Accellion learned of the Attacks (approximately 87 hours after learning of the December attack and approximately 74.5 hours after learning of the January attack), it acted swiftly to support its FTA customers, including by releasing patches for the vulnerabilities within days of discovery and offering to help each customer investigate that customer's FTA system to determine whether and how the customer's specific FTA software

1  had been affected. This response time was significantly faster than most, if not all, publicly

2  announced cyber attacks in the last 24 months. Accellion had not uncovered the vulnerabilities

3  in the customer's FTA software until Accellion was advised by the customer that the customer

4  had learned of the Attacks as a result of responding to the anomaly detector. The Attacks

5  occurred even though Accellion had taken steps to prevent such attacks by subjecting the FTA

6  software to more than 20 penetration tests and by establishing a robust "bug bounty" program.

7  For purposes of context, the existence of the anomaly detector in Accellion's FTA software was

8  unique, and its response time from learning of the Attacks to issuing patches placed Accellion's

9  response atop the industry standard.

10       35.    After the Attacks, Accellion engaged leading forensic consultant Mandiant to

11  conduct a thorough investigation of the Attacks and Accellion's response thereto. In its report,

12  Mandiant concluded the patches that Accellion released immediately after the Attacks "fully

13  resolved" the vulnerabilities (including potential variations of the exploit techniques used by the

14  attackers) and that the FTA software had no other potential vulnerabilities as of March 1, 2021.

15  A true and correct copy of the Mandiant Report is attached hereto as **Exhibit 2**; *see id.* at 3, 9

16  ("Mandiant…validated the efficacy of the patches Accellion released to address the Exploited

17  Vulnerabilities, which Accellion made available to FTA customers soon after each exploit was

18  identified."). Ultimately, Mandiant concluded the Attacks "demonstrate[d] a high level of

19  sophistication and deep familiarity with the inner workings of the Accellion FTA software,

20  likely obtained through extensive reverse engineering of the software." *Id.* at 7. In other words,

21  the Attacks were <u>not</u> the result of Accellion's failure to patch a known vulnerability. At all

22  times, Accellion complied with its contractual obligations and acted with due care with respect

23  to the FTA software and its FTA customers, including the Boston law firm.

24       C.  <u>ACCELLION'S CONTRACTUAL RELATIONSHIP WITH THE BOSTON LAW FIRM</u>

25       36.    From on or around March 20, 2012 through March 31, 2021, the Boston law firm

26  licensed the FTA software from Accellion subject to the EULA. The Boston law firm hosted its

27  own data in the FTA software on its premises. As with all FTA customers, the Boston law

28  firm—not Accellion—was responsible for maintaining the FTA software and timely installing

---

**COUNTERCLAIM OF DEFENDANT ACCELLION, INC. AGAINST PLAINTIFF ACE AMERICAN INSURANCE COMPANY; Case. No. 21-cv-09615-YGR**                                    10

1  software updates. Accellion had (and has) no knowledge of the data transmitted by the Boston

2  law firm using the FTA software.

3         37.     During the years the Boston law firm licensed the FTA software, Accellion

4  faithfully sent it software releases for the FTA software, including security updates and patches.

5  Sometimes, the Boston law firm, in compliance with the EULA, installed these security updates

6  and patches within five days of receipt as required by the EULA; other times, in breach of the

7  EULA, the Boston law firm failed to timely install security updates and patches. These breaches

8  of the EULA include the Boston law firm's failure to timely install security updates and patches

9  in the wake of the Attacks. The following chart reflects Accellion FTA software releases from

10 May 2016 through April 2021, and specifies when the Boston law firm installed the same:

| FTA Software Version/Security Updates & Patches | Date Accellion Sent Updates & Patches to Boston Law Firm | Date Boston Law Firm Installed Updates & Patches |
|---|---|---|
| FTA_9_12_51 | 5/9/2016 | 5/26/2016 |
| FTA_9_12_90 | 6/29/2016 | 7/7/2016 |
| FTA_9_12_130 | 8/19/2016 | 9/1/2016 |
| FTA_9_12_130 | 8/19/2016 | 10/6/2016 |
| FTA_9_12_160 | 11/29/2016 | 12/8/2016 |
| FTA_9_12_180 | 12/13/2016 | 12/14/2016 |
| FTA_9_12_220 | 1/31/2017 | 2/16/2017 |
| FTA_9_12_280 | 5/17/2017 | 5/25/2017 |
| FTA_9_12_300 | 8/1/2017 | 8/31/2017 |
| FTA_9_12_350 | 4/20/2018 | 5/10/2018 |
| FTA_9_12_360 | 9/27/2019 | 10/1/2019 |
| FTA_9_12_370 | 2/18/2019 | 2/28/2019 |
| FTA_9_12_380 | 12/20/2020 | 12/23/2020 |
| FTA_9_12_411 | 12/24/2021 | 2/1/2021 |
| FTA_9_12_411 | 12/24/2021 | 2/1/2021 |

| FTA_9_12_411 | 12/24/2021 | 1/21/2021 |
| FTA_9_12_416 | 1/25/2021 | 1/27/2021 |
| FTA_9_12_430 | 1/27/2021 | 1/28/2021 |
| FTA_9_12_432 | 1/28/2021 | 4/2/2021 |
| FTA_9_12_444 | 3/1/2021 | 4/3/2021 |

38.     The foregoing chart makes it clear that, for years, the Boston law firm received FTA software updates. The chart further shows that, while it ultimately installed FTA software updates and patches, including those transmitted in December 2020 and January 2021, the Boston law firm did not always do so within five days, a breach under the EULA. *See* Ex. 1, § 5. Finally, the chart shows that the Boston law firm continued to use the FTA software well after it knew of the Attacks.

39.     As detailed above, in December 2020, FTA customers were the victims of a sophisticated criminal cyber-attack on the FTA software at the customers' site. Because the FTA software contained an anomaly detector (which was very rarely installed in legacy products), when an FTA customer was hacked, the anomaly detector advised the customer to contact Accellion. Accellion received the first anomaly report from an FTA customer on or around December 16, 2020, when the FTA customer advised Accellion that the anomaly detector had been triggered. For purposes of clarity, this initial FTA customer report did not come from the Boston law firm.

40.     Accellion diligently investigated the FTA customer report and, within 4 days, identified the zero-day vulnerability exploited by the hackers. By December 20, 2020, Accellion developed and circulated a notice via HubSpot that a patch was available to fix the vulnerability.

41.     The Boston law firm did not receive the December 20, 2020 notification because, incredibly, the Boston law firm had chosen to opt out from receiving software updates from Accellion, including critical security updates. Prior to December 20, the Boston law firm had affirmatively unsubscribed from receipt of any further Accellion software updates, including critical security updates and patches. As a direct result, the Boston law firm did not receive the

1   December 20, 2020 patch and, on information and belief based on the allegations of the

2   Complaint, on December 22, 2020, the Boston law firm was the victim of a criminal hack,

3   wherein data it stored or transmitted on the FTA software at its site was stolen.

4        42.    In December 2020, after discerning that its FTA customers were under attack,

5   notwithstanding the Boston law firm's choice to forego receipt of notifications of security

6   updates via HubSpot, Accellion again reached out to the Boston law firm via Salesforce, emails,

7   and phone calls. Specifically, on December 22, 2020 at approximately 5:49 pm ET, Accellion

8   reached out to the unnamed Boston law firm's Network Manager via email, both to apprise the

9   Boston law firm of the potential threat to its FTA software, and to deliver instructions to install

10  the security patch. In response to this email, Accellion again received an automated response

11  indicating that said Network Manager was on vacation, with no alternative emergency contact

12  listed. Likewise, no return date was communicated to Accellion. Undeterred and ever committed

13  to its customers, Accellion continued to follow up, and finally got through to the Boston law

14  firm, resulting in its installation of the initial patch on December 22, 2020.

15       43.    Notwithstanding Accellion's diligent and faithful measures to assist, on

16  information and belief based on the allegations of the Complaint, the FTA software at the Boston

17  law firm was breached by criminal hackers who exfiltrated data. Thereafter, on information and

18  belief based on the allegations of the Complaint, the Boston law firm incurred costs to shore up

19  its cyber security systems, was the victim of a ransom request, and paid, directly or through Ace

20  American, a ransom amount. At no time prior to making these alleged payments was Accellion

21  consulted about whether such ransom should be paid. Instead, on information and belief, to

22  resolve the breach, the Boston law firm contacted its cyber insurer, Ace American, which claims

23  to have incurred fees and costs on behalf of the Boston law firm, and now claims to stand in the

24  Boston law firm's shoes via "an assignment" of claims. *See* Complaint, ¶ 34.

25       44.    The Boston law firm is therefore in breach of the EULA because it: (i) failed to

26  timely deploy critical updates (*see* Ex 1, Section 5, Maintenance Support Services); and (ii)

27  assigned the EULA to Ace American without Accellion's prior written approval (*id*. at Section

28  13.8, No Assignment).

45.     As a direct result of the Boston law firm's breaches of the EULA, Accellion has been damaged, including, but not limited to, by incurring, and continuing to incur, fees and costs, including attorneys' fees and costs, for which it is entitled to repayment in full. *Id.* at §§ 5, 9.1.

46.     In the alternative, given that the Boston law firm paid license fees of $42,181.82 for the relevant license term—April 1, 2020-March 31, 2021—it is liable to Accellion for reimbursement of every cent over $42,181.82 that Accellion incurs in connection with the Boston law firm's license of the FTA software, including all legal fees and costs. *Id.* at § 10.

47.     Ace American, which purports to sit in the Boston law firm's shoes via an illegal assignment, is equally liable for breach of the EULA because it claims to act under the EULA. Ace American may not "have its cake and eat it too."

48.     This Counterclaim follows.

### FIRST COUNTERCLAIM FOR RELIEF

### (Declaratory Relief—No Assignment)

49.     Accellion restates and incorporates by reference each of the allegations of paragraphs 1 through 48 of the Counterclaim as though fully set forth herein.

50.     Ace American claims to stand in the Boston law firm's shoes via "an assignment" of claims. *See* Complaint, ¶ 34.

