ASHLEY E. BAUERLE
CA Bar No. # 271119
COZEN O'CONNOR
501 West Broadway, Suite 1610
San Diego, CA  92101
Telephone: 800.782.3366
Facsimile: 619.234.7831
Email: abauerle@cozen.com

MATTHEW F. NOONE
COZEN O'CONNOR
One Liberty Place, 1650 Market St., Ste. 2800
Philadelphia, PA 19103
Telephone: (215)665-2192
Facsimile: (215)665-2013
Email: mnoone@cozen.com

Attorneys for Plaintiff,
ACE AMERICAN INSURANCE COMPANY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACE AMERICAN INSURANCE COMPANY, <br><br> Plaintiff, <br><br> vs. <br><br> ACCELLION, INC., <br><br> Defendant. | Case No.: **21-cv-09615-YGR** <br><br> PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S AMENDED COUNTERCLAIMS; AND PROPOSED ORDER <br><br> Date: August 23, 2022 <br> Time: 2:00 p.m. <br> Location: Oakland Courthouse <br> Courtroom 1, 4th Floor <br> Honorable Yvonne Gonzalez Rogers |

Plaintiff, Ace American Insurance Company, as subrogee of a Boston law firm ("Ace American"), files this motion to dismiss the amended counterclaims filed by Defendant, Accellion Inc. ("Accellion").

**I.   FACTS**

This case arises out of a cyber-attack whereby the files of Ace American's insured ("the law firm"), were exfiltrated off its server because of vulnerabilities in Accellion's File Transfer Application (FTA) software.  Amended Counterclaim, ¶¶ 1, 7.  On or about December 16, 2020, Accellion learned that its FTA software was vulnerable to a critical cyber-attack, one that could

result in the material loss of customer data. Amended Counterclaim, ¶¶ 7, 34, 39; Complaint, ¶¶ 11, 12.

On December 20, 2020, four days after learning of the vulnerability in its software, Accellion sent out a Critical Customer Alert email to all contacts in Salesforce with FTA Security Advisory and FTA Tech Advisory boxes checked. Complaint, ¶ 16; see also Amended Counterclaim, ¶¶ 8, 34, 40. The subject matter of the email stated "Critical Customer Alert: Urgent FTA security update." Complaint, ¶ 16. The text of the email stated, in pertinent part: "Accellion has released security software update FTA-9_12_380 with critical, time-sensitive security fixes. We strongly urge you to update your system as soon as possible." *Id*. The law firm did not receive this email. Amended Counterclaim, ¶ 8.

Contrary to Accellion's allegations, this is not because the law firm affirmatively opted out of receiving notification of software updates from Accellion. Rather, the law firm never received this email because no one at the law firm had any idea that a special notification list for security updates existed. Complaint, ¶ 30. The law firm had received many emails on a regular basis from Accellion, so it was unaware that it would not receive notification of the urgent need to install a critical update.

Nowhere in either the end user license agreement ("EULA"), nor the Maintenance Policy does Accellion notify the customer of either the existence of a Critical Alert Notification list, or the need to update this list. Amended Counterclaim, Ex. 1. The law firm received literally hundreds of emails from Accellion over the years and not one of them mentioned the list or the need to update the list. These emails were sent to numerous and various employees at the law firm.

Not surprisingly, a large percentage of these emails were marketing type emails, trying to get the law firm to expand and upgrade its service. Only one of these hundreds of emails mentioned "security advisories" and it was from December 2014, and directed to a single law firm employee, Ann Johnson. Accellion apparently enabled her account to receive technical and security advisories, even though she never asked to be added to the list.

The law firm is unable to find any emails from Accellion which described the security alert notification process and what, if anything, needed to be done to make sure that the law firm received

the security alert emails. Even the annual subscription renewal emails that Accellion sent out each year never mentioned this list or the need to update it. Complaint, ¶ 30.

At some point, unbeknownst to the law firm, Accellion added two additional law firm employees, Anne J. and Chris C., to the Critical Alert Notification list. *Id*. at ¶ 17. The law firm does not know why Accellion chose to add these two particular employees to the Critical Alert Notification list, nor when they were added.

Moreover, these employees had left the law firm years before the incident, indicating that Accellion had not conducted periodic blast emails to its Critical Alert Notification List in order to identify potentially erroneous or stale contacts. *Id*. at ¶ 19. Furthermore, Accellion would have received bounce back emails when it attempted to send the December 20, 2020 email to the two former law firm employees, notifying Accellion that the employees no longer worked there. *Id.* at ¶ 18. Accordingly, Accellion knew or should have known that the Critical Customer Alert email was not received by the law firm contacts. Yet it apparently made no further attempts to ensure that the law firm knew about the need to install the new updated software.