51.     Accellion contends this "assignment" is expressly proscribed by the EULA, which provides as follows: "Neither this Agreement nor any rights or obligations of Customer hereunder may be assigned by Customer in whole or in part without the prior written approval of Accellion. Any assignment in violation of the foregoing shall be null and void." *See* Ex. 1, § 13.8.

52.     Accellion never approved, in writing or otherwise, the assignment of the EULA from the Boston law firm to Ace American.

53.     Based on the foregoing, a substantial, immediate, and real controversy between the parties exists, warranting a declaration by this Court that the Boston law firm's assignment of the EULA to Ace American is null and void.

WHEREFORE, Accellion prays for relief as set forth below.

### SECOND COUNTERCLAIM FOR RELIEF

### (Declaratory Relief—Limitation of Potential Liability)

54.     Accellion restates and incorporates by reference each of the allegations of paragraphs 1 through 53 of the Counterclaim as though fully set forth herein.

55.     Accellion's Second Counterclaim is brought in the alternative to the First Counterclaim for Relief.

56.     To the extent this Court allows Ace American to proceed against Accellion in any capacity given the non-assignment clause in the EULA, because Ace American purports to stand in the shoes of the Boston law firm, immediate, real, and justiciable controversies exist warranting declaratory relief that Accellion's potential liability is limited to $42,181.82, the amount of the Boston law firm's license fee for the license term in question. *See* Ex. 1, § 10.

WHEREFORE, Accellion prays for relief as set forth below.

### THIRD COUNTERCLAIM FOR RELIEF

### (Breach of Contract—EULA § 5)

57.     Accellion restates and incorporates by reference each of the allegations of paragraphs 1 through 56 of the Counterclaim as though fully set forth herein.

58.     Accellion's Third Counterclaim is brought in the alternative to the First Counterclaim for Relief.

59.     To the extent this Court allows Ace American to proceed against Accellion in any capacity given the non-assignment clause in the EULA, Ace American, as a self-proclaimed proxy for the Boston law firm, is liable to Accellion for the Boston law firm's breach of Section 5 of the EULA.

60.     Specifically, on or around March 20, 2012, the Boston law firm licensed the FTA software from Accellion subject to Accellion's EULA. Under the EULA, the Boston law firm was "solely responsible and liable for the use of and access to" the FTA software "and for all files and data transmitted, shared, or stored using" FTA, and further responsible for deploying critical updates in five days or less. *See* Ex. 1, ¶¶ 4.3, 5.

61.   Under the EULA, Accellion did all, or substantially all, of the significant things the contract required it to do.

62.   The Boston law firm breached the EULA by, among other things, failing to timely install security updates, including critical security updates, in the wake of the Attacks.

63.   The Boston law firm's breach of the EULA actually and proximately caused harm to Accellion, for which Ace American should pay.

WHEREFORE, Accellion prays for relief as set forth below.

## FOURTH COUNTERCLAIM FOR RELIEF

### (Breach of Contract—EULA § 13.8)

64.   Accellion restates and incorporates by reference each of the allegations of paragraphs 1 through 63 of the Counterclaim as though fully set forth herein.

65.   Accellion's Fourth Counterclaim is brought in the alternative to the First Counterclaim for Relief.

66.   To the extent this Court allows Ace American to proceed against Accellion in any capacity given the non-assignment clause in the EULA, Ace American, as a self-proclaimed proxy for the Boston law firm, is liable to Accellion for the Boston law firm's breach of Section 13.8 of the EULA.

67.   Specifically, on or around March 20, 2012, the Boston law firm licensed the FTA software from Accellion subject to Accellion's EULA. Under the EULA, the Boston law firm was barred from assigning the EULA as follows: "Neither this Agreement nor any rights or obligations of Customer hereunder may be assigned by Customer in whole or in part without the prior written approval of Accellion. Any assignment in violation of the foregoing shall be null and void." *See* Ex. 1, § 13.8.

68.   Under the EULA, Accellion did all, or substantially all, of the significant things the contract required it to do.

69.   The Boston law firm breached the EULA by, among other things, assigning the EULA to Ace American without Accellion's permission, written or otherwise.

70.     The Boston law firm's breach of the EULA actually and proximately caused harm to Accellion, for which Ace American should pay.

WHEREFORE, Accellion prays for relief as set forth below.

### FIFTH COUNTERCLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Faith Dealing)

71.     Accellion restates and incorporates by reference each of the allegations of paragraphs 1 through 70 of the Counterclaim as though fully set forth herein.

72.     Accellion's Fifth Counterclaim is brought in the alternative to the First Counterclaim for Relief.

73.     The EULA was subject to an implied covenant of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties—both explicit and fairly implied—and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contract. These included the covenant that the Boston law firm would act fairly and in good faith in carrying out its contractual obligations to provide Accellion with a limitation on liability arising out of the use by the Boston law firm of the FTA software.

74.     Accellion's claim for breach of the implied covenant of good faith and fair dealing is not based on the breach of an explicit term in the EULA. The covenant is implied by law in every contract, and exists to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made, while not technically transgressing the express covenants. The gravamen of this claim for breach of the implied covenant of good faith and fair dealing is the alleged efforts of the Boston law firm and Ace American to undermine or prevent Accellion from receiving the benefits of the EULA, both by paying, directly by Ace American or through the Boston law firm, a ransom amount, while at no time prior to making these alleged payments consulting Accellion, as well as also incurring fees and costs on behalf of the unidentified Boston law firm in the amount of $2,400,000.00, which Ace American then seeks to recover from Accellion.

75.    Under the EULA, Accellion did all, or substantially all, of the significant things the contract required it to do, explicitly and impliedly.

76.    The Boston law firm and Ace American breached the covenant of good faith and fair dealing implied in the EULA by, among other things, undermining or preventing Accellion from receiving the benefits of the EULA, both by paying, directly by Ace American or through the Boston law firm, a ransom amount, while at no time prior to making these alleged payments consulting Accellion, as well as also incurring fees and costs on behalf of the unidentified Boston law firm in the amount of $2,400,000.00, which Ace American then seeks to recover from Accellion. The failure by the Boston law firm and Ace American to act in good faith denied Accellion the full benefit of its bargain under the EULA, explicitly and implicitly.

77.    The breach of the implied covenant of good faith and fair dealing by the Boston law firm and Ace American actually and proximately caused harm to Accellion, for which Ace American should pay.

78.    Accordingly, Accellion has been injured as a result of Ace American's breach of the covenant of good faith and fair dealing and is entitled to damages for that breach in an amount to be proven at trial, as well as a judgment for itself that Ace American has breached the covenant of good faith and fair dealing implied in the EULA.

WHEREFORE, Accellion prays for relief as set forth below.

### SIXTH COUNTERCLAIM FOR RELIEF

#### (Intentional Interference with Contract)

79.    Accellion restates and incorporates by reference each of the allegations of paragraphs 1 through 78 of the Counterclaim as though fully set forth herein.

80.    Accellion's Sixth Counterclaim is brought in the alternative to the First Counterclaim for Relief.

81.    A contract existed between Accellion and the Boston law firm in the form of the EULA.

82.    Ace American knew of this contract.

83.     Ace American's conduct as described herein, including its improper efforts as a result of the Attacks, induced breach of the EULA and/or prevented performance of the EULA and/or made its performance more difficult.

84.     Ace American intended to disrupt performance of the EULA by the Boston law firm because it wanted to obtain an assignment of the rights held by the Boston law firm for itself in order to pursue Accellion.

85.     Ace American's actions were a substantial factor in causing Accellion's harm.

86.     In doing the acts herein alleged, Ace American acted with oppression, fraud, or malice, and Accellion is entitled to punitive damages according to proof.

WHEREFORE, Accellion prays for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Accellion respectfully requests entry of judgment as follows:

A.     The Court dismiss with prejudice any and all claims of Ace American's Complaint and order that Ace American take nothing as a result of the Complaint and that all of Ace American's prayers for relief are denied;

B.     The Court find and declare, and enter a declaratory judgment in favor of Accellion and against Ace American that the Boston law firm's assignment of the EULA to Ace American is null and void and that the Complaint is therefore dismissed with prejudice;

C.     In the alternative, the Court find and declare, and enter a declaratory judgment in favor of Accellion and against Ace American that Accellion's potential liability is limited to $42,181.82, the amount of the Boston law firm's license fee for the license term in question;

D.     For compensatory damages, including, but not limited to, contractual damages according to proof at trial;

E.     For punitive damages according to proof;

F.     For an award to Accellion of costs of suit incurred herein; and

G.     For such other and further relief as the Court deems just and proper.

1

Dated: April 14, 2022                              **GREGORY LAW GROUP**

2

3                                                  By:   */s/ Philip L. Gregory*
                                                         **PHILIP L. GREGORY**
4

5                                                        *Attorney for Defendant and*
                                                         *Counterclaimant Accellion, Inc.*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1



# Legal

## ACCELLION SOLUTIONS LICENSE AGREEMENT 19.1

**ACCELLION SOLUTIONS LICENSE AGREEMENT**

THIS ACCELLION SOLUTIONS LICENSE AGREEMENT (THE "AGREEMENT") APPLIES TO THE USE OF ANY SOFTWARE PROVIDED DIRECTLY OR INDIRECTLY BY ACCELLION.  BY EITHER FOLLOWING THE ONLINE ACCEPTANCE PROCESS PROVIDED BY ACCELLION OR INSTALLING, ACCESSING, OR USING ALL OR ANY PORTION OF THE SOFTWARE, YOU AGREE TO BE LEGALLY BOUND BY THIS AGREEMENT.  A CONTRACT IS THEN FORMED BETWEEN ACCELLION AND EITHER YOU PERSONALLY, IF YOU ARE USING THE SOFTWARE FOR YOURSELF, OR THE COMPANY OR OTHER LEGAL ENTITY, WHICH YOU REPRESENT ("CUSTOMER").  IF CUSTOMER IS LOCATED IN CANADA OR THE UNITED STATES, "ACCELLION" MEANS ACCELLION USA, LLC, A DELAWARE CORPORATION WITH A PLACE OF BUSINESS AT 1804 EMBARCADERO PLACE, SUITE 200, PALO ALTO, CA  94303; OTHERWISE, "ACCELLION" MEANS ACCELLION PTE LTD, AN ENTITY ORGANIZED UNDER THE LAWS OF SINGAPORE WITH A PRINCIPAL PLACE OF BUSINESS AT BLK 750C CHAI CHEE RD #04-09 to 12, VIVA BUSINESS PARK, SINGAPORE 469003.