Once a day, at 1am, the FTA system ran a search for anomalous behavior on the Accellion platform. If anomalous behavior – which was defined as additional files on a customer's system – was found, the anomaly detector sent an email to the customer. On December 22, 2020 at 1am, two individuals at the law firm received the following email:

```
Hostname     : accellion.brownrudnick.com
Server name  : Boston(US)
Time         : Tue Dec 22 06:00:07 2020 (GMT)


Anomaly found:


Extra files found:
/home/seos/courier/about.html
/home/seos/courier/httpd.pid


Regards,
Accellion Support Team
```

Despite Accellion's claims to the contrary, the email did not contain any explanation as to the significance of "extra files found", nor did it instruct the recipients to contact Accellion. Because the email did not alert the recipients to the potential urgency of the situation, the two individuals at the law firm that received the email took no action.[1]

Pursuant to the terms and conditions of its insurance policy, Ace American paid to or on behalf of the law firm an amount in excess of Two Million Dollars, and the law firm incurred additional expenses of approximately $375,000 that were not covered by the insurance policy. *Id*. at ¶ 27. Pursuant to the terms of the subject policy, and otherwise by operation of law, Ace American is subrogated to the law firm's rights against Accellion to the extent of Ace American's payments to its insured. *Id*. at ¶ 34. In addition, on December 12, 2021, the law firm assigned its right to recover the approximately $375,000 that it sustained in uninsured losses to Ace American. *Id*.

### I.   LEGAL STANDARD

Under Rule 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted. Dismissal under Rule 12(b)(6) is proper if there is a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)). The complaint must plead "enough facts to state a claim [for] relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). If the facts alleged do "not nudge [a party's] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.*

A court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to defeat a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

////

---

[1] The email was received by Greg Powell and Keith Shultz. The only reason Accellion received an out of office reply was because the email was sent at 1am, and Greg Powell would set his out-of-office reply when his shift ended for the day, and would turn the reply off when he started his shift the following morning.

4

## II. ARGUMENT

### A. Accellion's First Amended Counterclaim Must Be Dismissed Because The Law Firm Complied With The Express Terms Of The Eula.

In its first amended counterclaim, Accellion asserts that the law firm "breached the EULA by, among other things, failing to timely install security updates, including critical security updates, in the wake of the Attacks." Section 5 of the EULA provides:

> Accellion will make available to Customer all Updates to the supported Accellion Solution that Accellion makes generally available to its other customers. Customer shall provide Accellion access to the Accellion Solution to install such Updates if required by Accellion. Customer agrees to deploy any critical Updates, as identified by Accellion, within five (5) days following receipt.

On December 20, 2020, Accellion notified its customers of the vulnerability of its software and the need to install a patch to address that vulnerability. Amended Counterclaim, ¶8. The law firm installed the patch on December 22, 2020, two days after Accellion made the patch available, and thus, within the five day period explicitly set forth in the EULA. *Id*. at ¶9. Because the law firm complied with the express terms of the EULA, Accellion's first amended counterclaim must be dismissed.[2]

### B. Accellion's Second Counterclaim Must Be Dismissed Because: (1) Accellion Sustained No Damage From The Law Firm's Assignment Of Its Breach Of Contract Action To Ace American And (2) The Anti-Assignment Clause In The Eula Does Not Preclude The Law Firm's Assignment Of Its Breach Of Contract Action To Ace American.

In its second counterclaim, Accellion alleges that the law firm breached the EULA by assigning the EULA to Ace American without Accellion's permission. Accellion claims that it had to take the following steps and independently incurred the following damages to address the law firm's alleged breach of the EULA's anti-assignment provision: (a) Accellion was required to incur charges for executive forensic consultation with the unidentified law firm, including over 20 hours

---

[2] In its counterclaims, Accellion cites to other instances in which the law firm failed to install an update within the mandated five day period. However, Accellion does not allege that it sustained any damage from these alleged unrelated breaches of the contract.

of work performed by its Chief Information Security Officer; (b) Accellion spent over 200 hours in direct support to the law firm provided by Tier 2 and Tier 3 teams, including, but not limited to: (i) applying the update; (ii) rebuilding the FTA system at the law firm; (iii) gathering data; and (iv) performing forensic analysis, such as reviewing system logs in the technical environment at the unidentified law firm; and (c) performing additional engineering and security forensic work on the system at the law firm, including, but not limited to, reviewing the FTA system at the law firm for additional vulnerabilities.