**1.    Accellion Software; Ordering.**

1.1    Accellion Software. Accellion licenses its software products on a subscription basis. Software is made available as a software-only (or "virtual") solution, as a hosted solution, or on a physical appliance. Customer's rights to use Accellion software apply only to the Accellion software licensed under an Order (defined below).

1.2    Order Process. Orders for Accellion software and services may be made online, through written Orders placed directly with Accellion, or through an Accellion authorized reseller ("**Channel Partner**").  An order becomes part of this Agreement upon acceptance by Accellion or a Channel Partner (the accepted order referred to as the "**Order**"), provided that for Orders placed through Channel Partners, only the line items for Accellion's published products and services listed in the Order and which are provided to and paid for by Customer constitute the "Order." The terms of Customer's form of purchase order or similar documents shall not apply to the relationship of Parties. In the event of any conflict between the terms of any Order and the terms of this Agreement, the terms of this Agreement shall govern.

1.3    Delivery.  For downloadable versions of the Accellion software, Customer may download the software from a link provided by Accellion.  For hosted versions of the Accellion Solution, access shall be provided through a password-protected web interface.  Delivery occurs when such link or access is made available to Customer.

**2.    Applicable Terms.**

2.1    Web Orders.  If Customer purchases a license online (a "**Web Order**"), then terms of this Agreement include the Web Order

Terms set forth in Section 13. In the event of any conflict between Section 13 and other Sections of this Agreement, Section 13 shall apply.

2.2    Trial Versions.  If Customer has ordered or downloaded a trial version of Accellion software, then the provisions of Sections 4.2, 5, 6.3, 8.1, 8.3, 9.2, 9.3, 9.4 and 12.2 shall not apply during the trial but shall be effective upon the date Customer upgrades to a paid subscription for such Accellion software.

2.3    Accounts for Web Orders.  This Section 2.3 applies to Orders placed online with Accellion.  Customer represents that the account information provided upon registration ("**Account Info**") is accurate, current and complete and that it will maintain Account Info current at all times.   Customer is solely liable for use of and access to the account and Accellion shall not have any liability to Customer for unauthorized access or use of the account.  Account Info is protected by Accellion's Privacy Policy, as modified from time to time, located at http://www.accellion.com/privacy-policy, the most current terms of which are incorporated herein by reference. If Customer sets up an account using an email address with an email domain of an Accellion Solutions licensee (e.g. where Customer's employer is already an Accellion Solutions licensee), then Customer consents to Accellion's disclosure of Customer's usage information to such party.

2.4    Inapplicability of Purchase Orders.  The terms and conditions of this Agreement shall govern the relationship of the Parties regarding Accellion software and services utilized by Customer and Customer's form of purchase order and similar documents shall have no force or effect.

3.    Definitions.  Unless otherwise specified, capitalized terms used in this Agreement will have the meanings attributed to them in this Section 3.

"**Accellion Solution**" means the object code versions of the Accellion software identified on an Order and includes related Server Software, Client Software, Updates, and Documentation, but does not include Open Source Software, which is provided pursuant to Section 4.5.

"**Affiliate**" means an entity which directly or indirectly controls, is controlled by or is under common control with a party to this Agreement.

"**Client Software**" means the object code versions of the desktop client software for the licensed Accellion Solution.

"**Designated User**" means the number of users for whom Customer has purchased rights to use the Accellion Solution, as set forth on the applicable Order, plus any additional True-Up Users added pursuant to Section 6.3 below.  Designated Users may consist of: (i) employees and independent contractors of Customer and its Affiliates, and (ii) individual representatives of vendors and/or service providers of Customer and its Affiliates.

"**Documentation**" means Accellion's standard written materials and specifications for the Accellion Solution licensed by Customer, as updated or revised by Accellion from time to time.

"**Effective Date**" means (i) for Orders submitted to Accellion, the date that Accellion accepts the Order; or (ii) for orders submitted to a Channel Partner on a form other than an Accellion Order form, the date Accellion makes the software available to Customer for download or, for software provided on a physical appliance, the date of shipment.

"**Hosted Services**" means the remote access and use of a hosted version of the Accellion Solution as hosted by Accellion, excluding Web Orders.

"*License Term*" means the subscription period for use of the Accellion Solution, as identified on the applicable Order. Each renewal is a separate License Term. For trial versions, the License Term period shall be for the period of forty-five (45) days unless otherwise indicated by Accellion.

"*Maintenance Support Services*" means the support services provided by Accellion to Customer in accordance with the applicable Maintenance Support Policy as described in Section 5.

"*Release*" means a version of the Accellion Solution for which Accellion charges a separate fee.

"*Server Software*" means the object code server software versions of the Accellion Solution, as identified on the applicable Order.

"*Update*" means additions, upgrades, or modifications to the Accellion Solution. Updates do not include Releases.

## 4.    License Terms.

4.1    <u>License Grant</u>. Subject to the terms and conditions of this Agreement, Accellion hereby grants to Customer during the License Term, a non-exclusive, non-transferable and non-sublicensable license to: (a) install and use the Client Software on supported environments for up to the number of Designated Users; and (b) use, access, and for Accellion Solutions not hosted by Accellion, copy the Server Software on supported environments for up to the number of copies identified on the Order for Customer's internal business purposes.

4.2    <u>Hosting</u>.

(a)    <u>By Accellion</u>. If Hosted Services are ordered by Customer, they are provided pursuant to the terms of Accellion's Hosting SLA located at http://www.accellion.com/terms/hostingsla, which is incorporated herein by reference.

(b)    <u>By Customer's Outsourced Provider</u>. For virtual versions of the Accellion Solution, if Customer elects to engage its own outsourcing provider (each a "*Outsourced Provider*"), then: (i) Customer may sublicense to Outsourced Provider the right to install and operate the Accellion Solution in the form as provided by Accellion, solely for the benefit of Customer and subject to the terms and conditions of this Agreement; (ii) Customer shall be liable for any acts or omissions of Outsourced Provider in violation of this Agreement; and (iii) Customer shall identify in writing to Accellion a single point of contact at Outsourced Provider for any maintenance and technical support matters. In order to provide warranty and Maintenance Support Services, Accellion requires remote access to the Accellion Solution and may require on-site access. Failure to provide Accellion with such reasonable access shall relieve Accellion of its warranty and Maintenance Support Services obligations with respect to such Accellion Solution.

4.3    <u>License Restrictions</u>. Customer shall not copy the Accellion Solution except to make a reasonable number of copies for the purposes of security back-up, relocation or disaster recovery; provided, however, that Customer may make and use the number of copies of Client Software that it deems appropriate unless the number of copies of Client Software is restricted as set forth on the applicable Order. The Accellion Solution may not be modified, disclosed, reverse-engineered, disassembled, or decompiled except and to the extent allowed by applicable law. Customer shall not transfer, sell, license, sublicense, outsource, rent or lease the Accellion Solution or use it for service bureau or other third-party use. All rights not expressly granted hereunder are reserved. Customer is solely responsible and liable for the use of and access to the Accellion Solution by Designated Users and for all files and data transmitted, shared, or stored using the Accellion Solution. Customer acknowledges and agrees that the licenses granted herein are neither contingent upon the delivery of any future functionality or features nor dependent upon any

oral or written public comments made by Accellion with respect to future functionality or features.

4.4 <u>Ownership</u>. All right, title, and interest, including without limitation all intellectual property rights, in and to the Accellion Solution, including any and all modifications, enhancements, derivative works, Updates and Releases, are the sole and exclusive property of Accellion and its licensors. Customer shall not remove, and shall reproduce on any permitted copies, all proprietary, copyright, trademark and trade secret notices contained in or placed upon the Accellion Solution. Customer will take reasonable precautions (including the precautions used for Customer's own confidential information) to prevent the unauthorized use or disclosure of the Accellion Solution, the Documentation, or the results of any performance or benchmark tests of the Accellion Solution. Customer will not allow the Software or any performance or benchmark test results to be made available to any third party unless Accellion approves that disclosure.

4.5 <u>Open Source Software</u>. Customer agrees that any software or materials which may be made available by Accellion, or otherwise obtained or used by Customer, subject to an open source license or other open source terms ("***Open Source Software***") shall be and shall remain subject to the terms and conditions of the original providers and are not part of the Accellion Solution. Open Source Software terms are made available either with the Accellion Solution or through the administration interface of the applicable Accellion Solution.

**5.** **Maintenance Support Services.** Except for Web Orders, Accellion provides Maintenance Support Services for the License Term at no additional charge under the terms set forth at http://www.accellion.com/supportguidelines/enterprise.html, which is incorporated herein by reference. As part of  Maintenance Support Services, Accellion will make available to Customer all Updates to the supported Accellion Solution that Accellion makes generally available to its other customers. Customer shall provide Accellion access to the Accellion Solution to install such Updates if required by Accellion. Customer agrees to deploy any critical Updates, as identified by Accellion, within five (5) days following receipt. Accellion will not be liable to Customer for damages, liabilities, fines, costs, and/or expenses, including costs of litigation and reasonable attorneys' fees, which Customer may incur, based upon or arising out of Customer's failure to implement any critical Updates.

**6.** **Payment; True-Up Users.**

6.1 <u>Payment</u>. Customer shall pay the fees specified in the Order. Orders are firm commitments of Customer and are not cancelable by Customer.  For orders made directly with Accellion, (i) Customer shall pay invoices in U.S. dollars within thirty (30) days of the invoice date and without offset or deduction, and (ii) all payment terms are subject to approval of Customer's creditworthiness, which approval may be withdrawn at any time; and (iii) payments are non-refundable except as otherwise explicitly stated in this Agreement and Accellion may apply a late charge on overdue invoices at a rate of one and one-half (1.5%) per month or the maximum allowed by law, whichever is less. FOR WEB ORDERS AND FOR UPGRADES FROM TRIAL VERSIONS TO PAID VERSIONS, CUSTOMER CONSENTS TO ALLOW ACCELLION TO CHARGE THE CUSTOMER'S CREDIT CARD, EITHER DIRECTLY OR THROUGH ITS PAYMENT PROCESSORS, FOR THE AMOUNTS DUE FOR THE INITIAL LICENSE TERM AND ANY RENEWALS, PLUS APPLICABLE TAXES.