The contractual agreement between the law firm and Accellion expired on March 31, 2021. The law firm assigned its breach of contract action to Ace American more than eight months later, on December 12, 2021. All of the above-referenced action that Accellion allegedly had to take occurred while the contract between Accellion and the law firm was still in effect, and thus, before the law firm assigned its uninsured losses to Ace American. As such, Accellion cannot claim that it incurred the above-referenced damages as a result of the law firm's alleged breach of the anti-assignment provision in the EULA.

Furthermore, Accellion fails to recognize that, if the law firm had not assigned its breach of contract claim to Ace American, the law firm would be free to pursue its breach of contract claim directly. There is no evidence that Accellion engaged in the above-referenced activities or incurred any additional expense as a result of the law firm's assignment of the breach of contract claim to Ace American.

In addition, Accellion fails to acknowledge that the law firm did not assign the EULA to Ace American, but merely assigned its cause of action for breach of contract. As this court had held, "[a] provision in a contract or a rule of law against assignment does not preclude the assignment of money due or to become due under the contract or of money damages for the breach of the contract." *Creditors Adjustment Bureau, Inc. v. IBT Media Inc.*, No. 19-CV-02305-LB, 2019 WL 3082845, at *2 (N.D. Cal. July 15, 2019); s*ee also Fluor Corp. v. Superior Ct.*, 61 Cal. 4th 1175, 1190, 354 P.3d 302, 310 (2015) (quoting *Trubowitch v. Riverbank Canning Co.* 30 Cal.2d 335, 339–340, 182 P.2d 182 (1947)) ("[A] provision in a contract ... against assignment does not preclude the assignment of money due or to become due under the contract..."); *United Food & Com. Workers Loc. 1776 &*

*Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, No. 14-MD-02521-WHO, 2015 WL 4397396, at *5 (N.D. Cal. July 17, 2015) (contracts' "non-assignment clauses [were] limited to the assignment of duties and obligations under the [contracts] themselves and [did] not include causes of action sounding in antitrust arising from those agreements."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 11-00711 SI, 2011 WL 3475408, at *3 (N.D. Cal. Aug. 9, 2011) ("Unless the circumstances indicate the contrary, a contract term prohibiting assignment of 'the contract' bars only the delegation to an assignee of the performance by the assignor of a duty or condition."); *Gottlieb v. Alphabet Inc.*, No. 5:17-CV-06860-EJD, 2018 WL 2010976, at *4 (N.D. Cal. Apr. 30, 2018) (anti-assignment clause "does not forbid the assignment of a cause of action for breach of contract, or the assignment of money damages for a breach of contract, in the absence of circumstances specifying a different intention by the parties."); Restatement (Second) of Contract § 322 ("A contract term prohibiting assignment of rights under the contract, unless a different intention is manifested ... does not forbid assignment of a right to damages for breach of the whole contract or a right arising out of the assignor's due performance of his entire obligation.").

Because the law firm did not breach Section 13.8 of the EULA by assigning its breach of contract claim to Ace American, and because Accellion has failed to prove that it sustained any damage as a result of the assignment, Accellion's second amended counterclaim must be dismissed.

C. **Accellion's third amended counterclaim must be dismissed because there is no evidence that the law firm breached the implied covenant of good faith and fair dealing**

In its third amended counterclaim, Accellion alleges that the law firm and Ace American[3] breached the implied covenant of good faith and fair dealing by: (1) "undermin[ing] or prevent[ing] Accellion from receiving the benefits of the EULA, both by paying, directly by Ace American or through the Boston law firm, a ransom amount, while at no time prior to making these alleged payments consulting Accellion, as well as also incurring fees and costs on behalf of the unidentified Boston law firm . . ."; (2) failing to communicate with Accellion in a timely manner after the

---

[3] Ace American was not a party to the EULA, and therefore, it could not breach a covenant implied by the contract. Accordingly, to the extent that Accellion seeks to hold Ace American liable for breach of the duty of good faith and fair dealing, the third amended counterclaim must be dismissed.

7

anomaly detector was triggered; and (3) intentionally foregoing receipt of security updates from Accellion.

### 1. **Payment of the ransom demand.**

The Northern District of California recently offered the following description of the covenant of good faith and fair dealing:

> It has long been recognized in California that there is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement. The covenant is aimed at making effective the agreement's promises. However, the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract. Accordingly, the covenant protect[s] the express covenants or promises of the contract, not ... some general public policy interest not directly tied to the contract's purpose. To make out a successful claim, the allegations which assert such a claim must show that the conduct of the defendant, whether or not it also constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement.

*Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1028-29 (N.D. Cal. 2020) (internal citations omitted).

As an initial matter, Accellion has not identified any authority for its argument that a party to a contract violates the covenant of good faith and fair dealing: (1) by failing to provide a breaching party with an opportunity to mitigate its damages or (2) by failing to consult with the breaching party before taking action to mitigate its own damages. After an exhaustive search of case law, Ace American has not uncovered any case, in California or elsewhere, to support Accellion's argument. Although the general public may have an interest in imposing such duties on a non-breaching party, the implied covenant of good faith and fair dealing protects the express covenants of the contract, rather than "some general public policy interest not directly tied to the contract's purpose." *Anderson*, 500 F. Supp. 3d at 1029.

In the present case, the law firm considered all available options, and made the reasonable determination that the best course of action was to pay the ransom demand, rather than risk disclosure of confidential information to the public. A party does not violate the implied covenant unless "it subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable." *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.,* 2 Cal.4th

342, 372, 6 Cal.Rptr.2d 467, 826 P.2d 710 (1992).  Although Accellion may disagree with the law firm's decision to pay the ransom demand, there is no evidence that the law firm lacked belief in the validity of its conduct or that such conduct was objectively unreasonable.

### 2. The anomaly detector.

As discussed above, on December 22, 2020 at 1am, two individuals at the law firm received the following email:

```
Hostname    : accellion.brownrudnick.com
Server name : Boston(US)
Time        : Tue Dec 22 06:00:07 2020 (GMT)


Anomaly found:


Extra files found:
/home/seos/courier/about.html
/home/seos/courier/httpd.pid


Regards,
Accellion Support Team
```

Despite Accellion's claims to the contrary, the email did not contain any explanation as to the significance of "extra files found", nor did it instruct the recipient to contact Accellion.  Because the email did not alert the recipients to the potential urgency of the situation, the recipients took no action.  The law firm cannot be found liable for failing to contact Accellion when the anomaly detector was triggered when the email generated by the anomaly detector did not instruct the recipients to do so.

### 3. Failure to receive security updates.

As discussed in more detail above, the law firm did not intentionally forego receipt of security updates from Accellion.  Rather, the law firm did not receive the security update at issue because no one at the law firm had any idea that a special notification list for security updates existed.  Nowhere in either the EULA, nor the Maintenance Policy does Accellion notify the customer of either the existence of a Critical Alert Notification list, or the need to update this list.  The law firm is unable to find any emails from Accellion which described the security alert

notification process and what, if anything, needed to be done to make sure that the law firm received the security alert emails. Even the annual subscription renewal emails that Accellion sent out each year never mentioned this list or the need to update it.

Furthermore, Ace American's breach of contract claims are based on the allegation that Accellion acted with gross negligence. If the fact-finder accepts Accellion's claims that the law firm affirmatively opted out of receiving security updates – claims which Ace American vigorously disputes – it necessarily follows that Accellion was not grossly negligent. Essentially, Accellion's counterclaim on this issue is simply a denial of liability. As such, it should be dismissed. *See J & J Sports Prods. v. Coyne*, No. C 10-04206 CRB, 2011 WL 227670, at *1 (N.D. Cal. Jan. 24, 2011) (granting motion to dismiss counterclaim because "[t]he counterclaim does not actually allege a claim at all; rather, it is a denial of wrongdoing dressed up as a counterclaim.")

For the foregoing reasons, Accellion's third amended counterclaim must be dismissed.

### III. CONCLUSION

For the foregoing reasons, Ace American respectfully requests that this Court dismiss each of Accellion's amended counterclaims.

Dated: July 15, 2022      COZEN O'CONNOR

By: _Ashley E. Bauerle_ (signature)
ASHLEY E. BAUERLE
MATTHEW F. NOONE

Attorneys for Plaintiff
ACE AMERICAN INSURANCE COMPANY

**PROPOSED ORDER**

Pending before the Court is the Motion of Plaintiff, ACE AMERICAN INSURANCE COMPANY TO DISMISS DEFENDANT'S AMENDED COUNTERCLAIMS. Having considered the Motion and the parties' responses thereto, it is hereby ORDERED that the Motion is GRANTED.

IT IS SO ORDERED. [In addition, the Court makes the further orders stated below:]

Dated:_____   By:_____
                              UNITED STATES DISTRICT JUDGE