6.2 <u>Taxes</u>. All fees are exclusive of value-added tax, sales tax, customs duties, or similar taxes or imposts, including withholding taxes, and shall be made by Customer without deduction therefore.  Customer shall pay all such taxes or duties, except taxes based on Accellion's net income, and reimburse Accellion or its Channel Partner if either is required to pay any taxes or duties.

6.3 <u>True-Up Users</u>. If Customer orders the True-Up Program, then Customer is permitted to add additional Licensed Users above their paid user count throughout the License Term ("***True-Up Users***"). Customer must report usage to Accellion in order to take advantage of the True-Up Program. Accellion may look at usage at any time to determine True-Up Users. True-Up Users

added during the License Term will be charged based on the peak overage throughout the License Term and those True-Up Users shall be included as Licensed Users for any subsequent renewals. The True-Up Program shall automatically renew each License Term unless Customer notifies Accellion in writing thirty (30) days prior to the renewal term. When the License Term expires, should Customer decide not to renew or to reduce their previous paid user count Order by fifty percent (50%), then Accellion shall be entitled to invoice Customer for such True-Up Users at a prorated amount of the annual rate stated in the applicable Order (i.e. for such calendar quarter and the remaining License Term).

6.4   <u>Automated Reporting</u>.  The Server Software periodically transmits technical data to Accellion. That data does not include the content of any emails or attachments, file names or any personally identifiable information.  The transmitted information contains aggregate non-personal usage information for each day the Accellion Solution is in use, including but not limited to: (i) the number of and type of messaging senders and recipients, (ii) account usage information, and (iii) the type of Accellion Solution features used and related data.  Customer will not in any way attempt to configure the Accellion Solution or create systems that prevent the transmission or delivery of such usage data. Accellion uses such data only for Accellion's own internal business purposes and such data shall be considered Accellion's Confidential Information.  Accellion only discloses such data (a) in an aggregated form with data from other customers in which neither Customer's identity nor that of Designated Users are revealed, or (b) as required by applicable law.

## 7.   **Confidentiality**.

7.1   <u>Confidential Information</u>.  Each party agrees not to use the Confidential Information of the other party for any purpose other than strictly for the purpose of performing its obligations or exercising its rights under this Agreement. Additionally, except as authorized below, each party agrees to maintain in confidence and not disclose any Confidential Information acquired directly or indirectly from the other party. "***Confidential Information***" shall include, but is not limited to, matters of a technical, financial, commercial, business, or other proprietary nature.  The results of any performance, penetration and/or benchmark tests of the Accellion Solution shall be the Confidential Information of Accellion.  Confidential Information does not include any information which (a) is or becomes publicly known other than through a breach of this Agreement by the receiving party; or (b) is already known to the receiving party at the time of disclosure as evidenced by the Receiving party's written documentation, provided that it was not previously obtained directly or indirectly by the receiving party from the disclosing party; (c) is lawfully received by the receiving party from a third party having no obligation of confidentiality with respect thereto; or (d) is proven by receiving party to have been independently developed by employees of the  receiving party who have not had direct or indirect access to, or directly or indirectly received any, Confidential Information under this Agreement; or (e) is authorized in writing by the disclosing party to be released from the confidentiality obligations herein.  Accellion may share Customer Confidential Information with its parent and subsidiary companies ("***Affiliates***"), but shall remain liable for any act or omission of such Affiliates in violation of this Agreement.  Each party agrees that in the event of such party's actual or threatened violation of the provisions of this section, the other party will not have an adequate monetary remedy and shall be entitled to seek appropriated immediate injunctive relief without any requirement to post bond, in addition to any other available remedies.

7.2   <u>Customer Protected Data</u>.  Customer acknowledges that Accellion does not need or require access to any files or attachments stored or transmitted with the Accellion Solution or any personally identifiable information about any Customer personnel, other than as described in Section 6.3, or customers (collectively, "***Protected Data***").  If Customer desires Accellion to receive and access any Protected Data, Customer shall first obtain the written approval of an executive officer of Accellion, which may be withheld by Accellion in its sole discretion. Customer will be responsible for the Protected Data and for complying with any regulations, laws, or conventions applicable to the Protected Data. If Customer is a "covered entity" or a "business associate" and maintains "protected health information" (as those terms are  defined in 45 CFR § 160.103) as part of Protected Data, Customer agrees to Accellion's Business Associate Agreement ("***BAA***") available on the Internet at
https://www.accellion.com/legal/accellion-business-associate-agreement which is incorporated herein by reference.  If

Customer is subject to the General Data Protection Regulation (EU) 2016/679 ("**GDPR**"), Customer agrees to Accellion's Data Processor Addendum available on the Internet at https://www.accellion.com/legal/accellion-dpa which is incorporated herein by reference.

7.3     Notice and Consent Regarding Transfer of Data.  Use of the Accellion Solution requires that when a Customer's End Users contact Accellion for customer service issues, the personal data of Customer's End Users (including but not limited to End User's email addresses, first and last names, geographic location, and phone number) be processed in the United States of America by Accellion USA, LLC, in Europe by Accellion UK Ltd and Accellion GmbH, and in Singapore by Accellion PTE Ltd, where customer support teams and computing systems and infrastructure necessary for Customer's exercise of its rights hereunder are located. Support would not be available without such processing of personal data in the United States of America, Europe, and Singapore, and, pursuant to Article 49 of the GDPR, Customer hereby expressly consents to the processing by, and transfer of personal data to, Accellion USA, LLC in the United States of America, Accellion UK Ltd and Accellion GmbH in Europe, and Accellion PTE Ltd in Singapore for that purpose. Accellion UK Ltd, Accellion GmbH, and Accellion PTE Ltd are subsidiaries of Accellion USA, LLC and each entity processes such personal data in compliance with the contractual requirements established with Customer.

## 8.     Limited Warranties and Disclaimer.

8.1     Limited Accellion Solution Performance Warranty.

(a)     Warranty. Accellion warrants to Customer that for a period of thirty (30) days after the date of delivery: (i) the media on which the Accellion Solution is furnished under normal use will be free from material defects in materials and workmanship; and (ii) the Accellion Solution and Open Source Software will operate in substantial conformance with the Documentation.

(b)      Remedy. Any warranty claim must be made by written notice to Accellion within the applicable warranty period. Accellion's entire liability and Customer's exclusive remedy under the warranty in subsection (a) above shall be replacement or repair of the defective media or Accellion Solution that does not meet Accellion's limited warranty and if Accellion is unable to repair or replace defective components of the Accellion Solution within a reasonable period of time (not to exceed thirty (30) days from Accellion's receipt of Customer's notice), this Agreement shall terminate, in which case: (i) Accellion shall refund all license fees received by Accellion for the Accellion Solution for the applicable License Term, and (ii) Customer shall uninstall and destroy the nonconforming Accellion Solution and certify in writing that it has done the same. Accellion is not liable under any warranty or otherwise for defects or liability caused by the use of the Accellion Solution in any manner or for any purpose other than that for which it was licensed to Customer, or for causes not within Accellion's reasonable control. Warranties are void if failures are caused in whole or in part by accident, abuse, misuse, or modifications not authorized in writing by Accellion.

8.2     Virus Protection.  Accellion warrants to Customer that, to the best of Accellion's knowledge as of the date of delivery, the Accellion Solution will be free from any viruses, spyware, trojans, or disabling or malicious code, provided that Server Software includes disabling mechanisms that prevent access to the Server Software following expiration of the License Term.

8.3     Limited Services Warranty.  Accellion warrants that for a period of thirty (30) days following installation or professional services, such services will be provided in a professional and workmanlike manner consistent with generally accepted industry standards.  As Customer's sole and exclusive remedy and Accellion's sole and exclusive liability for breach of the foregoing warranty, Accellion will, at its sole option and expense, and provided that Accellion is notified of any such breach during the warranty period, re-perform the services, or if Accellion is unable to perform the services as warranted, refund the fees paid to Accellion for the services.

8.4   <u>Disclaimer</u>.  THE EXPRESS LIMITED WARRANTIES IN THIS SECTION ARE IN LIEU OF ALL OTHER WARRANTIES AND CONDITIONS EXPRESS OR IMPLIED, CONTRACTUAL OR STATUTORY, INCLUDING BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON- INFRINGEMENT.  ACCELLION DOES NOT WARRANT THAT THE USE OF THE ACCELLION SOLUTION WILL BE UNINTERRUPTED OR ERROR FREE OR THAT ALL NONMATERIAL DEFICIENCIES OR ERRORS ARE CAPABLE OF BEING CORRECTED. ACCELLION MAKES NO REPRESENTATIONS OR WARRANTIES CONCERNING THE PRODUCTS OR SERVICES PROVIDED BY ITS CHANNEL PARTNERS OR ANY HOSTED SERVICES PROVIDERS, AND SHALL HAVE NO LIABILITY WITH RESPECT TO ANY ACT OR OMISSION OF ANY CHANNEL PARTNER OR HOSTED SERVICES PROVIDERS.  NO CHANNEL PARTNER OR HOSTED SERVICES PROVIDER SHALL HAVE ANY AUTHORITY TO BIND ACCELLION TO ANY TERMS OR CONDITIONS OTHER THEN THOSE EXPRESSLY SET FORTH HEREIN.

**9.**   <u>**Indemnification.**</u>

9.1   <u>Customer Indemnity</u>.  Customer will, at its expense, indemnify and hold Accellion, its Affiliates and their respective officers, directors, employees, agents, successors and assigns ("***Accellion Indemnitees***") harmless against any settlement agreed to by Customer, or any award of damages, liabilities, fines, costs, and/or expenses, including costs of litigation and reasonable attorneys' fees, which Accellion Indemnitees may incur, based upon or arising out of (i) any use of the Accellion Solution by Customer in breach of this Agreement, and (ii) the data, files, and content transmitted, shared, or stored using the Accellion Solution.

9.2   <u>Accellion Indemnity</u>. Accellion will defend any action brought against Customer to the extent that it is based upon a third party claim that the Accellion Solution infringes such third-party's U.S. patent or foreign equivalent existing as of the Effective Date of the applicable Order or any copyright, or misappropriates any trade secret (each a "***Claim***"), and will pay any costs (including reasonable attorney's fees) and damages finally awarded or paid in settlement of the Claim provided that Customer will give Accellion: (i) prompt written notice of such Claim, (ii) all cooperation and assistance reasonably requested by Accellion in the defense of the Claim, at Accellion's expense, and (iii) sole control over the defense and settlement of the Claim, provided that (a) Customer may participate in the defense of the Claim at its sole expense, and (b) Accellion may not, without the prior written consent of Customer, enter into a settlement which admits liability of Customer or imposes a monetary obligation on Customer.

9.3   <u>Exclusions</u>. Accellion will have no liability for a Claim to the extent it results from: (a) modification of the Accellion Solution made by a party other than Accellion, if the Claim would not have arisen but for the modification; (b) the combination, operation or use of the Accellion Solution with third party data, software, equipment or devices, if such Claim would not have arisen but for such combination, operation or use; (c) Customer's failure to use updated or modified software provided by Accellion if use of such updated or modified software or hardware would have resolved the Claim; or (d) compliance by Accellion with designs, plans or specifications furnished by Customer or on Customer's behalf, if the Claim would not have arisen but for such designs, plans or specifications.

9.4   <u>Remedies</u>. If the Accellion Solution is held or is likely to be held as infringing, then Accellion may (i) replace the Accellion Solution, without additional charge, with a non-infringing product that is at least functionally equivalent; (ii) modify the Accellion Solution to avoid the infringement; (iii) obtain a license for Customer to continue use of the Accellion Solution: or (iv) if none of the foregoing are commercially reasonable, terminate the license for the infringing Accellion Solution and refund a pro rata portion of all fees received by Accellion for the Accellion Solution as measured over the License Term.  Upon such termination Customer shall uninstall and destroy the nonconforming Accellion Solution and certify in writing that it has done the same. ACCELLION'S AGGREGATE INDEMNIFICATION LIABILITY FOR CLAIMS OF INFRINGEMENT OR MISAPPROPRIATION SHALL NOT EXCEED THE FEES PAID BY CUSTOMER FOR THE APPLICABLE ACCELLION SOLUTION. THIS SECTION 9 SHALL CONSTITUTE ACCELLION'S SOLE AND EXCLUSIVE LIABILITY AND CUSTOMER'S SOLE AND EXCLUSIVE REMEDY FOR A CLAIM OF INFRINGEMENT

OR MISAPPROPRIATION OF INTELLECTUAL PROPERTY RIGHTS OF ANY KIND.

10.    **Limitation of Liability.**  EXCEPT FOR THE INDEMNIFICATION OBLIGATIONS HEREIN, FOR A BREACH OF SECTION 7 (CONFIDENTIALITY), OR FOR CUSTOMER'S INTENTIONAL BREACH OF THE LICENSES GRANTED IN THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY, AND ACCELLION'S LICENSORS, AFFILIATES AND SUPPLIERS, BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOSS OF PROFITS, REVENUE, DATA OR USE ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE USE OR PERFORMANCE OF THE PRODUCTS OR SERVICES SUPPLIED HEREUNDER, WHETHER IN AN ACTION IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGES. WITHOUT LIMITING THE FOREGOING IN THIS SECTION, EXCEPT FOR A BREACH OF SECTION 7 OF THIS AGREEMENT (CONFIDENTIALITY), ACCELLION'S AGGREGATE LIABILITY FOR DAMAGES SHALL IN NO EVENT EXCEED THE TOTAL FEES RECEIVED FROM THE LICENSES GRANTED TO CUSTOMER UNDER THIS AGREEMENT IN THE PREVIOUS TWELVE MONTHS FOR THE APPLICABLE ACCELLION SOLUTION.  THE PARTIES EXPRESSLY ACKNOWLEDGE AND AGREE THAT THE PRICES AND TERMS OF THIS AGREEMENT WERE MADE IN RELIANCE UPON THE LIMITATION OF LIABILITY SPECIFIED HEREIN, WHICH ALLOCATE THE RISK BETWEEN ACCELLION AND CUSTOMER.

11.    **Term and Termination.**

11.1    Term. This Agreement commences on the Effective Date and shall continue for the License Term on the applicable Order, unless terminated earlier as provided in this Agreement.  Except for a trial version which shall terminate at the end of the applicable trial period, or unless otherwise expressly set forth on the Order, the License Term shall be automatically extended for a period of the same duration unless one party provides written notice of its intent not to renew at least thirty (30) days prior to the end of the then-current License Term.

11.2    Termination. Either party may terminate this Agreement or any license granted under this Agreement if: (i) the other party breaches any material provision of this Agreement for any reason, which breach has not been cured within thirty (30) days of written notice; or (ii) the other party becomes subject of a voluntary or involuntary petition in bankruptcy, or any proceeding relating to insolvency, receivership, liquidation or assignment for the benefit of creditors, which is not dismissed within sixty (60) days after commencement.

11.3    Consequences of Termination. Upon termination or expiration of this Agreement, for any reason, all rights granted under this Agreement shall terminate, and Customer will promptly return to Accellion or, at Accellion's request, destroy, the applicable Accellion Solution and provide Accellion with written certification by an officer of Customer certifying compliance with the foregoing. Customer's obligations to pay taxes and any amounts past due along with the following provisions shall survive any expiration or termination of this Agreement: Sections 4.3, 4.4, 4.5, 7, 8, 9, 10, 11.3 and 12.

12.    **Miscellaneous.**

12.1    Notice. Notices under this Agreement shall in writing and delivered via electronic mail, facsimile (with confirmation of receipt), in person, by overnight courier, or by prepaid certified or registered mail, return receipt requested, to a party at its addresses set forth on the Order, as amended by notice pursuant to this Section.  Notice by mail shall be deemed received five (5) days after deposit in the U.S. mails, with other notice deemed effective upon receipt.

12.2    Assignment.  Neither party may assign this Agreement without the prior written consent of the other party, provided that either party may transfer or assign this Agreement without such consent, whether by operation of law or otherwise, pursuant to a merger or other corporate reorganization or the sale of all or substantially all of the assets to which this Agreement relates. Accellion may delegate its obligations to Accellion Affiliates provided that Accellion shall remain liable for proper performance of

this Agreement. Any other purported assignment by Customer shall be null and void. This Agreement shall bind the Parties and their permitted successors and assigns.

12.3   <u>Modification, Waiver, and Remedies</u>.   No modification, alteration, amendment or addition shall be effective unless made in writing, dated and signed by a duly authorized representative of each party. No waiver of any breach hereof shall be held to be a waiver of any other or subsequent breach. Each party's rights and remedies are in addition to any other rights and remedies provided by law or in equity. No choice of any remedy shall constitute an election of remedies.

12.4   <u>Publicity.</u> Customer hereby consents to Accellion's inclusion of Customer's name in a customer listing, provided that Customer is not the sole Customer listed.

12.5   <u>Force Majeure</u>. Neither party shall be liable to the other for delays or failures in performance resulting from causes beyond the reasonable control of that party, including, but not limited to, acts of God, labor disputes or disturbances, material shortages or rationing, riots, acts of war, governmental regulations, communication or utility failures, or casualties. The foregoing shall not apply to Customer's payment and the mutual confidentiality obligations of the Parties.

12.6   <u>Export</u>.   Customer acknowledges that the Accellion Solution is subject to United States and local country laws governing import, export, distribution and use. Customer is responsible for compliance by Customer and the Designated Users with United States and local country laws and regulations and shall not export, use or transmit the Accellion Solution (i) in violation of any export control laws of the United States or any other country, (ii) to any country requiring as a condition of import the disclosure of source code, or (iii) to anyone on the United States Treasury Department's list of Specially Designated Nationals or the U.S. Commerce Department's Table of Deny Orders.

12.7   <u>Government Licensing</u>.   If the Accellion Solution is accessed or used by any agency or other part of the U.S. Government, the U.S. Government acknowledges that (i) the Accellion Solution and accompanying materials constitute "commercial computer software" and "commercial computer software documentation" under paragraphs 252.227.14 and 252.227.7202 of the DoD Supplement to the Federal Acquisition Regulations ("<u>DFARS</u>") or any successor regulations, and the Government is acquiring only the usage rights specifically granted in this Agreement; (ii) the Accellion Solution constitutes "restricted computer software" under paragraph 52.227-19 of the Federal Acquisition Regulations ("<u>FAR</u>") or any successor regulations and the government's usage rights are defined in this Agreement and the FAR.

12.8   <u>Governing Law</u>.   This Agreement shall be governed by the laws of the United States and the State of California, without reference to conflict of laws principles. Any dispute between the parties regarding this Agreement will be subject to the exclusive venue of the state and federal courts in the state of California in San Francisco, San Mateo and Santa Clara counties. If the Accellion entity is Accellion PTE Ltd., this Agreement shall be governed by the laws of England and Wales, without reference to conflict of laws principles. Any dispute between the parties regarding this Agreement will be subject to the exclusive venue of the courts in and for Singapore. The parties hereby consent to the exclusive jurisdiction and venue of such courts. Each party hereby waives its right to a trial by jury for any disputes between the Parties arising from this Agreement. The parties agree that the Uniform Computer Information Transactions Act and the United Nations Convention on the International Sale of Goods will not apply to this Agreement. Any dispute by one party to this Agreement against the other, which dispute arises from this Agreement, must be brought in accordance with this Section within one (1) year after the cause of action arises.

12.9   <u>Severability</u>.   If any provision of this Agreement is finally determined to be contrary to, prohibited by, or invalid under applicable laws or regulations, this Agreement will be modified so as to give effect to the intent of the Parties to the maximum possible extent. The remaining provisions of this Agreement shall remain in full force and effect.

12.10   Entire Agreement; Construction.  This Agreement constitutes the complete and exclusive agreement between the parties and supersedes any and all prior communications, representations and understandings, whether written or oral. There are no third-party beneficiaries of Customer. Section headings are for convenience only and shall not affect interpretation of the relevant section. This Agreement is in the English language only, which language shall be controlling in all respects, and all versions hereof in any other language shall not be binding on the parties hereto. All communications and notices to be made or given pursuant to this Agreement shall be in the English language. This Agreement may be executed in counterparts, each of which shall be considered an original, but all of which together shall constitute the same instrument.  Execution and delivery of this Agreement may be evidenced by facsimile or PDF (Portable Document Format) and shall hold the same force and effect as an original signature for purposes of binding the Parties.

**13.    Web Order Terms.**  The terms of this Section 13 apply to Web Orders only. REGARDLESS OF WHERE CUSTOMER IS LOCATED, "ACCELLION" MEANS ACCELLION USA, LLC, A DELAWARE CORPORATION WITH A PLACE OF BUSINESS AT 1804 EMBARCADERO PLACE, SUITE 200, PALO ALTO, CA  94303

13.1   License Term; Renewals. Customer's initial License Term shall be from the date of purchase through the term of the type of account purchased by Customer (monthly or annual) and shall automatically renew for additional terms of the same duration unless Customer cancels by sending an email to cancel@accellion.com which includes Customer's customer I.D. and the email address of the originator of Customer's account. IF CUSTOMER DOESN'T CANCEL CUSTOMER'S SUBSCRIPTION BY THE END OF THE THEN-CURRENT LICENSE TERM, CUSTOMER WILL BE CHARGED FOR, AGREES TO PAY SUBSCRIPTION FEES AND AUTHORIZES ACCELLION TO CHARGE CUSTOMER'S CREDIT CARD ON FILE FOR A SUBSEQUENT LICENSE TERM.

13.2   Storage and Bandwidth Fees. For the hosted version of the Accellion Solution, Customer's use is subject to storage and bandwidth limitations and Customer will be charged $1.00 per gigabyte (or the then-current per-gigabyte charge) that exceeds the storage limit or bandwidth limit for Customer's subscription ("***Excessive Use Charges***").  Customer may review Customer's storage and bandwidth usage through the Admin Console. To purchase additional bandwidth and/or storage, contact sales@accellion.com. Fees for Customer's subscription together with Excessive Use Charges are referred to as "Subscription Fees." CUSTOMER CONSENTS TO ALLOW ACCELLION TO CHARGE CUSTOMER'S CREDIT CARD, EITHER DIRECTLY OR THROUGH ITS PAYMENT PROCESSORS, FOR EXCESSIVE USE CHARGES.

13.3   Communications from Accellion.  Customer understands and agrees that Customer and Designated Users may receive certain communications from Accellion, such as service announcements and administrative messages, and that Customer and Designated Users will not be able to opt out of receiving them.

13.4   Restrictions.  Customer acknowledges and agrees that Customer, Designated Users and other users with access to shared folders: (i) will not use the Accellion Solution to transmit any communications or messages that constitute spam, are obscene, abusive, harassing, threatening, racist, malicious, illegal, fraudulent, defamatory, libelous, harmful to minors, or that violate or infringe the rights of third parties; and (ii) will comply with policies applicable to the hosted version of the Accellion Solution as made available to Customer by Accellion from time to time.

13.5   Representations and Warranties. Customer represents and warrants to Accellion that: (i) Customer and Designated Users are not subject to export control restrictions established by laws and regulations of the United States of America and Customer shall comply with all export and import laws, rules, regulations and restrictions of the jurisdictions in which Customer resides; (ii) Customer, Designated Users, and other users with access to shared folders have all necessary rights to any data stored on or sent with the Accellion Solution ("Customer Data") and that use of Customer Data as contemplated herein does not violate any third party rights; and (iii) Customer hereby grant Accellion and its contractors the right to use, copy, cache and transmit Customer's Data in conjunction with Customer's use of the Accellion Solution.

13.6    Termination.

(a)    Termination by Customer. Customer may terminate this Agreement at any time by contacting cancel@accellion.com and providing Customer's relevant Account Info and the email address of the originator of Customer's account.

(b)    Termination by Accellion. Accellion may terminate this Agreement without notice if: (i) Customer is in default and/or if Customer fails to pay applicable fees, (ii) if Customer otherwise violates the express terms of this Agreement, or (iii) in the event Accellion is prevented from providing any portion or all of the hosted version of the Accellion Solution by the actions of a third party.

(c)    Effect of Termination. In the event Accellion terminates this Agreement pursuant to Section 13.6(b)(iii) above, Accellion shall remit to customer a pro rata amount of any prepayment.  In the event this Agreement is terminated for any other reason, Customer will not be entitled a refund of any prepaid amounts and will remain liable to pay for Excessive Use Charges. Upon termination, the licenses granted to Customer by Accellion shall cease, Customer's account will be terminated following billing and payment of any past due amounts, and Customer will no longer be able to use the Accellion Solution.  In addition to the terms identified in Section 11.3, Sections 13.5, 13.6(c), and 13.7 shall survive expiration or termination of this Agreement.

13.7    Inapplicability of Certain Terms.  The support provisions of Section 5 and the indemnification provisions in Sections 9.2, 9.3 and 9.4 shall not apply to Web Orders, although Customer will be entitled to receive Updates.

13.8    Assignment. Neither this Agreement nor any rights or obligations of Customer hereunder may be assigned by Customer in whole or in part without the prior written approval of Accellion. Any assignment in violation of the foregoing shall be null and void.

13.9    Miscellaneous. Accellion may modify or amend this Agreement at any time by posting a revised version on our website at www.accellion.com which Customer agrees constitutes sufficient notice to Customer of such modification or amendment. Such amendments and modifications shall be effective upon renewal of Customer's License Term. As a party to this Agreement, Customer, if a resident of California, is entitled to the following specific consumer information under California Civil Code Section 1789.3: The Complaint assistance Unit of the Division of Consumer Services of the Department of Consumer Affairs may be contacted in writing at 400 R Street, Sacramento, California 95814, or by telephone at (800) 952-5210. Florida residents may contact the Florida Department of Financial Services in writing at 200 East Gaines Street, Tallahassee, Florida, 32399, or by telephone at 1-800-342-2762.

SIGN UP FOR THE LATEST BLOG
POSTS AND NEWS

First Name*

Company*

Business Email*

Last Name*

SUBMIT

## CONTACT  US

### Sales

+1-650-687-3130

sales@accellion.com

### Support

+1-888-654-3778

support@accellion.com

### PLATFORM

Platform Overview

Communication Consolidation

Unified Visibility

Unified Security

Unified Compliance

### CAPABILITIES

CISO Dashboard

Secure File Sharing

Secure Email

Secure Mobile

Remote Work Security

Enterprise App
Sharing

Secure Web Forms

Secure Collaboration

Virtual Data Rooms

Boardroom
Communications

Secure Managed File
Transfer

SFTP Server

Secure Content Access

Microsoft Office 365
Plugins

### RESOURCES

Resource Center

Case Studies

Customers

### Stay Connected

### INDUSTRY

Government

Healthcare

Financial Services

Legal

Manufacturing and Engineering

Higher Education

### COMPLIANCE

HIPAA

GDPR

FedRAMP

FIPS

SOC 2

CMMC

Data Sovereignty

eDiscovery

### COMPANY

About Us

Contact Us

Management Team

Accellion Solutions License Agreement 19.1 | Accellion                                     8/30/21, 11:58 AM

eBooks                                          Investors

Product Briefs                                  Partners

Webinars                                        Press & Media

Whitepapers                                     Events

Developer                                       Careers

Blog                                            Pricing

&ndash; Third Party Risk

&ndash; Regulatory Compliance

&ndash; GDPR Compliance

&ndash; HIPAA Compliance

&ndash; Secure Email

&ndash; Secure File Transfer

© 2021 ACCELLION. All rights reserved.

Privacy Policy | Legal

This website uses cookies to enhance your experience. By continuing to visit this site you agree to the use of cookies. To find
out more about the cookies we use, see our Privacy Policy                                                      ✖

# EXHIBIT 2





# ACCELLION, INC.

**FILE TRANSFER APPLIANCE (FTA) SECURITY ASSESSMENT**

MARCH 1, 2021



# CONTENTS

**EXECUTIVE SUMMARY**.............................................................................................................3

    Summary of Results ..........................................................................................................3

    Project Scope ...................................................................................................................3

**TECHNICAL DETAILS**.............................................................................................................5

    Timeline of Events ...........................................................................................................5

    Forensic Analysis ............................................................................................................6

    Validation of Accellion's Remediation of the Exploited Vulnerabilities ...............................8

    Testing FTA for Additional Vulnerabilities .........................................................................9



# Executive Summary

Mandiant was engaged by Accellion, Inc. (Accellion) to perform a security assessment of Accellion's File Transfer Appliance (FTA) software, in the wake of two related but distinct exploits used to attack client Accellion FTA systems—one that was discovered and addressed by Accellion in December 2020 (the "December Exploit"), and another that was discovered and addressed by Accellion in January 2021 (the "January Exploit") (collectively, the "Exploits").

The objectives of Mandiant's security assessment included:

- Independently identifying the security vulnerabilities used in the attack activity, based on review of compromised Accellion FTA instances

- Validating the patches that Accellion issued for the vulnerabilities

- Testing FTA version 9.12.432 (current as of the time of Mandiant testing) for further vulnerabilities in the software

This assessment was performed between February 4, 2021 and February 26, 2021.

## Summary of Results

Accellion identified two zero-day vulnerabilities that were part of the December Exploit—CVE-2021-27101 and CVE-2021-27104—and two zero-day vulnerabilities that were part of the January Exploit—CVE-2021-27102 and CVE-2021-27103. Based on Mandiant's own forensic analysis of a sample of compromised Accellion FTA instances—which were provided to Mandiant by Accellion as well as impacted Accellion customers (in investigations Mandiant conducted directly for those customers), Mandiant confirmed that the attacker activity exploited these vulnerabilities (the "Exploited Vulnerabilities"). Mandiant did not identify any additional vulnerabilities that were exploited by the attackers.[1] Mandiant also validated the efficacy of the patches Accellion released to address the Exploited Vulnerabilities, which Accellion made available to FTA customers soon after each Exploit was identified.

The Exploited Vulnerabilities were of critical severity because they were subject to exploitation via unauthenticated remote code execution. Through its source code analysis and penetration testing, Mandiant did not identify any new such unauthenticated remote code-execution vulnerabilities. Mandiant did identify two previously unknown authenticated-user vulnerabilities: (1) Argument Injection (CVE-2021-27730), accessible to authenticated users with administrative privileges; and (2) Stored Cross-Site Scripting (CVE-2021-27731), accessible to regular authenticated users. The Argument Injection finding yielded a Common Vulnerability Scoring System (CVSS v3.0) score of 6.6 (medium severity) and the Stored Cross-Site Scripting finding was rated 8.1 (high severity). Accellion has developed a patch for these two vulnerabilities (FTA 9.12.444), which Mandiant has validated.

## Project Scope

*Accellion FTA Vulnerability Identification:* Mandiant reviewed the source code for Accellion FTA versions 9.12.370 through 9.12.432, as well as a sample of ten (10) forensic images from affected Accellion FTA instances, in order to identify the vulnerabilities involved in the attack activity and to test for additional vulnerabilities. This review involved the following methods:

---

[1] As explained in a separate blog post, Mandiant has attributed the attack activity on FTA systems to two uncategorized threat groups—one that is believed to be responsible for compromising the systems (UNC2546), and another that is believed to be responsible for engaging in extortion activity with respect to a subset of the compromised customers (UNC2582).



A FireEye® Company

1. Source code analysis
2. Dynamic penetration testing of Accellion FTA
3. Forensic analysis of compromised Accellion FTA appliances

*Accellion FTA Patch Validation:* Mandiant reviewed the Accellion FTA product version 9.12.432 (current as of the time of Mandiant's review) to validate that the version mitigated the Exploited Vulnerabilities. Mandiant then attempted variations of exploits to determine if the 9.12.432 version of Accellion FTA could be exploited using variations of the known attack vectors. The following areas were reviewed during this portion of the assessment:

1. Attempting alternative variations of the previously identified exploits
2. Attempting to exploit web pages and web services application programming interfaces (SOAP APIs) not used by attackers



# Technical Details

This section describes the scope and technical details for this assessment.

## Timeline of Events

Below is a timeline of the relevant events, starting with the first detection of anomalous activity, up to the latest Accellion FTA patch pushed to customers.

| | | | |
|---|---|---|---|
| **December Exploit** | **Exploit** | • Dec. 16, 2020: | First known use of December Exploit: exploit trips FTA's built-in anomaly detector on customer's device |
| | **Investigation** | • Dec. 16, 2020: | Customer notifies Accellion that its anomaly detector was triggered |
| | **Investigation** | • Dec. 16-19, 2020: | Accellion investigates and identifies vulnerabilities affecting FTA 9.12.370 – SQL Injection (CVE-2021-27101) and OS Command Execution (CVE-2021-27104) |
| | **Mitigation** | • Dec. 20, 2020: | Accellion releases patch FTA 9.12.380, which remediates CVE-2021-27101 and CVE-2021-27104 |
| | **Mitigation** | • Dec. 23, 2020: | Accellion releases patch FTA 9.12.411, increasing anomaly detector checks from one per day to one per hour |
| **January Exploit** | **Exploit** | • Jan. 20, 2021: | First known use of January Exploit (unknown to Accellion at the time) |
| | **Exploit** | • Jan. 22, 2021: | Through multiple customer service inquiries, Accellion learns of anomalous activity indicative of new exploit |
| | **Mitigation** | • Jan. 22, 2021: | Accellion issues critical security alert advising FTA customers to shut down their FTA systems immediately |
| | **Mitigation** | • Jan. 22-25, 2021: | Accellion investigates and identifies Server-Side Request Forgery (CVE-2021-27103) and OS Command Execution (CVE-2021-27102) vulnerabilities |
| | **Mitigation** | • Jan. 25, 2021: | Accellion releases patch FTA 9.12.416, which remediates CVE-2021-27102 and CVE-2021-27103 |
| | **Mitigation** | • Jan. 28, 2021: | Accellion releases patch FTA_9.12.432, increasing frequency of anomaly detector checks to every 10 minutes |
| **Mandiant Review** | **Review** | • Feb. 4, 2021: | Mandiant begins security assessment |
| | **Review** | • Feb. 28, 2021: | Mandiant concludes assessment, identifying two new findings – Argument Injection (CVE-2021-27730) and Stored XSS (CVE-2021-27731) |
| | **Mitigation** | • Mar. 1, 2021: | Accellion releases patch FTA 9.12.444, addressing CVE-2021-27730 and CVE-2021-27731 |


A FireEye® Company

# Forensic Analysis

## Materials Reviewed

In analyzing the Exploited Vulnerabilities previously identified by Accellion – SQL Injection (CVE-2021-27101), Server-Side Request Forgery (SSRF) (CVE-2021-27103), and OS Command Execution (CVE-2021-27102, CVE-2021-27104) – Mandiant had access to and reviewed forensic images from ten (10) affected Accellion FTA instances. The majority of the instances reflected activity associated with the December Exploit, while the others reflected activity associated with the January Exploit. Based on Mandiant's experience, the activity observed on these instances is likely to be representative of attacker activity on other affected instances not reviewed by Mandiant, given the repetitive, script-like execution of the activity observed. In some cases, in addition to the FTA instances themselves, Mandiant had access to firewall logs from the networks the FTA appliances were hosted on, which allowed Mandiant to identify additional evidence of attacker activity based on known attacker IP addresses.

## How the Attack Operated

### December Exploit

With respect to the December Exploit, Mandiant observed that the attacker chained together the following vulnerabilities: SQL Injection (CVE-2021-27101) and OS Command Execution (CVE-2021-27104). The attacker leveraged the SQL Injection vulnerability against the file `document_root.html` to retrieve "w" keys from the Accellion FTA database. These keys were then used to generate valid tokens that allowed the attacker to then make additional requests to a file named `sftp_account_edit.php`. While abusing the OS Command Execution vulnerability in this file, the attackers were able to execute their own commands, resulting in the creation of a web shell[2] written to `/home/seos/courier/oauth.api`.

The attacker likely used the newly created `oauth.api` web shell to upload a custom, more full-fledged web shell with the filename of `about.html` (variant 1) to disk, which included highly customized tooling designed to facilitate exfiltration of data from the FTA system. While the timing of the requests resulting in the generation of this second web shell suggests that it was delivered via the `oauth.api` web shell, the available evidence does not indicate the exact mechanism used to write it to disk. For threat-tracking purposes, Mandiant has labeled this second web shell as "DEWMODE".

The DEWMODE web shell extracts a list of available files from a MySQL database on the targeted Accellion FTA system and lists those files and corresponding metadata (file ID, path, filename, uploader, and recipient) on an HTML page. File download requests are captured in the web logs for the Accellion FTA system, which will contain requests to the DEWMODE web shell with encrypted and encoded URL parameters, where `dwn` is the file path and `fn` is the requested file name. The DEWMODE webshell has features that allow the attacker to delete the Accellion FTA web logs. Forensic analysts may need to recover these logs from slack space for analysis.

The uploading of the DEWMODE web shell to the file location where the attacker placed it had the effect (likely unanticipated by and unknown to the attacker) of tripping the built-in anomaly detector included in the FTA software. Once the anomaly detector is tripped, it generates an email alert to the customer (specifically to the admin email account designated by the customer), advising the customer to contact Accellion for support. As a result, any FTA customer affected by the December Exploit likely was sent such an email – which, per Accellion, is how the December Exploit came to its attention (see above Timeline).

---

[2] A web shell is a script that can be uploaded to a web server to enable remote execution of commands.

**January Exploit**

Mandiant observed that, after the December 20, 2020 release of patch 9.12.380, which remediated the vulnerabilities associated with the December Exploit, the attacker pivoted to a new technique involving Server-Side Request Forgery (SSRF) (CVE-2021-27103) and OS Command Execution (CVE-2021-27102).

The attacker chained together an SSRF vulnerability (CVE-2021-27103) with a Command Execution vulnerability (CVE-2021-27102) to execute commands on the system. Specifically, the attacker leveraged the SSRF vulnerability against the file `wmProgressstat.html` to reach a local SOAP web service located in the file `sw_update.php`, which would not otherwise be accessible from the Internet. Once access was established with the file `sw_update.php`, the attacker abused the OS Command Execution vulnerability in this file to create other malicious files, including another `about.html` (variant 2) DEWMODE web shell used to further the remainder of their attack.

Notably, in the case of this second exploit, the attacker uploaded the DEWMODE web shell to a different location (`/home/httpd/html/about.html`), likely to avoid FTA's built-in anomaly detector. The earliest evidence we have seen of this change in tactic appears on January 20, 2020.

**Both Exploits**

Both the December Exploit and the January Exploit demonstrate a high level of sophistication and deep familiarity with the inner workings of the Accellion FTA software, likely obtained through extensive reverse engineering of the software. Among the things the attacker had to know were:

- How to call internal APIs to obtain keys to decrypt filenames
- How to forge tokens for internal API calls
- How to chain together the vulnerabilities involved to conduct unauthenticated remote code execution
- How to navigate FTA's internal database, requiring a detailed understanding of the database structure
- How to bypass FTA's built-in anomaly detector (in the case of the January Exploit)

## Indicators of Compromise

Based on Mandiant's review of the logs and images available for analysis, the attacker activity generated the following signatures for each affected customer, all of which should be considered as signs of potential compromise:

**December Exploit**

The December Exploit, which leveraged SQL Injection (CVE-2021-27101) and OS Command Execution (CVE-2021-27104), yielded Indicators of Compromise (IOCs) of the following files with their respective directories:

- `/home/seos/courier/about.html` (DEWMODE)
- `/home/seos/courier/httpd.pid`
- `/home/seos/courier/oauth.api`
- `/home/seos/courier/DF`
- `/tmp/.out`
- `/tmp/.scr`
- `/home/seos/courier/cache.jz.gz`

As noted above, the attacker activity tripped FTA's anomaly detector, causing an alert to be sent to the administrator of the affected customer's application.

During the cleanup routine, the attacker passed a specific query parameter named `csrftoken` with the value `11454bd782bb41db213d415e10a0fb3c` to DEWMODE. This would cause the following actions:

- A shell script is written to `/tmp/.scr`, which will:


A FireEye® Company

- Remove all references to about.html from log files located in `/var/opt/apache/`

- Write the modified log file to `/tmp/x` then attempt to replace the original log file at `/var/opt/apache/`

- Delete the contents of the `/home/seos/log/adminpl.log` log file

- Remove `/home/seos/courier/about.html` (DEWMODE) and `/home/seos/courier/oauth.api` (eval web shell), and redirect command output to the file `/tmp/.out`

- Change the permissions of the output file to be readable, writeable and executable by all users, and set the owner to "nobody"

- Delete the script file `/tmp/.scr` and other temporarily created files to assist in cleanup

- Display cleanup output to the requesting user

**January Exploit**

The January Exploit, which leveraged Server-Side Request Forgery (SSRF) (CVE-2021-27102) and OS Command Execution (CVE-2021-27103), yielded IOCs of the following files with their respective directories:

- `/home/httpd/html/about.html` (DEWMODE)
- `/home/httpd/html/httpd.pid`
- `/home/httpd/html/oauth.api`
- `/home/httpd/html/DF`
- `/tmp/.out`
- `/tmp/.scr`
- `/home/httpd/html/cache.jz.gz`

The variant instance of DEWMODE used in the January Exploit (`bdfd11b1b092b7c61ce5f02ffc5ad55a`) had a slightly modified cleanup routine, which included wiping of `/var/log/secure` and removing `about.html` and `oauth.api` from the directories `/home/httpd/html/` instead of `/home/seos/courier/`.

During the cleanup routine, the attacker removed all references of the `about.html` webshell from systems' `/var/opt/apache` log files, cleared the `/home/seos/log/adminpl.log` file, removed files from the `/home/httpd/html` directory, and cleared the `/var/log/secure` log file. This variant of `about.html` and the anti-forensic script appear to be an improvement of the earlier variant of `about.html`, which failed to clear the `/var/log/secure` log file where previous versions of the anti-forensic script were recorded. Mandiant did identify evidence of the anti-forensic script execution within rolled versions of the `/var/log/secure` log file.

## Validation of Accellion's Remediation of the Exploited Vulnerabilities

As reflected in the Timeline section, Accellion issued a patch addressing the vulnerabilities associated with the December Exploit on December 20, 2020 (four days after it started investigating anomalous activity associated with the exploit), and a patch addressing the vulnerabilities associated with the January Exploit on January 25, 2021 (three days after it started investigating anomalous activity associated with the exploit, having advised all FTA customers to shut down their FTA instances in the interim).

Accellion asked Mandiant to confirm that the patches successfully closed these Exploited Vulnerabilities, and that no other vulnerabilities were exploited as part of the attack activity. Mandiant's analysis confirmed both points.

Mandiant performed patch validation of Accellion FTA 9.12.432 (which includes the December 20 and January 22 patches) to validate that the latest version of Accellion FTA mitigates each of the four Exploited Vulnerabilities. As



part of this review, Mandiant reviewed the source code in both versions 9.12.370 (pre-dating both the December 20 and January 22 patches) and 9.12.432 to confirm that the changes completely mitigated the Exploited Vulnerabilities.

Mandiant also tested variations of the exploit techniques involved in the Exploits to ensure that Accellion's implementation of input validation and sanitization could not be bypassed. This component of the assessment included attempting alternative variations of the Exploits, as well as attempting to exploit web pages and SOAP APIs not initially used by attackers.

Based on these analyses, Mandiant confirmed that the patches issued by Accellion fully resolved the Exploited Vulnerabilities, as shown in the table below.

| Identified Exploits | CVE | Affected Scope | Status |
|---|---|---|---|
| SQL Injection | CVE-2021-27101 | document_root.html | Remediated |
| Command Injection | CVE-2021-27104 | Multiple administrative API endpoints[3] | Remediated |
| Server-Side Request Forgery | CVE-2021-27103 | wmProgressstat.html | Remediated |
| Command Injection | CVE-2021-27102 | sw_update.php | Remediated |

Mandiant also confirmed through forensic analysis of compromised Accellion FTA instances that the only vulnerabilities exploited in the attacker activity on the devices were the Exploited Vulnerabilities. Mandiant did not identify additional vulnerabilities that were part of the attacker activity.

## Testing FTA for Additional Vulnerabilities

**Objectives and Methodology**

Accellion also asked Mandiant to review the Accellion FTA software for any other vulnerabilities Mandiant was able to find, beyond the Exploited Vulnerabilities. Specifically, Mandiant reviewed the versions of the software dating from December 16, 2020 to the time of Mandiant's review, including:

- 9.12.370
- 9.12.380
- 9.12.411
- 9.12.416
- 9.12.432

Mandiant's review relied on both source code analysis and dynamic penetration testing:

- Source code analysis: Mandiant was provided a copy of unobfuscated source code by Accellion. Mandiant was also provided a list of unauthenticated endpoints provided by Accellion to prioritize. Mandiant reviewed the source code using manual techniques and did not rely on automated source code review tools.

---

[3] An API endpoint can be a URL of a webpage or web service.



- <u>Dynamic penetration testing</u>: The focus of the dynamic penetration testing phase of the assessment was to identify vulnerabilities by directly interacting with the Accellion FTA software. To facilitate this testing, Mandiant primarily used Burp Suite Professional ("Burp Suite"), a multifunction web proxy. Mandiant began the assessment by prioritizing analysis of endpoints that did not require authentication.

Mandiant began to review the files corresponding to endpoints, looking for insecure usage of functions that accept input from an untrusted source. This methodology is referred to as "taint analysis," as it involves identifying potentially insecure functions where an untrusted user input is being supplied. Mandiant analyzed each result from such inputs to determine if any vulnerabilities were surfaced. As a result of this analysis, Mandiant identified a Stored XSS vulnerability (CVE-2021-27731) resulting from lack of input validation or sanitization.

Mandiant continued this analysis by manually searching for sensitive or insecure PHP built-in functions that accepted untrusted input. Mandiant searched for insecure functions by referencing various documentation on the Internet detailing functions which have been historically exploited. In addition, Mandiant searched for additional instances of the functions exploited as part of the Exploited Vulnerabilities, to ensure untrusted inputs were not being provided to these functions. As a result of Mandiant's analysis of application endpoints accessible only to an administrator, Mandiant observed application endpoints calling a local Perl script named `admin.pl`. Specifically, Mandiant searched for usage of the insecure PHP functions `escapeshellargs` and `escapeshellcmd` used in conjunction with this function. After triaging the output, Mandiant identified a single API endpoint that did not properly sanitize user input, allowing Mandiant to inject an argument when calling the `admin.pl` script (CVE2021-27730).

Mandiant then proceeded to review the source code of each file corresponding to application API endpoints. This was necessary as the majority of these application endpoints were not accessible from the application user interface. In instances where functionality potentially of use to an attacker was identified, Mandiant attempted to craft requests and manipulate inputs to probe for vulnerabilities and observe the application's behavior. Specifically, Mandiant searched for functionality potentially susceptible to injection-based issues allowing for remote code execution or unauthorized access to data stored within the SQL database or on the remote file system. Mandiant did not identify any vulnerabilities as a result of this analysis.

Mandiant also carefully evaluated the Accellion FTA software's authentication logic to ensure it was not vulnerable to an authentication bypass issue, which might allow an attacker to access an authenticated endpoint without being validly authenticated. In addition to searching for injection-based issues, Mandiant searched for issues which could allow for users to bypass authentication or authorization controls. For example, Mandiant attempted to tamper with inputs containing session information such as cookies or tokens, to see if the requested application endpoint or file could still be accessed. Mandiant did not identify any vulnerability through this analysis.

**Results of Testing FTA for Additional Vulnerabilities**

The Exploited Vulnerabilities were of critical severity because they allowed for remote code execution by an unauthenticated user. Mandiant's source code analysis and penetration testing did not identify any new unauthenticated remote code-execution vulnerabilities beyond the Exploited Vulnerabilities.

Mandiant identified two new findings for *authenticated* users, consisting of Argument Injection (CVE-2021-27730), which was accessible only to authenticated users with administrative privileges, and a Stored Cross-Site Scripting (CVE-2021-27731), which was accessible only to regular authenticated users. The Argument Injection finding yielded a CVSS v3.0 score of 6.6 (medium severity) and the Stored Cross-Site Scripting finding was rated 8.1 (high severity).

After being alerted to Mandiant's findings, Accellion developed FTA patch 9.12.444 to address these newly identified findings. Mandiant validated that the patch effectively remediated these vulnerabilities, specifically attempting to exploit FTA version 9.12.444 and confirming that injected input was correctly sanitized.



*Disclaimer: While every precaution has been taken in the preparation of this document, neither Accellion nor Mandiant assumes any responsibility for errors or omissions resulting from the use of the information herein.*

**FireEye, Inc.**

601 McCarthy Blvd. Milpitas, CA 95035
408.321.6300/877.FIREEYE (347.3393)
info@FireEye.com

© 2021 FireEye, Inc. All rights reserved. FireEye is a
registered trademark of FireEye, Inc. All other
brands, products, or service names are or may be
trademarks or service marks of their respective
owners.

**About FireEye, Inc.**

FireEye is the intelligence-led security company. Working as a
seamless, scalable extension of customer security operations,
FireEye offers a single platform that blends innovative security
technologies, nation-state grade threat intelligence, and
world-renowned Mandiant® consulting. With this approach,
FireEye eliminates the complexity and burden of cyber security
for organizations struggling to prepare for, prevent, and
respond to cyber attacks. FireEye has over 5,300 customers
across 67 countries, including more than 845 of the Forbes
Global 2000.

